IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

RAZIEL OFER,
Plaintiff,

v. CASE NO.:

WILLIAM F JUNG, in his individual
And Official Capacity,
Defendant,
_______________________________/

FILED BY ____ D.C.
NOV 12 2026
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

## INITIAL COMPLAINT

MOVANT, RAZ OFER ("Ofer" or "Plaintiff"), as a self-represented litigant, sues William F. Jung ("Jung") in his individual and official capacity as a U.S. District Court Judge, for conduct engaged in by the Defendant in the complete unlawful and total lack of subject matter jurisdiction. Ofer states the following:

## JURISDICTION

1. This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §1332 under the Court's diversity jurisdiction. The case or controversy here exceeds $75,000.00 in damages.

## VENUE

2. The venue of this matter is proper in this district as the property in this matter is situated in this district and the transaction, event and/or occurrences took place within this district. The defending party conducts business within this district and maintains substantial and ongoing contacts in this district.

## PARTIES TO THIS CASE

3. Plaintiff Raziel Ofer is sui juris and is a foreign national, citizen of the United Kingdom and Israel, domiciled in the London, United Kingdom and maintains minimum contacts within this district.
4. Defendant William F. Jung is a citizen of the United States and is an Article III U.S. District Court Judge, domiciled within the state of Florida and maintains substantial and ongoing contacts in this district herein.

## ALLEGATIONS OF MATERIAL FACT

By way of Introduction, Ofer states:

5. This introduction provides the factual background and procedural history of this action and does not constitute a separate cause of action or count in the instant complaint. A similar form of this introduction was filed as part of a motion for reconsideration before Judge Jung.
6. As elaborated below, Jung's striking the motion for reconsideration after former Judge Isicoff's (Isicoff) opposition, Judge Jung ("Jung") acted outside his personal and subject-matter jurisdiction. This ultra vires act forfeits his judicial immunity, and his ruling constitutes a blatant admission of criminal activity. Because Jung struck the motion, Ofer is free to re-file it despite the notice of appeal already pending in the Eleventh Circuit Court of Appeals ("Eleventh Circuit").
7. Jung's ruling betrays his fury over Isicoff's tacit admission in her response to Ofer's motion for reconsideration that she acted without personal or subject-matter jurisdiction. It reads like the work of a desperate judge who has just realized his longtime friend threw him under the bus—recusing herself without a pending motion

or explanation, and simultaneously announcing her sudden retirement with nearly 17 years left on her term. While Isicoff contested a few secondary issues in Ofer's motion to mask her egregious rulings, she did not deny the central charge that she acted without subject matter jurisdiction and that her orders are void. Ofer is grateful to Isicoff for taking this courageous step.

8. Just as crucially, Isicoff does not deny Ofer's central allegation: that she is now indirectly assisting Ofer in drafting the motions to vacate her unlawful and unconstitutional orders. This further compounds Jung's already deeply compromised position before the State Attorney and in the upcoming appeal before the Eleventh Circuit.

9. Judge Jung's denial of Ofer's motion to depose former Judge Stephen Millan ("Millan") amounts to nothing less than the suppression and tampering of critical criminal evidence. Millan, who received free office space for seven years from Rodriguez IV ("ROIV") and Stuart Kalb ("Kalb"), Isicoff's business partners, possesses incriminating records—including emails and documents—demonstrating that Jung's initial dismissal of this action (subsequently reversed by the Eleventh Circuit) was orchestrated in coordination with, and at the request of, former Judge Isicoff.

10. Jung's attempt to block this testimony is particularly untenable given that Millan has already admitted in a separate District Court filing that he implicated Jung during a recorded conversation with Ofer—a recording lawfully made in a public venue. This action cannot properly be dismissed without Millan's deposition, which Ofer has repeatedly invited Jung to attend, with criminal counsel if necessary. Indeed,

preventing Millan's deposition appears to be the primary motivation behind Jung's dismissal of the complaint.

11. No procedural maneuvers will indefinitely shield Jung from Millan's testimony. By blocking the deposition of a former jurist, Jung implies that certain judges are too compromised to testify under oath or produce evidence of a conspiracy to facilitate the misappropriation of $120 million in real estate for $5.00. It is deeply ironic for Jung to hold himself out as an impartial jurist while simultaneously preventing Millan—a fellow former judge—from testifying under oath to establish the true basis for both the dismissal of this complaint and the striking of the motion for reconsideration.

12. Isicoff could not—and did not—deny acting without personal or subject-matter jurisdiction, as doing so would have required her to cite a statute allowing a Bankruptcy Court ("BK") to rule on property ownership after she already found the property was outside the estate excused on Ofer's scrivener's error on the deed, hence she awarded a $120M property for $5.00 (Five USD) to her business partner.. At that point, the Bankruptcy Court's mandate ended, as quiet-title jurisdiction rests exclusively with state courts. Aware of the consequences of acting without jurisdiction and immunity, Isicoff agreed to cooperate with Ofer to the detriment of her longtime friend, Jung.

13. Jung's illusory and fantastical 29 pages ruling to dismiss the case is nothing short of a prayer by Jung to the Eleventh to spare his freedom and shield him from financial ruin.

14. The systematic breakdown of the proceedings below is fully documented by the accompanying record evidence. **Exhibit A** contains three pivotal motions filed in the Bankruptcy Court—including responses and motions to vacate the DRO and the 942

Pennsylvania order—demonstrating a complete absence of personal and subject-matter jurisdiction, now whitewashed by Judge Jung, it was shockingly drafted with the direct input of the defendant, former Judge Isicoff. When the Plaintiff sought to build upon this record by moving to depose former Judge Stephen Millan (**Exhibit B**) and moving to recuse Judge Jung (**Exhibit C**), Jung engaged in a clear pattern of evasion. This culminated in the denial of Plaintiff's motion to appear via Zoom despite documented medical conditions approved by other District Court Judges. (**Exhibit D**), an arbitrary ruling designed to force a dismissal and prevent the deposition of former Judge Stephen Millan, whose recorded disclosures directly incriminate Judge Jung.

15. **Pre-Petition Collusion & Predetermined Rulings (Exhibit E):** A public recording captured Rodriguez IV and Stuart Kalb predicting Judge Isicoff's assignment to the future bankruptcy cases—and confirming her exact rulings—a full three months before the Chapter 11 petition was ever filed.
16. **Tolerance of Highly Inflammatory Filings (Exhibit F):** The record contains extreme, antisemitic affidavits advocating for Holocaust denial and the violent seizure of Jewish-owned properties, which went unchecked by the court.
17. **Failure to Dismiss a Jurisdictional Nullity (Exhibit G):** A sworn affidavit by attorney Mark Roher explicitly put the court on notice that the bankruptcy petition was completely unauthorized, lacking the mandatory signature of the entity's 50% owner.
18. **Systematic Denial of Relief and Recusal (Exhibits H & F):** Despite clear conflicts, Judge Isicoff denied an immediate motion to withdraw the 942 Penn petition filed a week after initiation, and systematically denied multiple, repeated motions seeking her recusal.

19. **Unprecedented, Unexplained Sua Sponte Recusal (Exhibit G):** Judge Isicoff ultimately exited the case by entering a recusal order *sua sponte*. Because this order was entered without a pending motion and entirely devoid of any stated rationale, it defies standard judicial protocol and underscores the compromised nature of the prior proceedings.

20. The record reflects that Ofer possesses an international real estate portfolio worth upwards of $350 million and belongs to one of Israel's wealthiest families. This level of global capitalization establishes beyond question that the underlying estate is exceptionally stable and asset-rich, completely contradicting the adversarial narrative pushed below and highlighting the arbitrary nature of the BK court's impartial rulings passed devoid of personal and subject matter jurisdiction.

21. The suggestion that the Plaintiff is a vexatious litigator is flatly contradicted by his extensive, highly successful, and professional litigation history in other jurisdictions. In New York City, the core hub of his real estate operations, Ofer has engaged in over 200 cases before the New York Supreme Court, maintaining an exemplary record. He prevailed in the vast majority of those matters and successfully vindicated his rights on appeal when necessary, notably establishing a landmark precedent against a major global financial institution. Tellingly, Ofer never moved for a judge's recusal in a New York court. His frequent, protective recusal filings in Miami are not the product of a litigious disposition, but rather a mandatory, defensive response to systemic constitutional due process failures that he never encountered under the stable jurisprudence of the New York courts.

22. The record reveals a critical, undisclosed conflict of interest that mandated Judge Jung's recusal from these proceedings. Specifically, Judge Jung failed to put on the record his extensive, long-term personal relationship with former Judge Isicoff—a relationship that directly implicates the integrity of the underlying actions. While six other District Court judges recognized the clear ethical boundaries and voluntarily disqualified themselves based on their familiarity with former Judge Isicoff, Judge Jung concealed his conflict to maintain control over the case, constituting a clear abuse of discretion and a violation of the federal recusal statutes.

23. The record contains direct evidence of extrajudicial coordination that completely undermines the integrity of Jung's rulings. As captured in a recorded call in a public place, former Judge Stephen Millan informed Ofer that Judge Jung was prepared to dismiss the case at the behest of former Judge Isicoff. This explosive recording reveals the true, non-judicial motive behind Judge Jung's aggressive maneuvers to block the deposition of former Judge Millan. By repeatedly denying the Plaintiff the right to depose a critical witness who possesses firsthand knowledge of judicial collusion, Jung outrageously abused its discretion and deployed its authority as a shield to suppress incriminating evidence against himself.

24. The Plaintiff initiated the underlying Chapter 11 reorganization strictly upon the strategic advice of legal counsel to secure a necessary change of forum. This tactical shift was necessitated by profound and documented procedural irregularities displayed by certain judges within the Miami-Dade County Circuit Court and three 3rd DCA judges, which severely compromised the Plaintiff's right to a fair adjudication. Crucially, the subject properties had been acquired by Ofer entirely in cash, free of

encumbrances, and consistently generated substantial monthly net revenue, making federal bankruptcy protection the only viable mechanism to safeguard these $120M highly valuable, performing assets from unlawful state-court overreach.

25. Rather than resolving the profound jurisdictional and ethical challenges raised below, Judge Jung's order systematically ignores the core controversy. The order fails to confront the recorded call in a public place and the disclosures made by former Judge Stephen Millan to Ofer concerning systemic corruption involving himself and his long standing friend, former Judge Isicoff. Consequently, the order, arbitrary and capricious and devoid of a rational basis, functions as an impermissible attempt to obscure the record and manipulate appellate review by the Eleventh, necessitating that this Court vacate the order and address the underlying corrupt structural defects in the proceedings. If anything, such a preposterous and unsustainable order that strains credulity, reflects a ruling so entirely unmoored from law and fact as to suggest a complete abdication of the judicial function.

26. **Judicial Intimidation & Retaliation:** Upon being confronted with the recorded admissions of her business partners, Judge Isicoff abused her position by threatening the Appellant with a felony conviction. It took six months of procedural delay for the court to finally admit the public recording was completely lawful, proving the initial threat was a bad-faith attempt to silence a litigant.

27. **Coordinated Suppression of Evidence:** Judge Jung is fully aware of this history of intimidation, yet he has weaponized his office to block the deposition of Judge Millan. This is not standard judicial discretion; it is a deliberate effort to shield witnesses and suppress material evidence.

28. **Forfeiture of Judicial Immunity:** By actively protecting compromised colleagues and suppressing evidence of financial self-interest, Judge Jung has ceased acting as an impartial arbiter. Because his recent orders are designed to frustrate justice rather than adjudicate a controversy, he is acting in the clear absence of jurisdiction. Consequently, Judge Jung has stripped himself of judicial immunity and implicated his office in the underlying misconduct.

29. **Unconscionable Disparity in Asset Transfer:** The defining act of these compromised proceedings was the court-ordered transfer of a **$120 million property** for a nominal payment of just **$5.00**.

30. **Enrichment of Undisclosed Judicial Partners:** This multi-million-dollar asset was not sold through a legitimate, competitive sale; instead, it was directly awarded to individuals identified by recorded evidence as Judge Isicoff's business partners.

31. **A Fatal Miscarriage of Justice:** A consideration of $5.00 for a $120 million asset represents a complete subversion of the bankruptcy court's fiduciary duty to maximize the estate's value. This transaction stands as one of the most egregious abuses of judicial authority in legal history, rendering all orders flowing from it completely void.

32. It is a foundational maxim of both common sense and equity that when a transaction appears completely decoupled from reality, it demands strict judicial scrutiny. The notion that a **$120 million premier real estate asset** could be legitimately exchanged under court order for a mere **$5.00** utterly shocks the conscience. Such a gross, unconscionable disparity is not a valid judicial transfer; it is a thinly veiled, unlawful confiscation designed to enrich the presiding judge's inner circle under the color of law.

33. If something looks too good to be true, it probably is. That timeless adage perfectly captures the absolute absurdity of the transaction at the heart of this matter.

34. In both law and common sense, a transaction that defies reality is the first and clearest red flag of underlying fraud or self-dealing. It shows how the transaction **shocks the conscience** of any reasonable observer.

35. The court-approved transfer in this matter defies every known principle of law, equity, and basic economics. The Appellant would welcome an explanation from the reviewing court—and specifically from Judge Jung—as to the lawful mechanism by which a **$120,000,000.00 property** can be legitimately acquired for a nominal fee of **$5.00**. Indeed, if such an unprecedented commercial standard exists under the Bankruptcy Code, the Appellant stands ready to double that consideration and offer $10.00 for an asset of equivalent magnitude.

36. The absurdity of this proposition underscores a fatal legal truth: a $5.00 purchase price for a multi-million-dollar real estate asset is not a judicial sale; it is a facial sham. By insulating this transaction from appellate review and blocking discovery into the underlying collusion, the reviewing court is attempting to legitimize a transfer that defies human reason and utterly shocks the judicial conscience.

37. The reviewing court's handling of this matter raises profound questions regarding its adherence to basic principles of asset valuation and property law. Despite any purported expertise or familiarity with real estate administration, Judge Jung's explicit defense of this transaction completely defies commercial reality. A transaction wherein a **$120,000,000.00 premier property** is transferred under court order for a nominal sum of **$5.00** cannot be rationalized by any recognized metric of real estate valuation.

By weaponizing his office to block essential discovery and insulate this facial sham from meaningful judicial review, Judge Jung is not exercising sophisticated real estate acumen—he is actively validating an unconscionable miscarriage of justice that violates every tenet of equity and property law.

38. As an established expert in the structuring and execution of complex real estate transactions, the Appellant possesses an intimate understanding of asset valuation, market mechanics, and commercial reality. It is precisely because of this specialized expertise that the Appellant openly challenges the reviewing court's baseline competency—or underlying intent—in validating the current record.

39. The Plaintiff would genuinely welcome an articulation from Judge Jung detailing the specific legal or economic theories that allow a **$120,000,000.00 premier property** to be legitimately conveyed for a nominal payment of **$5.00**. In the global market of sophisticated property administration, no such mechanism exists outside of a fraudulent conveyance or a facial sham. By using his office to suppress discovery and insulate this transaction from appellate review, Judge Jung is not demonstrating a secret real estate acumen; he is demonstrating a deliberate refusal to apply the most rudimentary standards of property law to a glaring miscarriage of justice.

40. As referenced in the aforementioned **Exhibit A,** it contains three pivotal motions filed in the Bankruptcy (BK) Court—including responses and motions to vacate the DRO and the 942 Pennsylvania orders—demonstrating a complete absence of personal and subject-matter jurisdiction, now whitewashed by Judge Jung, it was shockingly drafted with the direct input of the defendant, former Judge Isicoff. **The record demonstrates a fatal jurisdictional overreach that Judge Jung has deliberately**

**and actively ignored to shield a lifelong colleague.** A bankruptcy court's subject-matter jurisdiction under 28 U.S.C. § 157 and § 1334 is strictly limited to the administration of the debtor's estate. The court possesses jurisdiction only to determine whether a specific property belongs to the petitioner or the estate; if it determines the property is *not* estate property, its jurisdictional authority over that asset terminates immediately.

41. Here, Judge Isicoff explicitly ruled that the premier **$120,000,000.00 properties located at 1560 and 1568 Drexel Avenue** did not belong to the petitioner due to an alleged "scrivener's error" on the deed. At that precise moment, the bankruptcy court was legally required to exit the controversy. Instead, completely devoid of subject-matter or personal jurisdiction over the asset, Judge Isicoff exceeded her constitutional authority by affirmatively awarding this multi-million-dollar third-party property to her own business partners for a nominal **$5.00**. Under well-settled federal jurisprudence, a bankruptcy judge cannot utilize the bankruptcy apparatus to adjudicate quiet title disputes or execute asset transfers to third parties once an asset is deemed outside the estate. Judge Jung is fully cognizant of this absolute absence of jurisdiction, yet he has weaponized his office to insulate an order that is void *ab initio*.

42. **A bankruptcy court's subject-matter jurisdiction under 28 U.S.C. § 157 and § 1334 is strictly confined to the administration of the debtor's estate, rendering any extraterritorial adjudication a non-judicial act unprotected by immunity.** When a judicial officer acts in the complete absence of all jurisdiction—explicitly violating the strict statutory boundaries of 28 U.S.C. § 157 and § 1334 by distributing

non-estate assets to a third party or to personal associates—the protective shield of absolute judicial immunity is legally forfeited.

43. Under long-standing federal jurisprudence, judicial immunity does not extend to *ultra vires* actions taken entirely outside a court's lawful authority. By knowingly transcending these statutory limits to execute a fraudulent asset transfer, the presiding judge engaged in actions that cross the threshold from erroneous adjudication into personal liability and criminal overreach. Judge Jung is fully cognizant that these structural violations strip a judge of immunity, exposing the responsible parties to personal civil lawsuits and federal criminal prosecution. Consequently, any attempt by Judge Jung to insulate these actions constitutes a deliberate facilitation of an unconstitutional, unprotected abuse of power.

44. **Bankruptcy Fraud (18 U.S.C. § 152):** Knowingly and fraudulently transferring or concealing property belonging to a debtor's estate. This is a federal felony carrying up to 5 years in prison.

45. **Extortion Under Color of Official Right (The Hobbs Act - 18 U.S.C. § 1951):** Using the power of the judicial bench to unlawfully take property or force an asset transfer. This is a federal felony carrying up to 20 years in prison.

46. **Deprivation of Rights Under Color of Law (18 U.S.C. § 242):** Actively using judicial authority to deprive a citizen of their constitutional property rights without due process. If the property value is immense or accompanied by threats (such as the felony threats over the recording), it'll be prosecuted as a felony.

47. **The severe civil and criminal liabilities arising from these extrajudicial actions extend fully to Judge Jung, who has forfeited his judicial immunity by acting in**

**the complete absence of jurisdiction.** By weaponizing his office to actively insulate an unconscionable asset transfer and suppress evidence of collusion, Judge Jung has transcended the role of an impartial arbiter. Because a reviewing judge lacks all lawful authority to act as an advocate or to shield a compromised colleague from a lawful deposition, his actions are entirely *ultra vires*.

48. Under long-standing federal jurisprudence, actions taken outside a court's lawful jurisdiction strip a judicial officer of absolute immunity. Consequently, Judge Jung faces direct exposure to a personal civil lawsuit for monetary damages. Furthermore, because his intervention directly facilitates the ongoing deprivation of property rights and the concealment of fraudulent transfers, his conduct crosses the threshold into actionable state and federal criminal offenses. As a result, Judge Jung faces not only direct civil liability but also impending criminal prosecution by the State Attorney, stripping Jung of any presumption of institutional protection.

49. **The gravity of these jurisdictional violations has transcended civil discourse, culminating in active consultations with state law enforcement authorities.** Ofer, guided by one of Florida's most prominent criminal Attorneys, has initiated formal discussions with the State Attorney regarding the fraudulent asset transfers and extrajudicial threats documented in this record.

50. These ongoing discussions focus directly on the criminal overreach executed under the color of law by former Judge Isicoff and were subsequently insulated by Judge Jung. Because the State Attorney is actively reviewing these patterns of misconduct for potential prosecution, Jung can no longer claim the protection of institutional anonymity. Judge Jung is fully aware that his continued efforts to block discovery and

suppress evidence implicate his office in additional active criminal matters such as tampering with criminal evidence, completely destroying any appearance of judicial neutrality and rendering his immediate disqualification mandatory.

51. As part of this motion for reconsideration of this void ruling, Ofer demands Jung to order an immediate deposition of former Judge Stephen Millan, although Jung is aware that such deposition will incriminate himself. Simultaneously with the filing of the instant motion, Ofer is also filing yet another motion to disqualify Judge Jung as the destruction of any appearance of judicial neutrality rendering his immediate disqualification mandatory.

52. **The unprecedented timing of former Judge Isicoff's sudden recusal and subsequent retirement provides objective, powerful evidence of a consciousness of severe liability.** In a departure from standard judicial protocol, Judge Isicoff entered an order disqualifying herself completely *sua sponte*, without a pending recusal motion and completely devoid of any stated legal reasoning.

53. The true motivation behind this abrupt exit has remained a heavily guarded reality known only to the parties involved: a sudden recognition that her *ultra vires* actions transcended mere judicial error, creating a fatal exposure to both personal financial ruin and criminal prosecution. This reality is underscored by the sudden reversal in her career trajectory. Just weeks prior to her unexpected exit, the court had formally accepted a 17-year term extension, stating explicitly on the open record that she fully intended to see that extended term through to completion. Her sudden, unprompted decision to recuse herself and abruptly announce her retirement directly following

these jurisdictional breaches serves as definitive proof that the court recognized its absolute vulnerability to legal and criminal exposure.

54. **The structural reality of these proceedings reveals that former Judge Isicoff's abrupt exit was an act of personal preservation that directly exposed Judge Jung to liability.** In executing a *sua sponte* recusal and unexpected retirement to protect her own freedom from criminal and civil exposure, former Judge Isicoff knowingly left Judge Jung to defend an legally indefensible record. Judge Isicoff was entirely cognizant that her departure would force Judge Jung to bear the burden of insulating her *ultra vires* actions. By stepping down, she effectively transferred the legal target to Judge Jung, who has since chosen to compromise his own office by blocking discovery and maintaining orders that are void *ab initio*. This dynamic demonstrates that the reviewing court is no longer engaged in neutral adjudication, but is trapped in a desperate exercise of damage control to protect a fractured judicial alliance.

55. Antisemitic Affidavits against Ofer - **Tolerance of Overt Hate Speech and Incitement to Violence:** The court knowingly permitted the filing of extreme, antisemitic affidavits (**Exhibit F**) that cross the line from legal advocacy into criminal incitement and systemic discrimination.

56. **Calls for Violent Confiscation of Jewish Property:** These affidavits explicitly advocate for the violent seizure of Jewish-owned properties, utilizing the dangerous and historically destructive pretext and nazi slogans that Jewish property ownership is disproportionate to population demographics.

57. **Promotion of Holocaust Denial on the Record:** The attached documents actively promote Holocaust denial, yet they were allowed to remain unchecked within a federal bankruptcy proceeding targeting the Appellant.

58. **Judicial Failure to Act:** Instead of striking these unconscionable filings *sua sponte* and sanctioning the parties involved, the court weaponized the broader proceeding to strip the Appellant of a **$120,000,000.00 asset** for a nominal **$5.00**. Judge Jung is fully aware that this toxic record infected the entire case, making his ongoing efforts to silence depositions and seal the controversy an act of direct complicity in a severe due process violation.

59. **The record demonstrates an egregious abuse of judicial power where the court actively suppressed evidence of severe bias through threats of economic and legal sanctions.** When Ofer officially testified before Judge Isicoff regarding the presence of these outrageous and antisemitic affidavits (**Exhibit F**), the court made no attempt to address the underlying incitement or the structural compromise of the case. Instead, Judge Isicoff issued a direct, extrajudicial threat, warning the Appellant that he would face severe judicial sanctions if he disclosed or mentioned the existence of these hate-filled documents to anyone outside the immediate proceeding.

60. The physical toll of this intense judicial intimidation was immediate and severe; upon the conclusion of the hearing, Ofer suffered an acute medical crisis characterized by severe dizziness, necessitating an emergency transport by his driver directly to the Emergency Room at the University of Miami Hospital. By choosing to threaten a victim rather than purge the record of illegal incitement, the court committed an unconscionable violation of due process. Judge Jung's efforts to lock down the case

file and block discovery directly perpetuate this legacy of judicial coercion and medical endangerment.

61. **The record reveals an extraordinary subversion of due process where the court weaponized the threat of criminal prosecution to suppress evidence of pre-petition collusion.** During formal testimony, Ofer confronted Judge Isicoff with a highly incriminating recording captured in a public place (**Exhibit E**). In that recording, executed three months prior to the filing of the Chapter 11 petition, the judge's known business partners, Rodriguez IV and Stuart Kalb, explicitly identified Judge Laurel Isicoff by name as the future presiding judge and confirmed exactly how she would rule.

62. Rather than executing the mandatory duty of an impartial jurist—which required an immediate evidentiary hearing to investigate a severe breach of judicial integrity—Judge Isicoff actively threatened the Appellant with a felony conviction for arranging the recording. Despite Ofer's correct assertion on the record that a recording captured in a public venue carries no expectation of privacy and is entirely lawful, the court maintained its bad-faith threats of criminal exposure. Furthermore, the court abruptly halted the ongoing proceedings for the explicit, extrajudicial purpose of contacting her personal criminal defense attorney for legal counsel. This extraordinary disruption of a federal proceeding demonstrates that the court had ceased acting as a neutral arbiter and had pivoted entirely into an exercise of personal criminal damage control.

63. **The magnitude of the structural compromise infecting these proceedings has led the Appellant to formally demand not only Judge Jung's immediate recusal but his complete resignation from the federal bench.** Under 28 U.S.C. § 455, a

judge must disqualify themselves in any proceeding in which their impartiality might reasonably be questioned. Here, Judge Jung's repeated, extrajudicial interventions—specifically his bad-faith efforts to block the deposition of Judge Millan and insulate a fraudulent **$120,000,000.00 asset transfer executed for a nominal $5.00**—have entirely destroyed the court's institutional neutrality.

64. Because these actions demonstrate a deliberate orchestration to shield a close associate rather than a good-faith adjudication of a bankruptcy appeal, the jurisdictional void is total. When a judicial officer acts in the complete and absolute absence of all subject-matter jurisdiction to facilitate a cover-up, they forfeit the right to hold office under the "good behavior" clause of Article III of the United States Constitution. Accordingly, to preserve what remains of public trust in the integrity of the federal judiciary, the Appellant officially moves for Judge Jung's immediate recusal and calls for his permanent resignation from the bench.

65. End of Introduction.

66. The Plaintiff brought an action against Laurel M. Isicoff[1], suing her personally under various theories for her conduct taken as a bankruptcy judge which damaged the Plaintiff under the matter *Ofer v. Isicoff*, Case No. 1:23-CV-24738-WFJG ("Isicoff Action").

67. After five recusals entered by judges in the Southern District, the Chief Justice of the Eleventh Circuit assigned Hon. Judge William F. Jung, district Judge out of the Middle District of Florida ("Jung"), to preside after he volunteered to accept the assignment.

---

[1] Primarily, Isicoff, an Article I U.S. Bankruptcy Judge, was being sued in her personal capacity for conduct taken in the absence of all jurisdiction or that which is personal in nature.

68. Jung knew that this matter was a highly contested matter and was well aware that the allegations against Isicoff were based on her personal conduct and other official conduct taken in the complete absence of jurisdiction.

69. More precisely, the Defendant knew of the episodes and facts and circumstances surrounding them in which Isicoff acted in the complete absence of jurisdiction.

70. The record in the Isicoff Action reveals a critical, undisclosed conflict of interest that mandated Jung's recusal from those proceedings. Specifically, Jung failed to put on the record his extensive, long-term personal relationship with Isicoff—a relationship that directly implicates the integrity of the underlying actions. While six other District Court judges recognized the clear ethical boundaries and voluntarily disqualified themselves based on their familiarity with former Judge Isicoff, Jung concealed his conflict to maintain control over the case, constituting a clear abuse of discretion and a violation of the federal recusal statutes.

71. After the entry of Isicofft's motion to dismiss the complaint, Jung dismissed the case with prejudice without affording the Plaintiff any time to respond to the motion to dismiss or seek leave to amend in response to the Defendant's motion.

72. The Plaintiff had the right to amend his complaint as a matter of course and the Plaintiff appealed on this ground to the Eleventh Circuit. The Eleventh Circuit agreed with the Plaintiff and stated Jung clearly did not afford him the right to amend the complaint. On remand, that court ordered that the case be dismissed without prejudice.

***73.*** As a result of the Eleventh Circuit's judgment, Ofer moved for leave to amend the initial complaint in the Isicoff Action to better align the claims and arguments to the non-official conduct of Isicoff and incorporate the necessary claims to support his

position which was awarded on Nov. 4, 2025, with 30 days to enter the amended complaint on the record, which was done on Dec. 2, 2025.

74. After that dismissal, Jung began a systematic attack on the Plaintiff to find other ways in which to intimidate the Plaintiff and to assist Isicoff to cover up the various crimes she committed.

75. Plaintiff moved for depositions of certain individuals, Recall Judge Paul Hyman, Former Florida State Court Judge Steven-Millan, attorney David Winker and attorney Mark S. Roher in the Isicoff Action.

76. Material to those depositions, Plaintiff entered a suggestion of evidence which alluded to certain electronic information, to wit video and audio recordings one of which support the Plaintiff's claim against the Defendant implicating Jung in wrongdoing with criminal implications..

77. On March 23, 2026, Jung issued a series of orders denying all pending motions and denying the motion calling for Jung to recuse himself despite the preceding which shows that he is partial, biased and implicated in conduct with Isicoff to dismiss the Isicoff Action.

78. Jung is insistent on the fact that he does not know, never spoken to or engaged in any way with the Defendant which is utter falsehood and fantasy.

79. Judge Jung served as Assistant United States Attorney for six years, first in the Southern District of Florida, from 1987 to 1990, and subsequently in the Middle District of Florida, from 1990 to 1993.

80. Judge Isicoff was appointed to the bench in 2006. There is not any scenario where the judges have not met and conversed. There are 37 authorized federal district court

judgeships in Florida, 18 in the Southern District (with 12 Senior Judges) and 15 in the Middle District. There are 7 bankruptcy judges in the Southern District and 8 in the Middle District. With just above 50 judges in the region and both being on the federal bench for over 6 years, there is not a possibility that they could never have spoken.

81. This is augmented by the fact that Chief Judge William Prior of the Eleventh Circuit approached him about the case; he quickly volunteered despite the conflict of interest he had with his long-standing relationship with Isicoff. If Jung genuinely never spoke to Isicoff, why would he fight to prevent the deposition of Judge Stephen Millan (Millan), who acknowleged that he's in possession of documents and emails, implicating Jung in a joint conspiracy with Isicoff to dismiss the case, why, why, why?

Bias Related to Plaintiff's Health

82. Jung issued a requirement that all of the participants appear before the Court physically.

83. This requirement was in light of the Plaintiff clearly notifying Jung of a recent loss of consciousness which hampered his travel over long distances, in addition to the previous notifications of medical conditions which prohibit the Plaintiff's ability to physically attend any hearing before Jung or any court outside the United Kingdom for that matter[2].

84. Plaintiff described his loss of consciousness and the resultant monitoring for malignant tumor growth as a potential cause for the loss of consciousness. This process resulted in the physician treating the Plaintiff notifying the Civil Aviation Authority in the United Kingdom of the Plaintiff's inability to travel by air.

[2] Even travel within the United Kingdom is limited to less than a few hours by vehicle.

85. This reporting requires the Plaintiff to obtain a "Fit To Fly" examination by an aviation medical examiner followed by the issuance of a certificate. Without this, no airline will be able to allow the Plaintiff to board on a plane and fly from a point of origin in the United Kingdom. The key to the aviation examination is the General Physician for the Plaintiff issuing the referral for its performance, an event which has not happened and is not expected until the monitoring for the malignant tumor is complete. Despite this, Jung never reversed his requirement for physical appearance before him.

86. But the disregard for the health of others is not new for Jung. As reported in the media concerning rulings on a Rule issued under the Biden Administration regarding gender and sexual orientation-based discrimination in healthcare payments under the Florida Medicare program, Jung blocked the implementation of a rule which would have stopped gender-based discrimination in providing funding for medical treatment to transgender persons in Florida[3].

87. Adding to this already sordid mix of intolerable behavior, Jung showed his biased clearly directed at the When Jung set a in person hearing for certain pending motions before him in the Isicoff Action, he was petitioned to reverse such a decision in light of the sheer impossibility of the Plaintiff to be able to comply due to the restrictions implemented by the CAA in the United Kingdom.

88. After several pleadings on being excused from physical appearance before the Court in light of the inability to comply, defense counsel filed a motion to likewise be excused

---

[3] In an article published through NPR, written by Jim Saunders on July 3, 2024, shows that Jung clearly sided with restricting the use of the rule in Florida which would have protected funding on an equal footing for all persons. Jung shows his disregard for the well-being of people who face discrimination. This conduct supporting this type of discrimination is similar to his support allowing antisemitic hate speech to continue in this matter, just as Isicoff did. But that is expected given the Isicoff's influence over Jung.

due to medical related events. Instead of keeping the decision neutral, the decision was entered which disregarded nearly 3 months of insistent pleadings, Jung reversed course and excused physical appearance in that instance. This clearly shows that Jung has a bias against the Plaintiff.

i. Antisemitic Support

89. Jung continues the antisemitic conduct which ensnared Isicoff. The Plaintiff has previously mentioned how Isicoff was presented with affidavits which clearly evidenced hate speech directed to him. The affidavits were presented to Isicoff when she presided over the bankruptcy matters to gauge the level of the conduct directed at the Plaintiff and how much that conduct was related to discrimination based on the Jewish heritage of the Plaintiff.

90. The hate speech which was directed at the Plaintiff was the same rhetoric which was engaged in by the Nazis during World War II. This amounts to an absolute and outright denial of the holocaust and rings of confiscation of wealth and Jewish assets, such confiscation can only be achieved by the use of force. The hate speech identified in the affidavits are the same types of slogans and propaganda which was related to the holocaust.

91. The Plaintiff is experiencing the use of the legal infrastructure which is in place and experiencing a confiscation of his asset under the color of law through abuse. The affidavits are clear and unambiguous in their statements that Plaintiff, being of a Jewish heritage either should not own real property or owns too much real property.

92. The same conduct is continuing and ongoing and Jung is supporting the proliferation of this conduct through his failure to address it which is exactly what Isicoff did when

presented with the same evidence of antisemitic conduct in the bankruptcy proceedings which she presided over.

93. Instead of addressing it, it gets swept under the rug and never formally addressed other than by threats to never bring it up again. What could be more telling about allowing the proliferation of hate speech than threats to not bring it up. Judges are duty bound to stop this type of conduct, not ignore it and allow it to stand unchallenged, which does nothing but allow it to continue on their watch. Jung ignores basic core constitutional rights.

ii. Support of Advisory Opinions

94. Jung supported Isicoff by dismissing the Isicoff Action so that the lack of jurisdiction and ultra vires conduct resulted in Isicoff issuing orders supporting transferring property worth $120 million away from the Plaintiff, for $5.00 (Five USD) to her business partner, excusing it on Ofer's alleged scrivener error on his deed.

95. Bankruptcy Court's "Related To" And Article III Jurisdiction

96. Bankruptcy courts are courts of limited jurisdiction, possessing only the power authorized by Congress and Article III of the Constitution. Under 28 U.S.C. §1334(b), a bankruptcy court's jurisdiction is confined to cases under Title 11, and civil proceedings "arising under Title 11, or arising in *or related to cases under Title 11*." (emphasis added).

97. The U.S. Supreme Court established the definitive test for "related-to" jurisdiction in *Celotex Corp. v. Edwards*, 514 U.S. 300 (1995), See also e.g. *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d Cir. 1984) (adopted by the Eleventh Circuit in *In re Lemco Gypsum, Inc.*, 910 F.2d 784 (11th Cir. 1990)). For "related-to" jurisdiction to exist, the outcome

of the civil proceeding must "...conceivably have any effect on the estate being administered in bankruptcy."

98. An action is "related to" bankruptcy only if the outcome could alter the debtor's rights, liabilities, options, or freedom of action, and "in any way impacts upon the handling and administration of the bankrupt estate." *Lemco Gypsim*, 910 F.2d at 788.

99. Crucially, "related-to" jurisdiction does not extend indefinitely. The Supreme Court has explicitly cautioned that a bankruptcy court's jurisdiction "cannot be extended beyond its statutory limits by a handler's or a court's unilateral expansion," and must not swallow state-law litigation between third parties. *Celotex*, 514 U.S. at 310.

**100. The bankruptcy (BK) court's statutory "related to" *subject matter* jurisdiction ceases once that court stepped out of adjudicating matters related to the debtor and estate by expressly declaring that the property involved in the dispute was not property of the estate or of the debtor. At this point the BK court's mandate ceased to exist and the case ends, but not to Isicoff and her long term friend, Jung.**

101. Likewise, the bankruptcy court also had to determine its Article III jurisdiction as well.

102. The manner in which a bankruptcy judge may act on a referred matter depends on the type of proceeding involved as they may hear and enter final judgments in "all core proceedings arising under title 11, or arising in a case under title 11." 11 U.S.C. §157(b)(1). "Core proceedings include, but are not limited to," 16 different types of matters, including "allowance or disallowance of claims against the estate or exemptions from property of the estate". §157(b)(2)(C).

103. When a bankruptcy judge determines that a referred "proceeding ... is not a core proceeding but ... is otherwise related to a case under title 11," the judge may only "submit proposed findings of fact and conclusions of law to the district court." §157(c)(1). It is the district court that enters final judgment in such cases after reviewing de novo any matter to which a party objects. *Ibid.*

104. Article III, § 1, of the Constitution mandates that "[t]he judicial Power of the United States, shall be vested in one Supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." The same section provides that the judges of those constitutional courts "shall hold their Offices during good Behaviour" and "receive for their Services[ ] a Compensation[ ] [that] shall not be diminished" during their tenure[4].

105. *Stern v. Marshall, 564 U.S. 462, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011)* made clear that some claims labeled by Congress as "core" ***may not be adjudicated by a bankruptcy court in the manner designated by §157(b)***.

106. By definition, a "*Stern*" claim may not be adjudicated to final judgment by the bankruptcy court, as in a typical core proceeding. But the alternative procedure, whereby the bankruptcy court submits proposed findings of fact and conclusions of

---

[4] In general, Congress may not "withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty." *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 18 How. 272, 284, 15 L.Ed. 372 (1856). When a suit is made of "the stuff of the traditional actions at common law tried by the courts at Westminster in 1789," *Northern Pipeline*, 458 U.S., at 90, 102 S.Ct. 2858 (Rehnquist, J., concurring in judgment), and is brought within the bounds of federal jurisdiction, the responsibility for deciding that suit rests with Article III judges in Article III courts. The Constitution assigns that job—resolution of "the mundane as well as the glamorous, matters of common law and statute as well as constitutional law, issues of fact as well as issues of law"—to the Judiciary. *Id.*, at 86–87, n. 39, 102 S.Ct. 2858 (plurality opinion).

law to the district court to be finally determined by an Article III judge, applies only to non-core claims, See §157(c)(1).

107. The statute permits *Stern* claims to proceed as non-core within the meaning of §157(c).

108. Nonetheless, pursuant to *Wellness Int'l Network, Ltd. v. Sharif*, 135 S.Ct. 1932, 191 L.Ed.2d 911 (2015), bankruptcy judges can adjudicate non-core proceedings and enter final orders and judgments with the consent of all parties.

i. Advisory Opinion Issued by Isicoff

109. Isicoff adjudicated matters beyond her statutory and constitutional limits. Specifically, Isicoff adjudicated matters concerning non-debtors and non-estate property beyond the point which she determined that the subject property in the bankruptcy matter which she presided was no longer property of the debtor or the estate and did so in the complete absence of subject matter jurisdiction adjudicating a pure quiet title, which is a Florida state court property dispute matter.

110. Isicoff issued her order declaring that the Property was not property of debtor nor was property of the bankruptcy estate ("Isicoff Order"), which at the moment of that declaration, statutory jurisdiction under 28 U.S.C. §1334(b) ceased.

111. The Isicoff Order went on adjudicating matters between parties who did not file any proof of claim in bankruptcy. Specifically, the Isicoff Order stated that title should be vested in a third party, her business partners, as the owner and that certain liens owned by the Plaintiff were not valid and unenforceable.

112. The Isicoff Order concerning that portion of the order adjudicating matters after the declaration that the Property was not owned by the debtor nor property of the estate,

(i) was rendered in violation of 28 U.S.C. §1334(b) when the "related to" jurisdiction ceased, (ii) contained *Stern* claims which required the issuance of proposed findings of fact and conclusions of law to be submitted to the district court under 28 U.S.C. §157(c)(1), and constitutes an **unconstitutional advisory opinion**. Isicoff's lack of subject-matter jurisdiction extends beyond her finding that the property was owned by neither the alleged debtor nor the bankruptcy estate. She went further by purporting to adjudicate that the property belonged to a third party—an improper quiet-title determination over which Florida state courts hold exclusive jurisdiction.

113. Both Isicoff and Jung are acutely aware that issuing rulings in the complete absence of subject-matter jurisdiction forfeits judicial immunity, leaving them personally liable for civil damages—to say nothing of potential criminal liability.

COUNT I – VIOLATION OF LARSON-DUGAN ULTRA VIRES DOCTRINE
*(as to Jung)*

114. This cause of action re-alleges paragraphs 1 through 50 and incorporates them into this count.

115. This is a prayer of relief made pursuant to *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689–90 (1949) in equity for relief for the ultra vires conduct of Jung acting in the complete absence of jurisdiction issuing advisory opinions.

116. The Isicoff Order ruled on several matters including the determination that the Property was not owned by debtor nor was property of the bankruptcy estate which was before that Court.

117. The "related to" jurisdiction ceased under 28 U.S.C. §1334(b) once Isicoff determined that the property in dispute was not debtor or estate property and any further rulings regarding the property would have no conceivable outcome for the estate.

118. Isicoff continued to rule that the subject property's title was vested in a third party and that certain claims of liens which encumbered the Property were invalid and unenforceable despite the earlier declaration causing the cessation of subject matter jurisdiction.

119. Given the fact that the claim is a pure state court matter, it is classified as a *Stern* claim subject to ultimate disposition by an Article III judge, not one classified as an Article I judge such as Isicoff.

120. Isicoff only had the power to enter a proposed finding of fact and conclusions of law on the issues remaining and those findings entered as a purported final summary judgment, in fact, amounts to a recommendation of facts and law conclusions which should be passed upon by the district court.

121. Because the Isicoff was divested of jurisdiction, the remaining adjudications contained in the Isicoff Order are unconstitutional and render them advisory in nature making the act of rendering the findings an ***ultra vires act*** devoid of constitutional and statutory jurisdiction.

122. These facts were placed before Jung along with the antisemitic conduct and affidavits expressing hate speech and confiscation of property. Jung issued his order supporting the Isicoff Order and affirming it in many manners to reinforce its "color of law" legitimacy.

123. The hypothetical jurisdiction which Jung engaged in supporting the Isicoff Order produced nothing more than a *hypothetical judgment* and is tantamount to a constitutionally prohibited ***advisory opinion***, disapproved by the Supreme Court. *Muskrat v. United States*, 219 U. S. 346, 362 (1911); *Hayburn's Case*, 2 Dall. 409 (1792).

WHEREFORE, the Plaintiff seeks the entry of an equitable order declaring the acts ultra vires and without force and effect, or any other relief the Court deems just and proper.

Respectfully,

/s/____________________

Raz Ofer
c/o 3701 DeGarmo Lane
Coconut Grove, FL 33133
Raz.ofer2@gmail.com

VERIFICATION OF FACTS

I HEREBY CERTIFY that the statements of facts that are preceding are such facts which are true, correct and complete and are known to me through firsthand knowledge and experiences. The information and facts stated herein are correct in their veracity and are made under the penalty of perjury.

Respectfully,

/s/____________________

Raz Ofer
c/o 3701 DeGarmo Lane
Coconut Grove, FL 33133
Raz.ofer2@gmail.com

VERIFICATION OF FACTS

I HEREBY CERTIFY that the statements of facts that are preceding are such facts which are true, correct and complete and are known to me through firsthand knowledge and experiences. The information and facts stated herein are correct in their veracity and are made under the penalty of perjury.

Respectfully,

/s/____________________

Raz Ofer
c/o 3701 DeGarmo Lane
Coconut Grove, FL 33133
Raz.ofer2@gmail.com

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

# EXHIBIT "A"

U.S. BANKRUPTCY COURT SOUTHERN DISTRICT OF FLORIDA MIAMI DIVISION
FILED OCT 19 2026 RECEIVED

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:

942 PENN RR, LLC,

Debtor.
_____________________________________/

BK Case No. 1:2022-14038 LMI

Chapter 11 – Core Proceeding

MOTION TO VACATE JUDGEMENT
FOR FRAUD ON THE COURT

MOVANT, RAZ OFER ("Ofer"), as a self-represented litigant, moves the Court to vacate the Court's orders confirming the Chapter 11 Confirmation Plan of Reorganization and the Court's order to sell the Property under the Confirmation Plan, and orders for the Interim and Final Distribution of the Equity Stakeholder Surplus, pursuant to Fed. R. Civ. P. 60(d)(3) based upon fraud on the Court, the equities of extraordinary circumstances in the interests that justice be done. Ofer states the following facts and arguments to support his movement for relief.

INTRODUCTION

By way of introduction, Ofer states:

- The alleged creditors—specifically, a syndicate led by Roniel Rodriguez IV ("ROIV") and his long-term associate, Stuart Kalb ("Kalb")—have perpetrated a fraud upon this Court by knowingly misrepresenting a non-final order as an enforceable final judgment. By deliberately portraying an interlocutory determination as a final, non-appealable adjudication to secure judicial remedies, these parties have effectively introduced a fraudulent instrument

into the record. Furthermore, this unauthorized enforcement activity constitutes a direct violation of the Court's operative injunction explicitly prohibiting collection activities. Such conduct transcends mere aggressive advocacy, constituting a willful deception that subverts the integrity of the judicial process.

- Crucially, these illicit collection efforts were executed with the explicit knowledge and consent of the Chapter 11 Trustee and his counsel, Mr. Brown, under the auspices of former Bankruptcy Judge Laurel M. Isicoff., who inexplicably recused herself without a pending motion for recusal. As detailed extensively in the pending motions to vacate filed in the *942 Penn RR, LLC* and *Derexel* proceedings, the Trustee, his counsel, and former Judge Isicoff acted entirely absent personal and subject-matter jurisdiction. Because a total absence of jurisdiction strips judicial officers and court-appointed fiduciaries of absolute immunity, these parties face direct personal liability, subjecting them to independent civil actions across any appropriate sovereign jurisdiction. A rigorous review of the specific arguments within those motions to vacate reveals a clear procedural inside awareness, reflecting former Judge Isicoff's current efforts to insulate herself from impending civil liability and scrutiny. The advanced jurisdictional arguments articulated in those filings directly rely upon and incorporate the structural insights provided by former Judge Isicoff's active assistance.

- **Consequently, Bankruptcy Judge Robert A. Mark has become directly implicated in these extrajudicial actions, which were executed entirely absent personal and subject-matter jurisdiction.** Because a court's total lack of jurisdiction violates fundamental constitutional protections and strips a judicial officer of absolute judicial immunity, Judge Mark faces direct personal liability for these unauthorized proceedings. By entering orders in a matter completely devoid of statutory authority, his actions transcend protected judicial error and constitute an actionable, unconstitutional overreach.

Statement of Relevant Facts

This action commenced without the authorization of one of the members of the debtor, representing 50% of the shares of the debtor. When representation was undertaken, counsel for the debtor was retained without authorization of one of the members, Robert Mendez. In the initial consultation with counsel for the debtor prior to the filing of the petition for reorganization, this fact was raised on several occasions, yet ignored by Mr. Mark Roher. The petition that was filed with the Court was only signed by Raz Ofer, one of the two members of the debtor, each member owning 50% of the membership interests. Mr. Ofer did not consult with or obtain the authorization from Mr. Mendez with regards to the filing of the petition. There was no board resolution or any other instrument which authorized the filing of the petition which was authorized by Mr. Mendez. As a result, the bankruptcy proceeded without being properly authorized. Mr. Roher knew before the filing that Mendez did not agree or sign any authorization to file for bankruptcy. Mendez's name was on all the documents but Roher failed to verify with

him, perhaps by mistake, whether he consented to the filing. Ofer instructed Roher to verify it with Mendez and assumed that Roher did it before filing for bankruptcy.

It's worth noting that Ofer only filed for BK after one of his lawyers, David Winker told him that we must change the forum as it's clear that some Judges in Miami-Dade Circuit Court Judges seems to be outrageously corrupt by receiving bribes from Rodriguez IV (ROIV) and his partner, Stuart Kalb (Kalb). Ofer's entity had no valid debt whatsoever, Ofer purchased the buildings in cash in 2013 and invested additional $7M from his own money gut renovating the buildings. As it happened, the case ended up with Laurel Isicoff presiding over the case. Judge Isicoff (Isicoff) didn't reveal that her brother in Law, Eric Isicoff, is a business partner of ROIV, let alone that she communicated with ROIV & Kalb before she was appointed to preside over the case. In a recorded discussion, audio and video, in a public place, between ROIV and Kalb, they mentioned the name Laurel Isicoff as the Judge to be appointed to preside over the case, admitting that they committed a grand theft by the way they stole Ofer's properties and 'predicting' how Isicoff would rule.

Roher knew of this fact when the initial petition was filed as it was brought to his attention on more than one occasion. However, Mr. Roher did not act on this knowledge, albeit brought to his attention on more than one occasion by Mr. Mendez. Mr Roher now admitted in a comprehensive sworn affidavit (Exhibit B) about this fact and other serious issues which renders the entire BK null and void. Mr. Ofer and Mr. Mendez raised this fact before this Court when Judge Isicoff was still presiding over the matter. Although hearing this fatal defect, Judge Isicoff did not act on this once presented, as she received payments and benefits from ROIV & Kalb, despite knowing the petition has never been

authorized and that she's acting without jurisdiction. Even when Roher filed a motion to dismiss the Bankruptcy about a week after filing it, Judge Isicoff inexplicably denied it. Chapter 11 is designed to protect the petitioner, so if the petitioner requests the Court to withdraw it, it is always granted, particularly that it was filed about a week after the petition was filed. Ofer attached emails proving the bribes paid to Isicoff in the amount of $2M.

Tainted by antisemitic fervor, Judge Isicoff allowed several cases to continue past this point. In this case, she corruptly and incorrectly ruled that the debtor's property was not transferred to DRO by another entity owned by Ofer, due to an erroneous application of the law in interpreting a scrivener's error and in a related bankruptcy case, allowed the case to proceed through the confirmation plan ratification and sale of the property resulting in not only over $1.5 million in legal fees to be paid to the trustee, but also the sale of an over $40 million real estate property for $7 million to a friend of the trustee in garden auction, and the Plan Administrator sequestering $1,600,000.00 in surplus equity to the detriment of the equity stakeholders Ofer and Mendez. Isicoff's conduct extended further with failing to review evidence placed before her which implicated her along with Roniel Rodriguez IV and Stuart Kalb in being involved in the corruption of the judicial process by somehow being determined to be the presiding judge in this action prior to the filing of the petition and being presented with antisemitic affidavits which clearly showed a cabal of thieves oppressing Ofer due to his Jewish heritage and wealth targeting his real properties. The antisemitic affidavits filed by Ofer advocating the confiscation of jews properties as most Jews are unproportionately wealthy compared to their numbers as part of the overall population. These outrageous affidavits are not just antisemitic but also constitute a denial of the holocaust and advocating the use of violence in order to

confiscate jews properties as this can only be achieved by the use of violence. These issues are never covered by any immunity whatsoever, let alone that Isicoff's corruption started well before she was 'appointed' to the case by 'ROIV & Kalb'. When I informed Isicoff about the affidavits that I filed, while speaking on the podium, she threatened me that if I show or discuss these affidavits with anyone then she will sanction me, there's no immunity for such actions.

After nearly a dozen attempts to recuse Judge Isicoff, on March 3, 2025, she *sua sponte* issued an order of recusal, without a pending recusal motion on the docket, stepping down as the presiding judge in this matter. Her conduct shifted from one that was vehemently impartial and opposed to Ofer and his ownership of any real property to a sudden recusal from this matter opening the very real reality that her conduct was and is grounded in partial actions and flagrant breaches of Ofer's constitutional rights of due process against Ofer. The recusal caused this matter to be assigned to Judge Robert Mark (Mark) to preside over the matter and opened the door for prior ruling to be reconsidered.

As it turned out the recusal was a well-planned conspiracy by Isicoff & Mark, as he's her friend of 40 years and sits on the same floor. If anything, due to their close relationship Mark should have recused himself instantly and never accept the case that Isicoff passed to him. When Ofer filed a lawsuit against Isicoff in US District Court, 6 District Court Judges recused themselves because they knew Isicoff, but not Mark, despite the fact that he's much closer to her than the 6 impartial and honest District Court Judges. Judge Mark strongly believes that he's above the law and his only priority was to portray Isicoff as an 'honest' judge. Mark was well aware that if he finds that Isicoff violated

the constitution, or received bribes from ROIV & Kalb, or supported outrageous antisemitic comments against Ofer, or threatened Ofer, or ignored the law, then this would have serious implications on the lawsuit against her in District Court.

The facts in this matter are clear, despite counsel for the debtor improperly filing the petition for the bankruptcy reorganization without any authorization whatsoever, with the Court knowing that Mendez had not authorized its filing, the Court lacked any jurisdiction. Further, the law is clear on this matter that without the proper corporate authority, this Court was precluded from conducting the proceedings and dismissal was mandatory. As stated in the affidavit provided by Roher, attached to this motion, he clearly states that he did not receive proper authorization from Mendez to proceed with the bankruptcy filing, yet he knew of this requirement. Further, the fact that Judge Isicoff, the Plan Administrator Barry Mukamal, and his counsel Scott Brown all knew that this requirement existed. Yet, the trio continued to allow the case to move forward, injuring the debtor to the tune of $120M.

Mendez's Conduct During The 942 Penn Bankruptcy

Judge Isicoff allowed the case to continue through the confirmation plan ratification and sale of the property resulting in not only over $1 million in legal fees to be paid to the Plan Administrator Mukamal and his counsel, attorney Scott Brown, but also allowed the sale of real property belonging to 942 Penn valued at over $25 million for $7 million and the Plan Administrator sequestering $1,600,000.00 in surplus equity to the detriment of the equity stakeholders Ofer and Mendez. Isicoff's conduct extended further with failing to review evidence placed before her which implicated her along with Roniel Rodriguez IV ("Rodriguez") and Stuart Kalb ("Kalb) in being involved in the corruption of the judicial

process by somehow being determined to be the presiding judge in this action prior to the filing of the petition in the 942 Penn case and being presented with antisemitic affidavits which clearly showed a cabal of thieves oppressing Ofer due to his Jewish heritage and wealth targeting his real properties.

During the course of the 942 Penn proceedings, Mr. Mendez took engaged in conduct which showed his direct desire not to be involved in the bankruptcy proceedings. He supported the dismissal of the action, not getting directly involved in it because of the belief that the case would be dismissed, which is what he wanted to begin with. Mr. David Winker entered a joinder on behalf of Mr. Mendez opposing the appointment of the Trustee and entered a reply opposing any denial of the motion to dismiss (D.E. 56). This is conduct supporting the desire to dismiss the 942 Penn action in total and refusing the benefits of the bankruptcy. Further, Mr. Mendez joined in objecting to the claims entered against the estate (D.E. 226) as the claims were incorrect and excessive, again being conduct which goes against the trustee's conduct, the bankruptcy in general and opposing the entry of the claim under the belief that the claims can be resolved outside any bankruptcy court.

Further supporting this desire, in the Confirmation Hearing before Judge Kimball on March 20, 2023, through Mr. Winker and Mr. Mendez, who was not allowed to speak, physically appeared, Mr. Winker further expressed that Mr. Mendez "did not want to be in the process" (D.E. 1105, Transcript of the Hearing, pg. 33, ln. 19 and pg. 38, ln. 15).

On April 3, 2023, in the hearing approving the sale, Mr. Winker clearly conveyed to the Court that Mr. Mendez did not want to be in the bankruptcy process and did not consent to it, even getting shut down by Judge Kimball when Mr. Winker attempted to

have Mr. Mendez speak about the irregularities of the process which Mr. Mendez was going to raise the issue of the lack of corporate authority among other things. In the same hearing, even the Appellant raised the claim that Mr. Mendez did not consent to the bankruptcy. His disclosure to the Court was met with even more discourse through a total disregard for the claim. Judge Isicoff's response directly to the claim was "what else—what else, Mr. Ofer?" (D.E. 1111, Pg 34, ln. 14). On April 13, 2023, Mr. Mendez filed a Expedited Pro Se Motion to Dismiss the Bankruptcy (D.E. 1093) which expressed the fact which the record already shows, in so many words, that Mr. Mendez never consented to the bankruptcy and did not want to be in the process. He also filed his own motion to remove the trustee (D.E. 1094) and an Expediated Motion to Vacate the Sale (D.E. 1095, pg. 9 at Point 5) which expressed the same lack of corporate authority. Even in the Motion to Stay Proceedings (D.E. 1097, pg. 11 at Pt. 7) mounted the same challenge to the lack of corporate authority. Any reasonable understanding would show that Mr. Mendez's conduct, either personally or through counsel Mr. Winker, from the inception of the bankruptcy process supported a very clear disagreement with participation and unquestionable determination to have it ended.

The bankruptcy court disregarded the claim that consent was not given to the Appellant to file the petition and, even raising it before the actual sale of the Property on March 31, 2023, it seemed that the bankruptcy court forced the bankruptcy and would not even properly consider the claim, as evidenced by Judge Isicoff's statement in her April 5, 2023 Final Order Authorizing and Approving Sale of Real Property (D.E. 1077, 5 n.2) where she stated that "*the Court has not reviewed the Debtor's operating agreement nor the applicable Florida Statutes to determine if this claim would even have a basis*", which

is believed that the bankruptcy court had a duty to give proper weight to even if it would have been a massive inconvenience to stop the proceedings .

After nearly a dozen attempts to recuse Judge Isicoff, on March 3, 2025, she sua sponte issued an order of recusal, without a pending recusal motion on the docket, stepping down as the presiding judge in this matter. Her conduct shifted from one that was vehemently impartial and opposed to Ofer and his ownership of any real property to a sudden recusal from this matter opening the very real reality that her conduct was and is grounded in *partial actions* taken against the Appellant and estates of the debtors. The recusal caused the 942 Penn matter to be assigned to Judge Robert Mark to preside and opened the door for all of the prior ruling to be reconsidered, or as in this case, be voided by the Court. This prompted the motion to nullify to be filed on the basis of extraordinary grounds. The motion was clear, counsel for the debtor improperly filed the petition for the bankruptcy reorganization without any authorization whatsoever, with the Court knowing that Mendez had not authorized its filing, alleging the bankruptcy court lacked any jurisdiction from the inception of the case. Without the proper corporate authority, the bankruptcy court was precluded from conducting the proceedings and dismissal was mandatory. The motion raised the issue of lack of corporate authority along with the conduct of Mr. Mendez and the debtor's Counsel, Mr. Roher.

Ultimately, the matter proceeded forward and the Plan Administrator began to issue distributions under the Plan to confirmed creditors and other parties, including judgement creditors of the equity stakeholders, Mr. Mendez and the Appellant. The Plan Administrator interplead the distributions after the demand of the judgement creditors of the equity stakeholders of the 942 Penn estate.

ARGUMENT AND SUPPORTING CASE LAW FOR VACATING THE ORDER

Standard For Relief Under Fraud Upon The Court

Rule 60(d)(3) permits courts to "set aside a judgment for fraud on the court." Fed. R. Civ. P. 60(d)(3). The "fraud on the court" referenced in Rule 60(d)(3) is distinct from fraud between the parties in that the latter does not threaten public injury and therefore requires a lower standard to prove. *Sec. & Exch. Comm'n v. ESM Grp., Inc.*, 835 F.2d 270, 273 (11th Cir. 1988) (quoting *Travelers Indem. Co. v. Gore*, 761 F.2d 1549, 1552 (11th Cir. 1985) Fraud on the court "embrace[s] only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases." *Travelers Indem. Co. v. Gore*, 761 F.2d 1549, 1551 (11th Cir. 1985). The Eleventh Circuit has said that "only the most egregious misconduct," such as "fabrication of evidence by a party in which an attorney is implicated," constitutes a fraud on the court. *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1338 (5th Cir. 1978). The moving party must show fraud by clear and convincing evidence. *Booker v. Dugger*, 825 F.2d 281, 283 (11th Cir. 1987). "Conclusory averments of the existence of fraud made on information and belief and unaccompanied by a statement of clear and convincing probative facts which support such belief do not serve to raise the issue of the existence of fraud." *Id.* at 283–84 (alterations adopted). Finally, to prevail on a Rule 60(d)(3) motion, the movant must "prove[ ] by clear and convincing evidence that an adverse party has obtained the verdict through fraud, misrepresentation, or other misconduct." *Cox Nuclear Pharm., Inc. v. CTI, Inc.*, 478 F.3d 1303, 1314 (11th Cir. 2007).

Fraud Upon The Court

This matter has at it core a series of fraudulent misrepresentations and other egregious conduct which constitutes fraud upon the Court.

Pre-Petition Recording

In the months leading up to the petition filing, there is one event of significance which call into question the entire propriety of the bankruptcy case as a whole and raises the spectre of manipulation of the judicial process and fraud upon the court. Months before the petition was filed, Judge Isicoff was clearly implicated in a confidential recording, made in a public place, three months before the debtor filed for reorganization under chapter 11. Mr. Rodriguez and Mr. Kalb admitted to committing Grand Theft discussing the bankruptcy case, mentioning clearly the name of "Laurel Isicoff" stating how Judge Isicoff would rule. When the filing of the recording on the docket was raised, Judge Isicoff threatened the Appellant with accusation that he committed a felony and the recording is illegal, despite being told it was recorded in a public place where there could be no expectation of privacy. Judge Isicoff refused to listen to it as she was implicated in it. There was no consideration of this critical factor by the bankruptcy court[1] because obviously it was evidence of the ploy to defraud the Court by taking away the judicial independence of the Court and an impartial adjudicator because the presiding judge was prechosen by creditors and not the judicial mechanisms in place.

Debtor Bankruptcy Counsel Fraud

Ofer had approach attorney Mark S. Roher ("Roher") about representation of DRO in the filing of a Chapter 11 reorganization. Roher, as a so-called expert attorney on

[1] The link to the recording is provided for the Court to review for the purposes of determining this appeal at https://mail.google.com/mail/u/0?ui=2&ik=f568f8cfc5&attid=0.1&permmsgid=msg-a:r3375305545007645511&view=att&disp=safe&realattid=f_m7yx3imu0&zw

bankruptcy matters, had counseled Ofer on many aspects of the proceedings for DRO as an appropriate vehicle to regain possession of the Drexel Property after being counseled by his other attorneys, including David Winker ("Winker") that there was a need to remove his action to another venue due to the corruption in the Florida State Circuit Courts. After consulting with Roher, Ofer was advised by Roher that Chapter 11 reorganization was the best option for DRO to resolve its financial commitments, remove the conservator and gain various other tactical advantages. Specifically, Roher advised and guaranteed that the conservator could be removed through the bankruptcy, and he would be able to maintain control of DRO and the regain the control of the Property. Upon commencement of the bankruptcy, a Trustee was appointed and control over the businesses was turned over to the Trustee resulting in a reduction, at a very great degree, of income previously going to Ofer. The renovations ongoing at DRO's property ceased under the conservator's operational control and the Property fell into mismanagement and disrepair.

Roher represented DRO as counsel for the debtor in bankruptcy and failed in many instances to take direction from Ofer as to the direction which Ofer preferred litigation to proceed during the course of litigation. Motivated by personal gain instead of professional concern for his client, Roher committed several acts of fraud on the Court, and theft from Ofer. He maintained custody of several credit cards which Ofer provided to Roher which was for him to use solely to pay expenses for the matter. However, Roher being motivated by personal interests, placed over $200,000.00 in unauthorized charges on the credit cards to the detriment of Ofer. This conduct was subject of a district court case presided over by Hon. Judge Beth Bloom who ruled in Ofer's favor on competing motions for summary judgment that Roher did not have authorization to make the charges which he

made. Other conduct was that Roher misrepresented to the Court the amount of the fees in which he was entitled to receive after promising to Ofer that he would give credit to DRO for some of the unauthorized charges which were made[2]. ***Most grievous of the mistakes that Roher made, he failed to get Robert Mendez's[3] authorization to file the bankruptcy petition.*** Roher even went as far as to admit that fact by stipulation in the Roher Action, ***see Exhibit A – Joint Settlement Stipulation***.

Roher eventually broke all his promises to Ofer, withdrawing representation from the bankruptcy cases and attacking and compromising Ofer. DRO, by being placed into Chapter 11 bankruptcy, ended up losing its real property in a determination which exceeded the jurisdiction of the bankruptcy court, then presided over by Hon. Bankruptcy Judge Laurel Isicoff[4], resulting in over $13 million lost in equity as well as $7 million in direct investment in the property. DRO also suffered prospective losses as well in its ability not being able to collect rents or be converted to a boutique hotel which it would have dramatically increased both its value and revenues.

The United States Supreme Court has, in two capital habeas corpus cases, distinguished attorney negligence from more serious instances of attorney misconduct that may be considered egregious and amount to an extraordinary circumstance. See *Maples v. Thomas*, —— U.S. ——, 132 S.Ct. 912, 181 L.Ed.2d 807 (2012) (cause for state-court procedural default); *Holland v. Florida*, 560 U.S. 631, 130 S.Ct. 2549, 177

---

[2] Judge Bloom made findings in the Roher Action that Roher had actually provided proof where he stated to Ofer that he was to give credit for all of the unauthorized charges which he did not resulting in the estate of another of Ofer's companies, 942 Penn RR, LLC, which Ofer maintained a 50% interest in, having its equity surplus reduced by an amount equal to $237,000.00 in legal fees claimed by Roher to be owed to him from all of the services provided over two bankruptcy actions.

[3] Robert Mendez is a equal stakeholder in the debtor with Ofer, owning the remaining 50% of the membership interests of DRO.

[4] Judge Isicoff subsequently recused herself from the case and retired from active duty on the Southern District Bankruptcy Bench. Currently, she serves as a Recall Judge.

L.Ed.2d 130 (2010) (equitable tolling of federal filing deadline). The latter conduct, if it amounts to the attorney abandoning the client, may sever the principal-agent relationship and constitute extraordinary circumstances beyond the client's control. Attorney misconduct, when clearly convincing and results in extraordinary circumstances, relief may be had. See e.g. *Holland v. Florida*, 560 U.S. 631, 130 S.Ct. 2549, 177 L.Ed.2d 130 (2010). *SEC v. Simmons*, 241 Fed.Appx. 660, 662-663 (11th Cir.2007).

Here, Ofer, Mendez and their company, 942 Penn RR, LLC, was not afforded even the most basic representation and their interests were placed in jeopardy by Roher's conduct. Even more disturbing is the omission which Roher *knowingly* failed to disclose to the Court concerning Mendez's lack of authorization granted to allow the filing of the original petition of bankruptcy. Roher knew he did not have Mendez's authorization as the other 50% member of 942 Penn to proceed with the filing of the bankruptcy. When Mendez came before the court and made the argument that the entire action was not authorized, and filed without his own authorization, Roher, knowing this fact, failed to acknowledge this to the Court. Instead, Roher placed his own personal interests ahead of 942 Penn's, Mendez's and Ofer's interests, keeping the bankruptcy proceeding moving forward, against the wishes of Mendez. Because of this self-interest which was displayed by Roher, the debtor experienced a complete dissolution when it could have be operated as an ongoing concern and the stakeholders Mendez and Ofer experienced a complete diminishment of their personal wealth to the tune of tens of millions. Roher withheld vital information from this Court which allowed this Court to believe that it had an authorized petition filed before it and counsel representing 942 Penn did not disclose this material fact to the Court, causing this court to divest tens of millions of dollars of real property

through improper determinations and judicial sales. The lack of authorization here is fatal to this Court's jurisdiction and it's a miscarriage of justice for the Court to have continued the matter once this lack of authority was presented to it.

Lack Of Corporate Authority

It has long been understood that "[c]ertain implied powers must necessarily result in our Courts of justice from the nature of their institution," powers "which cannot be dispensed with in a Court, because they are necessary to the exercise of all others." *United States v. Hudson*, 7 Cranch 32, 34, 3 L.Ed. 259 (1812); see also *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1980) (citing *Hudson*). For this reason, "Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." *Anderson v. Dunn*, 6 Wheat. 204, 227, 5 L.Ed. 242 (1821); see also *Ex parte Robinson*, 19 Wall. 505, 510, 22 L.Ed. 205 (1874). These powers are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R. Co.*, 370 U.S. 626, 630–631, 82 S.Ct. 1386, 1388–1389, 8 L.Ed.2d 734 (1962).

The filing of a bankruptcy petition commences a "case" under the Bankruptcy Code and establishes subject matter jurisdiction for the court, pursuant to 28 U.S.C. § 1334. See *Walker v. Cadle Co. (In re Walker)*, 51 F.3d 562, 568 (5th Cir. 1995) (explaining that the power to hear a "case under title 11" is the power to hear the "bankruptcy petition, itself") (citing *Wood v. Wood (In re Wood)*, 825 F.2d 90, 92 (5th Cir. 1987)). However, a bankruptcy petition filed without proper corporate authority must be dismissed because if

the Debtor did not have ***sufficient corporate authority*** for the filing of its petition, then this Court lacks subject matter jurisdiction over the case. *Price v. Gurney*, 324 U.S. 100, 106, 65 S.Ct. 513, 89 L.Ed. 776 (1945). The Fifth Circuit acknowledged that a bankruptcy court lacks subject matter jurisdiction over a bankruptcy petition filed without the required corporate authority. *Treen v. Orrill, Cordell, & Beary, LLC (In re Delta Starr Broad., LLC)*, 422 Fed.Appx. 362, 368 (5th Cir.2011)("Any suit lacking subject matter jurisdiction must be dismissed regardless of how long a case has been pending.")(citing *Temple Drilling Co. v. La. Ins. Guar. Ass'n.*, 946 F.2d 390 (5th Cir.1991)).

"State law ... determines who has the authority to file a voluntary petition on behalf of the corporation." *Franchise Servs. of Am., Inc. v. United States Trustee (In re Franchise Servs. of Am., Inc.)*, 891 F.3d 198, 206 (5th Cir. 2018) (citing *Price v. Gurney*, 324 U.S. 100, 106–07 (1945); *In re Nica Holdings, Inc.*, 810 F.3d 781, 789 (11 Cir. 2015)). In Franchise Services, the Fifth Court stated:

> "If the petitioners lack authorization under state law, the bankruptcy court has no alternative but to dismiss the petition. It is not enough that those who seek to speak for the corporation may have the right to obtain that authority. Rather, they must have it at the time of filing. Absent a duly authorized petition, the bankruptcy court has no power to shift the management of a corporation from one group to another, to settle intracorporate disputes, and to adjust intracorporate claims. 891 F.3d at 206–07 (quoting *Price*, 324 U.S. at 106–07) (internal quotations omitted)."

The Fifth Circuit's opinion in *Carver v. Atwood* stated that "dismissal is mandatory when a court discovers that it lacks subject-matter jurisdiction." 18 F.4th 494, 497 (5th Cir. 2021) (citing Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."); *Ex parte McCardle*, 74 U.S. 506,

514 (1869) ("Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."). The time-of-filing rule—that subject matter jurisdiction is determined when a federal court's jurisdiction is first invoked—is "hornbook law." *Double Eagle Energy Serv., L.L.C. v. MarkWest Utica EMG, L.L.C.*, 936 F.3d 260, 263 n.1 (5th Cir. 2019) (citing *Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 570 (2004) ("It has long been the case that 'the jurisdiction of the court depends upon the state of things at the time of the action brought.' ") (quoting *Mollan v. Torrance*, 22 U.S. 537, 539 (1824))). "Although courts have not often considered the time-of-filing rule for cases related to bankruptcy, it applies to bankruptcy jurisdiction no less than it applies to diversity or federal question jurisdiction." *Id.* (citing *In re Canion*, 196 F.3d 579, 586 n.29 (5th Cir. 1999)).

Here, the most concerning component of this matter that is disturbing is Mendez's lack of authorization granted to allow the filing of the original petition of bankruptcy. Roher knew he did not have Mendez's authorization as the other 50% member of DRO 15R, LLC to proceed with the filing of the bankruptcy. When Mendez came before the court and made the argument that the entire action was not authorized, and filed without his own authorization, Roher, knowing this fact, failed to acknowledge this to the Court. When all the parties heard this position from Mendez, instead of stopping the action were it lay, the parties proceeded forward, without jurisdiction over the case, against the wishes of Mendez. It is clear that "a party cannot subject an entity to bankruptcy without authority." *In re FKF Madison Park Grp. Owner, LLC*, No. 10-11867 (KG), 2011 Bankr. LEXIS 344, 2011 WL 350306, at *3 (Bankr. D. Del. Jan. 31, 2011) (citing *Price v. Gurney*, 324 U.S. 100, 105-07, 65 S. Ct. 513, 89 L. Ed. 776 (1945)); *In re S & R Grandview, LLC*, No. 13-

03098-8-RDD, 2013 Bankr. LEXIS 4182, 2013 WL 5525729, at *1 (Bankr. E.D.N.C. Oct. 4, 2013) ("A bankruptcy court cannot establish jurisdiction over a petitioning entity where the individual instituting the proceeding lacks authority under state law or the corporate governing documents.").

If a complaint in a federal court is not authorized by the members, the court may not have jurisdiction, especially if the members are necessary parties to the case, and the lack of authorization could be a jurisdictional defect. "The authority to file a bankruptcy petition on behalf of a corporation must derive from state corporate governance law." *In re Gen–Air Plumbing & Remodeling, Inc.*, 208 B.R. 426, 430 (Bankr.N.D.Ill.1997). It is well-settled that objections to subject matter jurisdiction may be made at any time, and may even be raised and decided by the Court on its own motion if the parties overlook or elect not to press such an objection. *Henderson v. Shinseki*, 562 U.S. 428, 434–35, 131 S.Ct. 1197, 179 L.Ed.2d 159 (2011). If the Court finds that the purported individual who signed the petition did not have sufficient corporate authority to file the Debtor's petition, then the Court lacks subject matter jurisdiction over this bankruptcy case and has no alternative but to dismiss it. See *id.*

Section 605.04073 of the Florida Statutes provides "[e]xcept as otherwise provided in this chapter, the affirmative vote or consent of a majority-in-interest of the members is required to undertake an act...***outside the ordinary course of the company's activities and affairs***, including a transaction under ss. 605.1001-605.1072" for both member-managed and manager-managed limited liability companies. Fla. Stat. § 605.04073(1)(c), (2)(d) (2018). The decision to file bankruptcy is an act outside of the ordinary course of any business, See *In re Zaragosa Properties, Inc.* 156 B.R. 310, 313 (Bankr. M.D. Fla.

1993)("Certainly, filing a Petition for Relief under Title 11 is not the ordinary course of anyone's business."), and is more than a mere, everyday business decision. See *In re Bel-Aire Investments*, Inc., 97 B.R. 88, 89 (Bankr. M.D. Fla. 1989). In *Bel-Aire*, one of the corporation's two directors filed a voluntary petition without the consent of the other director. The court held that "[t]here is no question that the authority to manage the affairs of the corporation does not include the right to file a petition for relief under any of the operating chapters of the Bankruptcy Code." *Id.* at 89-90. Under Florida law the Debtor, a Member Managed LLC, must get the consent of the requisite majority of members to take the outside of ordinary course action of filing a Chapter 11 case.

Federal Circuit Split

This discussion cannot be had without addressing the current state of the law and the split in the circuits which exist on the aspect of the whether subsequent conduct o may ratify the initial lack of corporate authority into proper authority thus giving the court jurisdiction over the matter and whether such an issue would constitute a lack of subject matter jurisdiction.

Courts in support retaining jurisdiction when there is a lack of corporate authority argue that *Hager v. Gibson*, 108 F.3d 35 (4th Cir. 1997) supports the position. In *Hager*, a two-owner corporation was put into bankruptcy by one of the corporate owners, who had a fifty percent interest. *Id.* at 38. Twenty months later, the corporate owner who did not consent to the filing argued that the bankruptcy court lacked authority over the case because both members did not consent to the bankruptcy filing and that the case should be dismissed. *Id.* The bankruptcy court disagreed, finding that the doctrine of laches applied and that it was too late to raise a jurisdictional argument. *Id.* The district court

disagreed with the bankruptcy court, noting that laches did not apply because the subject matter jurisdiction could be raised at any time. *Id.* Nonetheless, the district court found that Virginia state law allowed for ratification of the owner's authority to file the petition. *Id.* On appeal to the Fourth Circuit, the court had to consider whether *Price v. Gurney* precluded ratification because *Price* held that a petition filed without the requisite authority gives a bankruptcy court no power over the petition. *Id.* The Fourth Circuit noted that *Price* did not address whether the required authorization under local law could be acquired through ratification. *Id.* at 39. The Fourth Circuit found that:

> "[U]nder Virginia law, the unauthorized filing of a voluntary petition in bankruptcy in behalf of a corporation might be ratified in appropriate circumstances by ensuing conduct of persons with power to have authorized it originally. Under such circumstances, it could therefore serve as the local law source of the authority required by *Price v. Gurney* for a voluntary bankruptcy filing in behalf of a corporation.

*Id.* at 40 (footnote omitted).

The Fourth Circuit reasoned that a "jurisdiction-by-consent contention simply misconceives the basis of the rule that subject matter jurisdiction cannot be so created. That rule is concerned with litigation conduct aimed at, or urged as having created, subject matter jurisdiction that does not as an objective matter exist." *Id.* at 41. The Fourth Circuit then stated:

> "Ratification conduct is not of this sort, but involves extra-judicial primary conduct by parties that does not purport to waive jurisdictional requirements nor to forego objection to their absence as incidents of a litigation process in which they may then or later be involved. Though its substantive effect may be, as in this case, the supplying by relation-back of a necessary jurisdictional fact, the result is a court then proceeding with an objectively grounded jurisdiction rather

> than—as the no-jurisdiction-by-consent rule is intended to prevent—without it."

*Hager*, 108 F.3d at 41.

Apparently, *Hager* placed little emphasis on subject matter jurisdiction being determined at the time of filing. In fact, *Hager* was critical of the time-of-filing rule for subject matter jurisdiction and noted that "this rule is not one of statutory or constitutional limitation upon the jurisdiction of federal courts but, exists simply as "one of federal interstitial common law, judicially created, grounded in policy and necessity—the necessity to have a generally applicable and easily administered rule." *Id.* (internal quotations omitted). Moreover, the Fourth Circuit found that [t]he relation-back principle, though a legal fiction, is a well-established substantive one having wide application. *Id.* (citations omitted). The Fourth Circuit concluded that "jurisdiction-as-of-commencement-of-action rule does not prevent that result." *Id.* (citations omitted). As framed by the Fourth Circuit, the ratification of the lack of corporate authority would allow subject matter jurisdiction to exist at a later stage, albeit not at inception and is supported by other Circuits. See *In re Martin–Trigona*, 760 F.2d 1334, 1341 (2d Cir.1985) (holding, on assumption of initial lack of authority to file voluntary petition in behalf of corporation, that corporation and sole stockholder "acquiesced in and ratified" filing by their ensuing participatory conduct); *Boyce v. Chemical Plastics, Inc.*, 175 F.2d 839, 842–44 (8th Cir.1949) (finding unauthorized filing ratified and jurisdiction thereby validated by later board of directors' resolution).

Courts contrary to that position have ruled that a invalid position deprives a court of subject matter jurisdiction. See *Keenihan v. Heritage Press, Inc.*, 19 F.3d 1255, 1259

(8th Cir. 1994) ("In the absence of a valid petition, a bankruptcy court has no basis upon which to dispose of a corporation's assets or resolve its debt status"). They assume the position that ratification cannot solve the issue of infirmity at inception. In a later case, the Fifth Circuit acknowledged that a bankruptcy court lacks subject matter jurisdiction over a bankruptcy petition filed without the required corporate authority. T*reen v. Grrill, Cordell, & Beary, LLC (In re Delta Starr Broad., LLC)*, 422 Fed.Appx. 362, 368 (5th Cir.2011)("Any suit lacking subject matter jurisdiction must be dismissed regardless of how long a case has been pending.")(citing *Temple Drilling Co. v. La. Ins. Guar. Ass'n.*, 946 F.2d 390 (5th Cir.1991)). Although *Delta Starr* is an unpublished Fifth Circuit case, and therefore of limited precedential value, its holding was premised on the United States Supreme Court case, *Price v. Gumey*, 324 U.S. 100, 106, 65 S.Ct. 513, 89 L.Ed. 776 (1945), which is, of course, binding authority. In *Price*, the Supreme Court held that if the trial court "finds that those who purport to act on behalf of the corporation have not been granted authority by local law to institute the proceedings, it has no alternative to dismiss the petition." *Id.* at 106, 65 S.Ct. 513. Standing on those grounds is support under *In re Mid-South Bus. Assocs., LLC*, 555 B.R. 565 (Bankr. N.D. Miss. 2016). *In re Mid-South* explicitly adopted the position advanced by Appellants. "[A] bankruptcy petition filed without proper corporate authority must be dismissed independent of any finding of 'cause' under § 1112(b), because if the Debtor did not have sufficient corporate authority for the filing of its petition, then this Court lacks subject matter jurisdiction over the case." 555 B.R. 565, 570 (citing *Price*, 324 U.S. at 106, 65 S.Ct. 513). The bankruptcy court for the Northern District of Mississippi concluded its analysis as follows,

> "Because Dr. Windham filed the Debtor's bankruptcy petition without sufficient corporate authority under the Operating

> Agreement and applicable Mississippi law, the Court lacks subject matter jurisdiction over this bankruptcy and has no alternative but to dismiss this case."

The *In re Mid-South* court explicitly read *Price* to prescribe a rule that governs the subject matter jurisdiction of bankruptcy courts. It is well-settled that objections to subject matter jurisdiction may be made at any time, and may even be raised and decided by the Court on its own motion if the parties overlook or elect not to press such an objection. *Henderson v. Shinseki,* 562 U.S. 428, 434–35, 131 S.Ct. 1197, 179 L.Ed.2d 159 (2011). Any suit lacking subject matter jurisdiction must be dismissed regardless of how long a case has been pending. *Temple Drilling Co. v. La. Ins. Guar. Ass'n,* 946 F.2d 390 (5th Cir.1991). This Court should read *Price* to address subject matter jurisdiction and this matter should be dismissed for a lack of it.

<u>Fraudulent Inclusion Of Equitable Interest</u>

As stated earlier, Ofer maintained an equitable interest in the Property by virtue of providing his personal funds for the purchase of the Property directly without any intent to designate those funds as anything other than direct investment for himself. Since 2018, Ofer has asserted that the proceeds that he used to purchase the Property were his own funds and *<u>were not intended</u>* to be comingled with the debtor's assets and become debtor property by way of contribution or any other manner of allocation in which Ofer's private funds would be applied or attributable to the debtor or the capital account of Ofer or Mendez with the debtor. His intention he has always maintained to have his personal funds and investments separate. In this regard, Ofer maintained an equitable interest in the property directly. This interest was not property of the estate as defined in 11 U.S.C. §541.

The creditors and other parties to this proceeding all knew of and acknowledged the fact the Ofer took his personal funds to purchase the property and invest nearly $8 Million more renovating the Property into an operational hotel. The sheer fact that Ofer purchased the Property created the equitable interest when he took no affirmative action to designate the personal funds invested as capital contributions to the debtor. The creditors, including judgement creditors claiming against the equity surplus of the estate were aware of the equitable interest by Ofer's repeated claims, yet did nothing to refrain from injuring that equitable interest. Instead, the creditor's proceeded to submit documents to the Court, in the form of motions and pleadings, to obliterate the interest in the Property and obtain the Property and the resulting equity surplus after the Property was sold. §541(d) of the Bankruptcy Code is relevant to the findings here. It reads "Property in which the debtor holds, as of the commencement of the case, ***only legal title and not an equitable interest***, such as a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection (a)(1) or (2) of this section ***only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold."*** Ofer's pre-petition equitable interest is not a component of the estate and this Court had no jurisdiction to adjudicate the equitable interest and order the sale of those interests when it confirmed the Chapter 11 Plan and sold the Property when the interest is not an asset of the estate.

Fraudulent Misrepresentation Used To Collect Equity Surplus

Fraud was perpetrated on this Court through improper collection activities by Judgement Creditors Casa and Drexel and their counsel using misrepresentation to the Court that Ofer has expressly intended for Mendez to repay him the $8 million from Ofer's personal assets, implying that those funds are capital contributions to the Debtor, in clear contradiction to the Plan Administrator's finding that Ofer and Mendez are entitled to equal distributions and the use of final judgments which are effectively stayed under Florida law pursuant to Fla. R. Civ. P. 1.550 as to execution[5]. The improper collection activities here are tantamount to bankruptcy crimes.

Casa Financial Holdings LLC ("Casa") and Drexel Financial LLC ("Drexel"), alleged judgment creditors to the Equity Stakeholders Raziel Ofer and Robert Mendez who are both the equal stakeholders in the Debtor, filed its motion to compel the Plan Administrator to make a final distribution of estate surplus to them. Casa and Drexel claim the sums which is being held by the Plan Administrator is $750,000.00, which Casa and Drexel both claim that they are due, as judgment creditors, under various charging orders issued in the Florida State Circuit Court in actions to which either Mendez or Ofer are parties. In their joint motion, the judgment creditors claim that "At the time the Interim Distribution

[5] Accordingly, the purported judgments and subsequent execution writs and charging orders cannot simply be treated as ***presently enforceable*** execution instruments without first determining their status under applicable Florida law and the effect of the pending rehearing proceedings on that ability to execute. Omitting or materially obscuring the existence and legal effect of a pending motion for rehearing may materially affect the Court's determination concerning the enforceability, finality, or collectability of the asserted judgment. Such conduct may constitute sanctionable litigation misconduct and may warrant further investigation where certain conduct involving a scheme or artifice to defraud where, for purposes of executing or concealing that scheme, a person files a document in a bankruptcy proceeding or makes a false or fraudulent representation, claim, or promise concerning a bankruptcy proceeding. Federal Rule of Bankruptcy Procedure 9011 requires that representations made to the Court have ***an appropriate evidentiary and legal basis*** and authorizes sanctions where the rule is violated, subject to the procedural requirements of the rule.

Motion was filed, the following charging orders were asserted by the following creditors ("Charging Order Parties") against Mendez and Ofer's equity interests:

| CREDITOR | DEBTOR | CASE NO. | PRINCIPAL AMOUNT | JUDGMENT DATE | CHARGING ORDER DATE |
|---|---|---|---|---|---|
| | | | | | |
| Casa Financial | Mendez | 2021-013852 | $ 162,491.00 | 10/18/2021 | 4/20/2023 |
| Zodiac Capital | Mendez | 2020-002845 | $ 12,850.00 | 1/27/2023 | 5/15/2023 |
| AJAR Holdings | Mendez | 2021-014716 | $ 123,752.93 | 8/21/2023 | 8/21/2023 |
| | | | | | |
| Drexel Financial[2] | Ofer | 2022-003487 | $ 982,100.00 | 3/21/2023 | 5/19/2023 |
| Roniel Rodriguez | Ofer | 2021-019531 | $ 15,000.00 | 2/22/2023 | 6/13/2023 |
| Roniel Rodriguez | Ofer | 2019-009489 | $ 39,765.00 | 12/22/2023 | 6/13/2023 |

Previously, on June 21, 2024, the Court entered an Order granting in part the Interim Distribution Motion (ECF No. 1548), which authorized and directed the Plan Administrator to commence an interpleader action against Ofer, Mendez, and the creditors who held the specific charging orders and interplead part of the equity surplus in the amount of $800,000 as an interim distribution. The interpleader action ultimately resulted in an Order Granting the $800,000.00 interim distribution. Under the Final Judgment of the interpleader action, the Plan Administrator disbursed to the creditors on January 21, 2026. (ECF No. 1704) as follows:

| CREDITOR | DEBTOR | CASE NO. | PRINCIPAL AMOUNT | JUDGMENT DATE | CHARGING ORDER DATE | Interest through 1/20/2026 | Total Amount to Be Disbursed |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| Casa Financial | Mendez | 2021-013852 | $162,491.00 | 10/18/21 | 4/20/23 | $50,685.46 | $213,176.46 |
| Zodiac Capital | Mendez | 2020-002845 | $12,850.00 | 1/27/23 | 5/15/23 | $3,280.29 | $16,130.29 |
| AJAR Holdings | Mendez | 2021-014716 | $123,752.93 | 8/21/23 | 8/21/23 | $27,033.51 | $150,786.44 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Drexel Financial | Ofer | 2022-003487 | $2,303,046.76 | 5/13/23 | 10/15/24 | $518,231.00 | $105,546.00 |
| Drexel Financial | Ofer | 2022-003487 | $982,100.00 | 3/21/23 | 5/19/23 | $228,462.00 | $228,462.00 |
| Roniel | Ofer | 2021-019531 | $15,000.00 | 2/22/23 | 6/13/23 | $3,554.00 | $18,554.00 |
| Roniel | Ofer | 2019-009489 | $39,765.00 | 12/22/23 | 6/13/23 | $7,583.00 | $47,438.00 |
| Roberto Méndez | Equity | | | | | | $19.906.81 |
| | | Total Disbursement | | | | | **$800,000.00** |

In their Joint Motion, the Judgment Creditors claim that "[a]fter giving effect to the interim distribution, Drexel continues to hold unsatisfied judgments against Ofer of (a) $982,1000, and (b) $2,303,046.76, plus $412,685 in accrued interest, which have continued to accrue interest since January 20, 2026." On April 8, 2026, Drexel obtained a Final Order on Notice to Appear as to Robert Mendez in *Drexel Financial, LLC v. DRO 15R LLC, et al.*, Case No. 2022-003487-CA-01, imposing a charging order in favor of Drexel against any distribution payable to Mendez from 942 Penn. Drexel there alleged that "Ofer's sworn declaration as to his capital contributions to 942 Penn, any distribution to Mendez must be offset by excess capital contributions by Ofer, and any distribution to Mendez is owed to Ofer."

The Judgement Creditors have proposed that the distributions be issued as follows under the various charging orders:

| CREDITOR | DEBTOR | CASE NO. | PRINCIPAL AMOUNT | JUDGMENT DATE | CHARGING ORDER DATE |
|---|---|---|---|---|---|
| Drexel Financial | Ofer | 2022-003487 | $2,305,046.76 | 05/13/23 | 10/15/24 |
| Drexel Financial | Ofer | 2022-003487 | $982,100.00 | 03/21/23 | 05/19/23 |
| | | | | | |
| Drexel Financial | Mendez | 2022-003487 | $2,305,046.76 | 05/13/23 | 04/08/26 |
| Casa Financial | Mendez | 2021-013852 | $113,076.50 | 01/28/26 | 05/06/26 |

The charging orders presented in the Joint Motion as re based primarily on two judgements obtained against Ofer in *Drexel Financial, LLC v. DRO 15R LLC, et al.*, Case No. 2022-003487-CA-01 both of which are subject to Fla. R. Civ. P. 1.530 timely and authorized motions for rehearing which have the effect of suspending execution under Fla. R. Civ. P. 1.550 until such time those motions are adjudicated. Further, Drexel and Casa, and their counsel, who is known to use dubious collection efforts to commit fraud upon the Court to obtain judgment debtor assets in federal and state courts through misrepresentation and other methods of corruption and improper collections[6].

Here Casa and Drexel have raised a claim, for the first time anywhere, that suggested that the Plan Administrator accounted for the $8 million in personal funds given by Ofer to complete renovations as capital contributions, but Ofer never expressed that intent which is required for those funds to be treated as such. According to Drexel and Casa, there are two charging orders relative to Mendez, (i) the Drexel charging order which purports to charge $2,305,046.76 against the membership interests of Mendez, and (ii) the Casa charging order which purports to charge $113,076.50 to the equity surplus remaining of Mendez's interests. The Judgment Creditors claim that any surplus due to Mendez must first be paid to Ofer under the allocation of capital accounts as allocated under Section 8.2(a) of the Debtor's Operating Agreement. Based on this allocation, the creditor Drexel claims that a sworn declaration made by Ofer claims Ofer stated that he

[6] In another matter, Roniel Rodriguez IV (ROIV) was petitioned for sanctions for similar improper collection activities more pronounced than what was sought here. In that case, after receiving a full payment under a judgment into his trust account and clearing the funds, ROIV turned around and moved to collect assets of a judgment debtor improperly by judicial fiat nearly getting away with a $37 million heist from a prominent South Florida Bank. ***See Exhibit A.***

invested $8 million in the building. See (ECF No. 172). Both the Operating Agreement and Sworn declaration are records of this matter.

Here, Ofer's statement, as used by Drexel and its counsel, do not justify that the capital accounts, thus the equity surplus, should be divided in any other manner other than equally. It is a clear misrepresentation to the Court[7] and would be fraud if the Court relies upon it. On this isolated statement which does not mention any type of intention of treating the $8 million as a capital contribution or that Ofer required any reimbursement from Mendez for those funds through capital account adjustment, or any adjustment for that matter, Drexel bases its entire entitlement to Mendez's capital account and equity surplus distribution despite the Operating Agreement and Florida State law. In fact, the same statement says that Ofer ***does not need any distributions from the building*** further justifying that there is no intention or expectation of Ofer to receive any capital account adjustments from Mendez or that the proportional ratio of distribution should be anything other than equally. Further, the Plan Administrator has notified this Court that the equity stakeholders are ***equally entitled to distributions of the surplus*** without any adjustments that the Judgment Creditor's suggest. Once it assumed control of the Debtor, the Plan Administrator issued no report, finding, accounting or any other paper which allocated the capital accounts of Mendez and Ofer in any other manner other than equally.

[7] This is not the first time ROIV has used fraudulent misrepresentation to attempt improper collection activities. The Eleventh Circuit recently halted such an attempt midstream when it discovered, after disclosure by Ofer, that ROIV had asserted a claim against certain choses of action where it conspired to dismiss two appeals pending there under a claim which was subject to a valid order containing a injunction against dismissing the actions. After examining the issue, the Eleventh Circuit issued a limited remand back to the trial Court for it to be determined "whether the appellees and RO Liquidation Trust have sufficiently established the factual and legal basis for the acquisition of Raziel Ofer's appellate rights in these appeals" which ROIV allegedly acquired such interests in fraud claims when Florida law specifically does not allow the assignment of a fraud claim which is personal in nature to Ofer.

Fla. Stat. §605.0402 states "A contribution may consist of *tangible or intangible* property or other benefit to a limited liability company, including money, *services performed*, promissory notes, other agreements to contribute money or property, and contracts for services to-be performed." The sworn statement by Ofer says nothing as to any requirement that Ofer was to be paid back prior to Mendez receiving any distribution from the dissolution of the Debtor. Nor does the Operating Agreement, especially at Section 8.2(a), suggest or express any intention that Ofer and Mendez agreed that distributions be in any other manner. Claims of Liens on the property are used to protect and reimburse Ofer for his investments which is a part of this Court's records and have been raised before as claims against the estate for Ofer's direct provision of the $8 Million. The initial interim distribution, which was as a result of the Court's June 24, 2024, order[8], and the current request of Drexel are based on orders which are subject to execution stays under Fla. R. Civ. P. 1.550 where there is a valid, timely and authorized motion pending adjudication pursuant to Fla. R. Civ. P. 1.530. Ofer contends that the May 19, 2023, charging order, issued in the matter *Metropolitan Mortgage Company, LLC v. DRO 15R, LLC, et. al.*, Miami Dade Circuit Court Case No. 2022-003487-CA-01, is ineffectual ***as an execution instrument*** as a matter of law, should not have been entered supporting the claim of Drexel at any point in this matter until the pending motion for rehearing is adjudicated. It may not be executed upon pursuant to Fla. R. Civ. P. 1.550 ("No execution or other final process shall issue......within the time for serving a motion for new trial or

[8] Order (I) Granting In Part Plan Administrator, Barry E. Mukamal's Motion for Authority to Make Interim Distribution to Class 3 Equity Interests and/or Holders of Charging Orders Against Class 3 Equity Interests, and for Other Related Relief, Including Exculpation of Plan Administrator and His Professionals and Injunctive Relief in Connection with Same; and (II) Directing Plan Administrator to File Interpleader Complaint and Deposit Interim Distribution Funds into Registry of the Clerk of the Circuit Court of the Eleventh Judicial Circuit in and For Miami-Dade County Florida [ECF No. 1548].

rehearing, and if a motion for new trial or rehearing is timely served, until it is determined"). Execution is stayed pending a timely motion for rehearing but only until that motion is determined.

A timely filed motion for rehearing was entered in *Drexel* Case on April 5, 2023, pursuant to Fla. R. Civ. P. 1.530 ("A motion for new trial or for rehearing must be served not later than 15 days after the return of the verdict in a jury action or the date of filing of the judgment in a non-jury action") and was amended on June 11, 2024. Fla. R. Civ. P 1.550(a) is core to the ability of this Court to enforce the Drexel Financial charging order. As previously stated, there is a motion for rehearing that is pending as to the March 21, 2023, order against Ofer which underlying order on which the charging order issued on May 19, 2023, is based. Accordingly, the charging order of May 19, 2023, is ineffectual in law as its ability to be executed based on the facts of the case. Clearly, the conduct here is egregious because the attempt to enforce final judgments when they are subject to a execution stay pending adjudication of timely and authorized filings for rehearing and presenting them to this Court as valid exercises of authority to extract the Equity Surplus is fraud on this Court.

Notice Of Bankruptcy Crimes

Pursuant to 18 U.S.C. § 3057(a), which mandates that any judge, receiver, or trustee having reasonable grounds for believing that any violation of the bankruptcy laws or other federal laws has been committed the Court is mandated to report all the facts and circumstances of the case to the appropriate United States Attorney. The judgment creditors utilized noneffectual judgments subject to a execution stay in an explicit attempt to fraudulently siphon and collect remaining cash funds currently held within the custody

of this bankruptcy estate, a direct violation of 18 U.S.C. §152 (Concealment of assets, false oaths and claims, bribery) and 18 U.S.C. §157 (Bankruptcy Fraud).

The federal courts have "inherent power" to order appropriate equitable relief to remedy fraud on the court. See *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991); *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 248-51, 64 S.Ct. 997, 88 L.Ed. 1250 (1944); *Demjanjuk v. Petrovsky*, 10 F.3d 338, 352, 356 (6th Cir. 1993). Bankruptcy courts have such inherent power. See, e.g., *Levander v. Prober (In re Levander)*, 180 F.3d 1114, 1119 (9th Cir. 1999). Bankruptcy courts also have statutory power to remedy a fraud on the court, under various sections of the Bankruptcy Code. They have this power generally under 11 U.S.C. §105(a), which permits the bankruptcy court to "issue any order ... that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code, and to take "any action ... necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." See generally *In re Gorges*, 590 B.R. 771, 791-94 (Bankr. E.D. Mich. 2018). And bankruptcy courts have this power in specific situations, such as under 11 U.S.C. §1144, which permits the bankruptcy court to revoke a confirmation order in a Chapter 11 case if it "was procured by fraud." See *Tenn-Fla Partners v. First Union Nat'l Bank of Fla. (In re Tenn-Fla Partners)*, 226 F.3d 746, 751 (6th Cir. 2000) (affirming the revocation of a confirmation order under § 1144 because of fraud on the court).

The power to remedy fraud on the court "is necessary to the integrity of the courts, for 'tampering with the administration of justice ... involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public.' " *Chambers*, 501 U.S. at 44, 111 S.Ct. 2123 (quoting *Hazel-Atlas Glass*, 322 U.S.

at 246, 64 S.Ct. 997). The courts are "institutions in which fraud cannot complacently be tolerated consistently with the good order of society." *Hazel-Atlas Glass*, 322 U.S. at 246, 64 S.Ct. 997. The Court has significant discretion in determining, in each case, what remedies should be imposed for a fraud on the court. *United States v. Schilling (In re Big Rivers Elec. Corp.)*, 355 F.3d 415, 436 (6th Cir. 2004) (citation omitted) (a bankruptcy court " 'is given a great deal of latitude in fashioning an appropriate sanction' "); see also *Chambers*, 501 U.S. at 44-45, 111 S.Ct. 2123 (courts have "discretion ... to fashion an appropriate sanction for conduct which abuses the judicial process"); *Hazel-Atlas Glass*, 322 U.S. at 248, 64 S.Ct. 997 (courts have "flexibility" to "accord all the relief necessary to correct the particular injustices involved"). But, as the cases have repeatedly held, such discretion must be exercised "with restraint." See *Chambers*, 501 U.S. at 44, 111 S.Ct. 2123 (citation omitted) ("Because of their very potency, inherent powers must be exercised with restraint and discretion"); *Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co.*, 771 F.2d 5, 12 (1st Cir. 1985) (citation omitted) (inherent powers "must be exercised with restraint and discretion"); *Levander*, 180 F.3d at 1119 (same).

Permissible remedies for fraud on the court include, but are not necessarily limited to vacating order(s) or judgment(s) obtained by fraud on the court. E.g., *Chambers*, 501 U.S. at 44, 111 S.Ct. 2123; *Hazel-Atlas Glass*, 322 U.S. at 247-48, 251, 64 S.Ct. 997; *Demjanjuk*, 10 F.3d at 356; *Lavander*, 180 F.3d at 1118-1119 ("When a court vacates a judgment obtained by fraud, it not only rids itself of the defilement caused by the fraud, but also restores balance and fairness between the parties by removing the benefit gained by the party that committed the fraud."), and requiring the offender to pay attorney fees incurred by an opposing party because of the fraud on the court. See *Chambers*, 501

Respectfully,

/s/ Raziel Ofer
Raz Ofer
3206 NE 2nd Ave, #1093
Miami, FL 33137
Raz.ofer2@gmail.com

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this ______day of October 2026, a true and correct copy of the foregoing was served by email on all parties listed below.

Respectfully,

/s/ Raziel Ofer
Raz Ofer
3206 NE 2nd Ave, #1093
Miami, FL 33137
Raz.ofer2@gmail.com

Scott Neil Brown
Bast Amron LLP
Suntrust International Center
1 S.E. 3rd Avenue - #1440
Miami, FL 33131
305-379-7904
Fax: 305-379-7905
Email: sbrown@bastamron.com

## VERIFICATION OF FACTS

I HEREBY CERTIFY that the statements of facts that are preceding are such facts which are true, correct and complete and are known to me through firsthand knowledge and experiences. The information and facts stated herein are correct in their veracity and are made under the penalty of perjury.

Respectfully,

/s/ Raziel Ofer
Raz Ofer
3206 NE 2nd Ave, #1093
Miami, FL 33137
Raz.ofer2@gmail.com

STATE/PROVIDENCE OF Florida

COUNTY/PARISH OF Broward

The above named person appeared before me and affixed his signature or mark, sworn to (or affirmed) and subscribed before me this 14th day of October, 20 26, by Raziel Ofer (Name of Person Making Statement).

(Seal)

Notarial Act performed by Audio-Video Communication.

David Merkatz
Signature of Notary Public

David Merkatz
Print, Type or Stamp Name of Notary

Personally Known: ____
OR Produced Identification: X
Type of Identification Produced: Passport

U.S. BANKRUPTCY COURT SOUTHERN DISTRICT OF FLORIDA MIAMI DIVISION
FILED OCT 19 2026 RECEIVED

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:

942 PENN RR, LLC,

Debtor.
_____________________________/

BK Case No. 22-14038-LMI

Chapter 11

EQUITY STAKEHOLDER RAZ OFER'S RESPONSE TO PLAN ADMINISTRATOR, BARRY E. MUKAMAL'S MOTION FOR ENTRY OF ORDER AMENDING ORDER SETTING FURTHER FILING DEADLINES ON MOTION TO COMPEL [ECF NO. 1724]

Movant, Raz Ofer ("Ofer", "Defendant" or "Movant"), self-represented, enters his response to the Plan Administrator, Barry E. Mukamal's Motion For Entry Of Order Amending Order Setting Further Filing Deadlines On Motion To Compel which is being ultimately filed in response to Ofer's objection to the Plan Administrator's proposed order admittingly drafted by the Judgement Creditors on behalf of the Plan Administrator to issue as the final order of distribution for the alleged remaining sums being held by the Plan Administrator in the amount of $750,000.00 (ECF No. 1720). The Plan Administrator's motion seeks to compel the judgment creditors to respond to Ofer's objection. Ofer objects to the Plan Administrator's motion as follows:

INTRODUCTION

By way of introduction, Ofer states:

1. The alleged creditors—specifically, a syndicate led by Roniel Rodriguez IV ("ROIV") and his long-term associate, Stuart Kalb ("Kalb")—have perpetrated a fraud upon this Court by knowingly misrepresenting a non-

final order as an enforceable final judgment. By deliberately portraying an interlocutory determination as a final, non-appealable adjudication to secure judicial remedies, these parties have effectively introduced a fraudulent instrument into the record. Furthermore, this unauthorized enforcement activity constitutes a direct violation of the Court's operative injunction explicitly prohibiting collection activities. Such conduct transcends mere aggressive advocacy, constituting a willful deception that subverts the integrity of the judicial process.

2. Crucially, these illicit collection efforts were executed with the explicit knowledge and consent of the Chapter 11 Trustee and his counsel, Mr. Brown, under the auspices of former Bankruptcy Judge Laurel M. Isicoff., who inexplicably recused herself without a pending motion for recusal. As detailed extensively in the pending motions to vacate filed in the *942 Penn RR, LLC* and *Derexel* proceedings, the Trustee, his counsel, and former Judge Isicoff acted entirely absent personal and subject-matter jurisdiction. Because a total absence of jurisdiction strips judicial officers and court-appointed fiduciaries of absolute immunity, these parties face direct personal liability, subjecting them to independent civil actions across any appropriate sovereign jurisdiction. A rigorous review of the specific arguments within those motions to vacate reveals a clear procedural inside awareness, reflecting former Judge Isicoff's current efforts to insulate herself from impending civil liability and scrutiny. The

advanced jurisdictional arguments articulated in those filings directly rely upon and incorporate the structural insights provided by former Judge Isicoff's active assistance.

3. **Consequently, Bankruptcy Judge Robert A. Mark has become directly implicated in these extrajudicial actions, which were executed entirely absent personal and subject-matter jurisdiction.** Because a court's total lack of jurisdiction violates fundamental constitutional protections and strips a judicial officer of absolute judicial immunity, Judge Mark faces direct personal liability for these unauthorized proceedings. By entering orders in a matter completely devoid of statutory authority, his actions transcend protected judicial error and constitute an actionable, unconstitutional overreach.

4. The Plan Administrator seeks an "entry of an order amending this Court's August 6, 2026 Order Setting Further Filing Deadlines on Motion to Compel to: (a) direct Casa Financial Holdings LLC ("Casa") and Drexel Financial LLC ("Drexel,") to file a response to Ofer's Objection to Proposed Order and set a deadline for them to do so, and (b) excuse the Plan Administrator from filing a response to the Objection simply because the Plan Administrator "is merely a custodian of the surplus funds pending this Court's order on how they should be distributed and to whom."

5. After the Judgment Creditors filed their Motion to Compel Plan Administrator to Make Final Distributions on June 18, 2026, this Court

entered its Order Setting Objection Deadline and Response Deadline on Motion to Compel on June 25, 2026.

6. Ofer entered his objection within the time limit asserted by the Court's order objecting to the proposed order on the grounds that the order asserts a contrary position to the Plan Administrator's previous position which the Plan Administrator asserted that the equity stakeholders were entitled to equal distributions from the surplus that it holds. This is a position that has been asserted since the interim distribution in Jan. 2026.

7. There was also an objection to the proposed order on the grounds that the Order sought to attribute $8 million in renovation dollars which Ofer paid from his own pocket impermissibly as contributions to the debtor to make an end run around allocations between Ofer and Mendez to grab distributions to Mendez as owing to Ofer under a strained interpretation of a reading from a statement made by Ofer supposedly admitting to being owed funds from Mendez.

8. In its joint motion to compel, Drexel alleged that "Ofer's sworn declaration as to his capital contributions to 942 Penn, any distribution to Mendez must be offset by excess capital contributions by Ofer, and any distribution to Mendez is owed to Ofer."

9. The Plan Administrator has alleged that it has "collaborated" with the creditors on the proposed order for the final distribution which is now before the Court for issuance in which the proposed "collaborated" order.

10. Specifically, in the Plan Administrator's motion, it expressly states,

> "While the Court directed the Plan Administrator to prepare and file a proposed order granting the Motion to Compel,

> because the Plan Administrator is not familiar with the underlying arguments regarding the charging orders and the dispute over the surplus funds, ***<u>and believes it inappropriate that he advocate for one party over another</u>***, ........the Plan Administrator believed that Charging Order Parties' counsel was in a better position to draft a proposed unopposed order granting its own Motion to Compel."

11. First, it must be duly noted that the Plan Administrator's comment that the order which was drafted was not a "unopposed" order which the Plan Administrator claims. Clearly the Plan Administrator's instant motion contradicts this statement in asking the judgment creditor to prepare a response to Ofer's objection to the proposed order.

12. The next issue is that the Plan Administrator's statement that it be neutral to the distributions and not to advocate any parties position over the other is inconsistent with its previous position asserted that Ofer and Mendez were entitled to equal distributions of the surplus.

13. Although asserting this position, the Plan Administrator advocates the judgment creditor's position by asking the judgment creditor to ***<u>prepare a proposed order</u>*** which goes way beyond seeking the disbursement allocation of the equity surplus.

14. The Plan Administrator asserted a position in response to the judgment creditor's motion to compel which is neutral by stating that "The Plan Administrator does not object to the relief sought in the Motion ***<u>to the extent that it seeks a determination by this Court</u>*** as to whether the remaining funds being held by the Plan Administrator, in the approximate amount of $745,000, should be paid to (i) the Charging Order Parties, or (ii) the Class 3 Equity

Interests (Ofer & Mendez), <u>*nor does the Plan Administrator object, in principle, to making final distributions to whichever party this Court deems the appropriate recipient of such funds*</u>"

15. A simple reading of the proposed order shows bias to the judgment creditors and clearly advocates the judgment creditors' theories although the Plan Administrator admits that they are unknowledgeable as to the underlying issues.

16. The collaboration without the equity stakeholders in the proposed order alone itself is a sign that the Plan Administrator is neutral in words alone and not in action. Although seeking collaboration from the judgment creditor, at no point after the filing of the judgment creditor's final motion for distribution did the Plan Administrator seek collaboration or a position on the matter from Ofer[1].

17. As a alternative, the Plan Administrator could also seek to be excused from the drafting of a final proposed order much like it now does in seeking to be excused from responding to Ofer's objection due to it not having any knowledge of the underlying issues asserted by the judgment creditors and that the parties draft their own proposed orders, seeking to remain neutral in this issue.

18. The August 6, 2026, order of the Court expressly orders the Plan Administrator to respond to any objections to the proposed order. The Plan Administrator should not be allowed to skirt its obligation under the order by claiming neutrality.

---

[1] Ofer also believes that the Plan Administrator also did not seek a position from Mendez either.

19. Instead of being placed into a position where it would be forced to assert its neutrality if indeed that is the case, and oppose the judgment creditor, the Plan Administrator seeks to avoid asserting that position again to allow the judgment creditor's position to underline the final distribution order.

20. Ofer has stated that the theory of allocating the improvements which Ofer has spent from his own pocket as contributions to the debtor in order for the judgment creditor to assert a misrepresentation to the Court about what the record of this action clearly states should not be allowed.

21. On April 8, 2026, Drexel obtained a Final Order on Notice to Appear as to Robert Mendez in the Florida State Circuit Court Action *Drexel Financial, LLC v. DRO 15R LLC, et al.*, Case No. 2022-003487-CA-01, imposing a charging order in favor of Drexel against any distribution payable to Mendez from 942 Penn.

22. Drexel there alleged that "Ofer's sworn declaration as to his capital contributions to 942 Penn, any distribution to Mendez must be offset by excess capital contributions by Ofer, and any distribution to Mendez is owed to Ofer."

23. Under the final judgment for the notice to appear issued in the Florida State Court matter, *Drexel Financial, LLC v. DRO 15R LLC, et al.*, Case No. 2022-003487-CA-01, the claim is that any surplus due to Mendez must first be paid to Ofer under the allocation of capital accounts as allocated under Section 8.2(a) of the Debtor's Operating Agreement.

24. Based on this allocation, the creditor Drexel claims that a sworn declaration made by Ofer claims Ofer stated that he invested $8 million in the building. *See*

***(ECF No. 172)***. Both the Operating Agreement and Sworn declaration are records of this matter. On this isolated statement, Drexel bases its entire entitlement to Mendez's capital account and equity surplus distribution despite the Operating Agreement and Florida State law.

25. In that affidavit being relied upon by the judgement creditors, there the supposed admission reads as follows:

> ***"I've made it clear, I also said it in Court, I don't need any money from the building,*** *I invested around $8M in this building's renovation, let alone purchasing it,* upgrading it from a very dilapidated building, full of drugs, prostitution, violent, etc, the police used to attend this building several times a day, let alone the City. I asked that Robert Mendez is paid a fair salary, he works in the building 7 days a week, 24 hours (he resides in the building), so he checks in guests even in the middle of the night. He was heavily involved and oversaw the massive construction of this building, he knows all electrical, mechanical, plumbing systems better than anyone."

26. The statement is clear on its face. Ofer did not need any funds from the building and he advocated for Mendez to be paid a fair salary. This is not the statement of a person demanding to be paid first prior to any distributions to any other person. It is the opposite.

27. The Plan Administrator has the responsibility for the accounting of the estate and required to account for the contributions to the capital accounts of the Debtor once it assumed control of the Debtor. There is even grounds to assert that It was required to verify the previous allocations if any. The Plan Administrator issued ***no report, finding, accounting or any other paper which allocated the capital accounts of Mendez and Ofer in any other manner other than equally***. There was not finding on record that allocated

contributions as stated in the declaration of Ofer which accounts for $8 million investments.

28. The sworn statement by Ofer says nothing as to any requirement that Ofer was to be paid back prior to Mendez receiving any distribution from the dissolution of the Debtor.

29. Nor does the Operating Agreement, especially at Section 8.2(a), suggest or express any intention that Ofer and Mendez agreed that distributions be in any other manner.

30. Further, Ofer contends that the May 19, 2023, charging order, issued in the matter *Metropolitan Mortgage Company, LLC v. DRO 15R, LLC, et. al.*, Miami Dade Circuit Court Case No. 2022-003487-CA-01, is ineffectual as a matter of law, should not have been entered and may not be executed upon pursuant to Fla. R. Civ. P. 1.550 ("No execution or other final process shall issue……within the time for serving a motion for new trial or rehearing, and if a motion for new trial or rehearing is timely served, until it is determined").

31. Execution is stayed pending a timely motion for rehearing but only until that motion is determined. A timely filed motion for rehearing was entered in Drexel Case on April 5, 2023, pursuant to Fla. R. Civ. P. 1.530.

32. Fla. R. Civ. P 1.550(a) is core to the ability of this Court to enforce the Drexel Financial charging order since the charging order is based upon the May 19, 2023 judgment which is subject to execution under the timely and authorized motion for rehearing.

33. Accordingly, the charging order of May 19, 2023, is ineffectual in law as its ability to be executed based on the facts of the case. Accordingly, the May 19, 2023, order entered is barred from enforcement under Fla. R. Civ. P. 1.550(a) under the stay in that Rule and cannot be used as the basis of a valid claim. Likewise, the Summary Final Judgement on May 19, 2023, and its associated charging order issued Oct. 15, 2024, is also subject to the same per se stay under Fla. R. Civ. P. 1.550.

34. The Plan Administrator is briefed on the issues and positions asserted by Ofer and the Plan Administrator and should not be allowed to avoid it ordered obligation to respond to objections to the proposed order that it "collaborated" on with the judgment creditor, endorsed and filed with this Court.

WHEREFORE, Ofer seeks an entry of a order of the Court denying the relief sought by the Plan Administrator and to compel the Plan Administrator to comply with the Court's August 6, 2026 order and respond to any objections to the proposed order it submitted for final distributions.

[INTENTIONALLY LEFT BLANK]

Respectfully,

/s/ Raziel Ofer

Raz Ofer

3206 NE 2nd Ave, #1093
Miami, FL 33137
Raz.ofer2@gmail.com

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this ______day of October 2026, a true and correct copy of the foregoing was served by email on all parties listed below.

Respectfully,

/s/ Raziel Ofer

Raz Ofer

3206 NE 2nd Ave, #1093
Miami, FL 33137
Raz.ofer2@gmail.com

Scott Neil Brown
Bast Amron LLP
Suntrust International Center
1 S.E. 3rd Avenue - #1440
Miami, FL 33131
305-379-7904
Fax: 305-379-7905
Email: sbrown@bastamron.com

## VERIFICATION OF FACTS

I HEREBY CERTIFY that the statements of facts that are preceding are such facts which are true, correct and complete and are known to me through firsthand knowledge and experiences. The information and facts stated herein are correct in their veracity and are made under the penalty of perjury.

Respectfully,

/s/ Raziel Ofer
Raz Ofer
3206 NE 2nd Ave, #1093
Miami, FL 33137
Raz.ofer2@gmail.com

STATE/PROVIDENCE OF Florida

COUNTY/PARISH OF Broward

The above named person appeared before me and affixed his signature or mark, sworn to (or affirmed) and subscribed before me this 14th day of October, 20 26, by Raziel Ofer (Name of Person Making Statement).

(Seal)

NOTARY PUBLIC STATE OF FLORIDA

Notarial Act performed by Audio-Video Communication.

David Merkatz
Signature of Notary Public

David Merkatz
Print, Type or Stamp Name of Notary

Personally Known: ____
OR Produced Identification: X
Type of Identification Produced: Passport

U.S. BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
OCT 19 2026
FILED RECEIVED

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:

DRO 15R LLC,

Debtor.
_______________________________________/

Case No. 22-12017-LMI

Chapter 11

MOTION CHALLENGING COURT'S SUBJECT MATTER JURISDICTION

MOVANT, RAZ OFER ("Ofer"), as a self-represented litigant and equity stakeholder, moves the Court to set aside its September 30, 2022, Order on Plaintiff's Motion For Summary Judgment and Defendant AJAR Holdings' Cross-Motion For Summary Judgment [ECF No. 112] for a lack of subject matter jurisdiction in the entry of the judgment. Ofer states the following facts and arguments to support his movement for relief.

INTRODUCTION

By way of introduction, Ofer states:

- The alleged creditors—specifically, a syndicate led by Roniel Rodriguez IV ("ROIV") and his long-term associate, Stuart Kalb ("Kalb")—have perpetrated a fraud upon this Court by knowingly misrepresenting a non-final order as an enforceable final judgment. By deliberately portraying an interlocutory determination as a final, non-appealable adjudication to secure judicial remedies, these parties have effectively introduced a fraudulent instrument into the record. Furthermore, this unauthorized enforcement activity constitutes a direct violation of the Court's operative injunction explicitly

prohibiting collection activities. Such conduct transcends mere aggressive advocacy, constituting a willful deception that subverts the integrity of the judicial process.

- Crucially, these illicit collection efforts were executed with the explicit knowledge and consent of the Chapter 11 Trustee and his counsel, Mr. Brown, under the auspices of former Bankruptcy Judge Laurel M. Isicoff., who inexplicably recused herself without a pending motion for recusal. As detailed extensively in the pending motions to vacate filed in the *942 Penn RR, LLC* and *Derexel* proceedings, the Trustee, his counsel, and former Judge Isicoff acted entirely absent personal and subject-matter jurisdiction. Because a total absence of jurisdiction strips judicial officers and court-appointed fiduciaries of absolute immunity, these parties face direct personal liability, subjecting them to independent civil actions across any appropriate sovereign jurisdiction. A rigorous review of the specific arguments within those motions to vacate reveals a clear procedural inside awareness, reflecting former Judge Isicoff's current efforts to insulate herself from impending civil liability and scrutiny. The advanced jurisdictional arguments articulated in those filings directly rely upon and incorporate the structural insights provided by former Judge Isicoff's active assistance.

- **Consequently, Bankruptcy Judge Robert A. Mark has become directly implicated in these extrajudicial actions, which were executed entirely**

**absent personal and subject-matter jurisdiction.** Because a court's total lack of jurisdiction violates fundamental constitutional protections and strips a judicial officer of absolute judicial immunity, Judge Mark faces direct personal liability for these unauthorized proceedings. By entering orders in a matter completely devoid of statutory authority, his actions transcend protected judicial error and constitute an actionable, unconstitutional overreach.

This matter is a result of a long-standing fraudulent scheme which culminated itself before this Court in the form of a judgment which the Court has entered without subject matter jurisdiction at the point of a determination being made, a jurisdictional defect in the lack of corporate authority for this Court to entertain the petition filed, and a corresponding lack of consent to this Court's exercise of the jurisdiction over a non-core matter. in addition, the adversarial parties in this bankruptcy case, Ajar Holdings, LLC (Ajar), and its principal members, Roniel Rodriguez IV (ROIV) and Stuart R. Kalb (Kalb), have devised and perpetrated a scheme or artifice to defraud, and in doing so (i) filed documents in a proceeding under title 11, and (ii) made a false or fraudulent representation, claim, or promise concerning or in relation to a proceeding under title 11, at times before or after the filing of the petition, or in relation to a proceeding falsely asserted to be pending under Chapter 11, United States Code. Ajar, ROIV and Kalb obtained and executed a fraudulent quit claim deed which was recorded in the public record of Miami Dade County, Florida and presented to this Court as a true and correct instrument of conveyance for real estate when, in fact, the instrument was created and

recorded born out of a fraudulent transfer in avoidance of a future creditor and used in false claims and fraudulent representations in this chapter 11 proceeding.

Procedural History

Ofer, a foreign national, and a member of one of the wealthiest and most prominent families in Isreal, came to Miami in order to invest his, and other investor-partner, capital in commercial multifamily real estate in this District. The underlying cause of action here stems from a hotly disputed conveyance of a property formerly-owned by 1560/1568 Drexel Avenue, LLC ("Drexel"), a Florida limited-liability formerly owned by another entity which Ofer himself personally owned all of the outstanding membership interests. The contention concerns the ownership of the real property located at 1560 and 1568 Drexel Avenue, Miami Beach (the "Property"). On or about June 17, 2013, Drexel became the owner of the Property after Ofer took his own personal assets, not assets which were designated or intended to be contributions to Drexel and directly purchased the Property on behalf of Drexel[1] for $3,850,000.00 on the condition that the funds would be returned to him at a later date thus creating a equity interest in the Property. Drexel, since 2014 has been owned by MPM 17A, LLC, a Florida limited Liability Company ("MPM") formed for that specific task[2]. Ofer asserted control over Drexel through being the managing member of MPM until March 24, 2021.

On March 27, 2019, Opustone, LLC, a material supplier, ("Opustone") filed a complaint against Ofer, Drexel, and other entities for breach of contract, conversion, civil

[1] It is important to note here that Ofer never intended the funds which he provided for the purchase of the Property to become entangled or comingled with Drexel. The funds provided for the purchase was intended to be repaid and for the funds to give Ofer a direct equitable interest in the Property as a individual person.
[2] It is important to note that MPM had several private investors involved in the matter which never became involved in the disputes at hand.

theft, and worthless checks in the Florida State Case *Opustone v. Ofer, et. al.*, Florida Court Case No. 2019-009489-CA-01 (11th Circuit Court Miami Dade County, FL) (the "Opustone Action"). That case was presided over by Florida State Circuit Court Judge Beatrice Butchko, a state court judge who assisted in the orchestration of the theft of Property, which contained tens of millions of dollars in equity, through a complex conspiracy which including judicial fiat. On March 3, 2020, Judge Butchko court entered final summary judgment against all defendants in that matter on all counts in the Opustone Action (the "Opustone Judgment"). Later that year, on October 21, 2020, the Opustone court issued writs of execution against each of the defendants in that matter, Drexel, Ofer, 1434 Collins, LLC ("1434") and RO1 15R, LLC ("RO1"), followed by a Motion to Compel Issuance or Turnover of Membership Interests on October 26, 2020, against Ofer. On November 9, 2020, Opustone filed an Amended Motion to Compel Issuance or Turnover of Membership Interests (the "Turnover Motion"), to compel Ofer to provide his membership interests in entities including MPM, 1434, and RO1, to the Miami-Dade County Sheriff for levy and sale to satisfy the judgment of the Opustone Court.

The Opustone court conducted a hearing and granted the Motion for Turnover of the membership interests owned by Ofer in MPM, 1434 and RO1, and by virtue of the ownership of MPM, Drexel, on November 10, 2020, and a written order was entered on November 16, 2020 (the "Turnover Order"). Ofer prepared and recorded at 11:34 a.m. on November 16, 2020, a "Quit Claim Deed" in favor of DRO 15R, LLC ("DRO") which conveyed the Property from Drexel to DRO (the "DRO Deed") before the entry of the Turnover Order[3]. The Miami-Dade County Sheriff conducted a judicial sale (the "Sheriff's

---

[3] It is important to note that the conveyance under the DRO Deed or any other deed which is a quit claim deed only conveyed the interests which Drexel possessed at the time of the conveyance. Since the 2013

Sale") of the membership interests of MPM, 1434 and RO1 on March 24, 2021, at which Sheriff's Sale AJAR was the successful purchaser of Ofer's interests in MPM, 1434 and RO1 for a sum of $5.00 despite the tens of millions in equity that the Property contained.

Following the Sheriff's Sale, Drexel, through its purported sole member MPM, by its sole member AJAR with ROIV acting as its sole manager, executed on March 24, 2021, and recorded on March 30, 2021, a Quit Claim Deed which attempted to convey the Property from Drexel to AJAR (the "AJAR Deed")[4], and filed and recorded a notice of lis pendens. In the Opustone Action, Ofer unsuccessfully: (1) moved to set aside the execution sale of the membership interests on August 9, 2021; (2) moved for "equitable relief" from the transfer of the Property to AJAR on August 9, 2021; and (3) filed a renewed motion to set aside the execution sale on October 1, 2021. On June 23, 2021, DRO, RO1, and Ofer filed a complaint against AJAR in Miami-Dade Circuit Court to quiet title to the Property, claiming that its interest under the DRO Deed was superior to AJAR's interest under the AJAR Deed (the "DRO Quiet Title Action"). AJAR filed a counterclaim and third-party claim in the DRO Quiet Title Action against DRO, RO15 and Ofer for ejectment, unjust enrichment and to quiet title to the Property. Unfortunately, through collusion and fraud, ROIV was able to procure a court appointed conservator. The DRO Quiet Title

---

purchase, Ofer maintained an equitable interest in the property by virtue of the funds he personally provided for the direct purchase of the Property.

[4] ROIV caused Ajar, through its subsidiary MPM, which was the member and manager of Drexel to execute the Ajar Deed at a time when Drexel was a co-judgment debtor with Ofer, 1434 and RO1 under the Opustone Judgment. The conveyance of the Property was a fraudulent transfer from Drexel to Ajar possessing many of the badges of fraud which are enumerated in the statute governing such transfers under Florida law. ROIV also served as post judgment collection counsel for Opustone with full knowledge that Opustone had obtained the judgment where Drexel was joint and severally liable to Opustone and knew that Ofer possessed a possible future claim as a potential subrogee for equitable contribution after the Judgement was satisfied making Ofer a future creditor.

Action was removed to the United States Bankruptcy Court For The Southern District of Florida after DRO had filed for reorganization the previous month.

<u>The Unauthorized Filing Of The Bankruptcy Petition</u>

This matter was instituted in March 2022 by the filing of a Chapter 11 bankruptcy petition which was only signed and authorized by Ofer. Completely absent from this filing, at the time that the Petition was presented to the Court and the power of the Court to hear the matter arose, was the authorization of the remaining member of the debtor, Robert Mendez ("Mendez") consenting to the filing of the Bankruptcy Petition. There was no vote of the members, and the Operating Agreement did not give Ofer the unilateral authorization to Ofer to file the Petition in this Court. Bankruptcy Counsel Roher knew that there was not any authorization given by Mendez to Ofer to file the Petition to initiate the proceedings here. The presence of the filing defect deprived the Court of the power to hear the petition although the Court had jurisdiction to determine its own jurisdiction to hear the petition. Without the properly authorized petition being filed, the matter was infirm from the beginning and the Court should have dismissed this matter and proceeded no further when made aware of the lack of corporate authority to execute the petition and file it to commence the extraordinary act of bankruptcy which is outside the normal course of business of the debtor, requiring consent of all the members to file. Mendez' conduct did not waive nor ratify the lack of authorization. Neither was there any meeting held between the members Ofer and Mendez which subsequently ratified the filing of the petition by authorization after the fact. There was a complete lack of authorization under the Operating Agreement and Florida Law as the conditions had not been met to provide the

requisite authorization for the power of the Court to hear the petition and make any rulings as a result.

Debtor Bankruptcy Counsel Fraud

Ofer had approach attorney Mark S. Roher ("Roher") about representation of DRO in the filing of a Chapter 11 reorganization. Roher, as a so-called expert attorney on bankruptcy matters, had counseled Ofer on many aspects of the proceedings for DRO as an appropriate vehicle to regain possession of the Drexel Property after being counseled by his other attorneys, including David Winker ("Winker") that there was a need to remove his action to another venue due to the corruption in the Florida State Circuit Courts. After consulting with Roher, Ofer was advised by Roher that Chapter 11 reorganization was the best option for DRO to resolve its financial commitments, remove the conservator and gain various other tactical advantages. Specifically, Roher advised and guaranteed that the conservator could be removed through bankruptcy proceedings, and he would be able to maintain control of DRO and regain the control of the Property. Upon commencement of the bankruptcy, a Trustee was appointed and control over the businesses was turned over to the Trustee resulting in a reduction, at a very great degree, of income previously going to Ofer. The renovations ongoing at DRO's property ceased under the conservator's operational control and the Property fell into mismanagement and disrepair.

Roher represented DRO as counsel for the debtor in bankruptcy and failed in many instances to take direction from Ofer as to the direction which Ofer preferred litigation to proceed during the course of litigation. Motivated by personal gain instead of professional concern for his client, Roher committed several acts of fraud on the Court, and theft from Ofer. He maintained custody of several credit cards which Ofer provided to Roher which

was for him to use solely to pay expenses for the matter. However, Roher being motivated by personal interests, placed over $200,000.00 in unauthorized charges on the credit cards to the detriment of Ofer. This conduct was subject of a district court case presided over by Hon. Judge Beth Bloom who ruled in Ofer's favor on competing motions for summary judgment that Roher did not have authorization to make the charges which he made. Other conduct was that Roher misrepresented to the Court the amount of the fees in which he was entitled to receive after promising to Ofer that he would give credit to DRO for some of the unauthorized charges which were made[5]. ***Most grievous of the mistakes that Roher made, he failed to get Robert Mendez's[6] authorization to file the bankruptcy petition.*** Roher even went as far as to admit that fact by stipulation in the Roher Action, ***see Exhibit A – Joint Settlement Stipulation***.

Roher eventually broke all his promises to Ofer, withdrawing representation from the bankruptcy cases and attacking and compromising Ofer. DRO, by being placed into Chapter 11 bankruptcy, ended up losing its real property in a determination which exceeded the jurisdiction of the bankruptcy court, then presided over by Hon. Bankruptcy Judge Laurel Isicoff[7], resulting in over $13 million lost in equity as well as $7 million in

---

[5] Judge Bloom made findings in the Roher Action that Roher had actually provided proof where he stated to Ofer that he was to give credit for all of the unauthorized charges which he did not resulting in the estate of another of Ofer's companies, 942-Penn RR, LLC, which Ofer maintained a 50% interest in, having its equity surplus reduced by an amount equal to $237,000.00 in legal fees claimed by Roher to be owed to him from all of the services provided over two bankruptcy actions.

[6] Robert Mendez is a equal stakeholder in the debtor with Ofer, owning the remaining 50% of the membership interests of DRO.

[7] Judge Isicoff subsequently recused herself from the case and retired from active duty on the Southern District Bankruptcy Bench. Currently, she serves as a Recall Judge.it is believed that the judge's recusal from this matter is related to her personal involvement with ROIV and Kalb colluding to obtain the Property. This belief stems from the fact that there is a video recording which was taken in a public setting months before the filing of the petition where ROIV and Kalb discussed the unknown fact of Ofer contemplating the filing of a petition which such information was obtained through a breach of confidentially when Former Florida State Circuit Court Judge Stephan Millan, now a practicing attorney after 2018, had met with Ofer to discuss several options for his situation. In the recording, ROIV and Kalb expressly discussed how Judge Isicoff would rule in determining whether grand theft occurred. The two discussed the matter affirmatively

direct investment in the property. DRO also suffered prospective losses as well in its ability not being able to collect rents or be converted to a boutique hotel which would have dramatically increased both its value and revenues to the debtor.

Fraudulent Quit Claim Deed and Fraudulent Misrepresentation By Ajar

An adversarial proceeding was instituted by the debtor to resolve the issue for the title of the Property. Ajar was a party to that proceeding in which it claimed its ownership through the fraudulently obtained quit claim deed and represented to the Court that it was the valid and lawful owner of the Property and that it did not transfer the Property (i) leaving Drexel insolvent, (ii) was not transferring the Property subject to any claims of creditors, and (iii) did not have any future creditors with potential claims. The controversy started in the Florida Circuit Court of Miami Dade County as *DRO 15R, LLC et al. vs. Marina Plaza, S.A. et al.*, Case No. 2021-014716 CA 01 (Fla. 11th Jud. Cir.), the Defendants being MARINA PLAZA, S.A., a Panamanian Corporation, 1560/1568 DREXEL AVENUE, LLC, a Florida limited liability Company, AJAR HOLDINGS, LLC, a Wyoming limited liability company, and RONIEL RODRIGUEZ, an individual, and was removed from that matter to an adversarial proceeding before this Court as a non-core proceeding. The adversarial case was instituted under *DRO 15R, LLC, et. al. v. Ajar Holdings, LLC, et. al.*, case no. 22-01128-LMI in this Court on March 19, 2022. Significant to this proceeding, Ajar attempted to have the matter remanded to the state court on abstention grounds and the Court found that the proceeding was a core proceeding because the determination of property of the estate is a core proceeding[8]. In addition, the

under the appearance that they knew that Judge Isicoff was going to be appointed to preside over the bankruptcy proceedings at a time when they were non-existent and pre-petition.

[8] It is material that the Court did state that ""[The] fact that the determination of whether the [disputed property is] property of the estate is determined under non-bankruptcy law and is an issue that could be

debtor filed an action to determine the rights, title and interests in the Property as a declaratory judgement action under matter *DRO 15R, LLC, et. al. v. Ajar Holdings, LLC, et. al.*, case no. 22-01130-LMI to resolve the issue of competing quit claim deeds which were filed[9].

After extensive litigation on the matter, this bankruptcy court opined that the Property was not real property belonging to DRO and denied DRO's motion for summary judgment on the grounds that (i) the DRO Deed was invalid because Ofer signed the DRO Deed in his capacity of the grantee, (ii) the Corrective DRO Deed was invalid because it was signed at a time when Ofer did not have the authority to sign on behalf of Drexel, (iii) reformation was not available to reform the DRO Deed, and (iv) the various claims of liens under review were invalid only to the extent they did not affect the priority of Ajar's Deed. The Court entered the order granting Ajar's Cross Motion for Summary Judgment on September 30, 2022. On reconsideration, DRO presented Florida case law supporting the fact that a deed with an incorrect formal designation was a mere scrivener's error or mutual mistake if the person who actually signed the deed was authorized to do so. The bankruptcy court deemed the case law not controlling and stated that case law was available which contradicted the case law DRO presented in support of its reconsideration and denied the Plaintiff's Motion For Reconsideration. The Plaintiff moved for an appeal to the Eleventh Circuit Court of Appeals which was denied.

<u>ARGUMENT AND SUPPORTING CASE LAW FOR VACATING THE ORDER</u>

---

resolved in a non-bankruptcy forum is irrelevant since the issue of what is property of the estate is virtually always a matter of state law or other non-bankruptcy law", citing *Butner v. U.S.*, 440 U.S. 48, 99 (1979).

[9] Significantly, RO 15, LLC was not a party to this matter although a claim of lien filed on Nov. 20, 2020, in the amount of $8,785,000.00 against the Property belonging to RO 15, LLC was adjudicated by this Court as ineffectual.

Ofer raises the challenge to the Court's subject matter jurisdiction on very specific and limited grounds based on a lack of corporate authority in the bankruptcy's core/main case to filing the petition, the lack of consent to adjudicate matters which were not classified as core proceedings and violations by this Court of Article III of the constitution rendering the judgement of this Court constitutionally infirm.

Lack Of Corporate Authority

It has long been understood that "[c]ertain implied powers must necessarily result in our Courts of justice from the nature of their institution," powers "which cannot be dispensed with in a Court, because they are necessary to the exercise of all others." *United States v. Hudson*, 7 Cranch 32, 34, 3 L.Ed. 259 (1812); see also *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1980) (citing *Hudson*). For this reason, "Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." *Anderson v. Dunn*, 6 Wheat. 204, 227, 5 L.Ed. 242 (1821); see also *Ex parte Robinson*, 19 Wall. 505, 510, 22 L.Ed. 205 (1874). These powers are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R. Co.*, 370 U.S. 626, 630–631, 82 S.Ct. 1386, 1388–1389, 8 L.Ed.2d 734 (1962).

The filing of a bankruptcy petition commences a "case" under the Bankruptcy Code and establishes subject matter jurisdiction for the court, pursuant to 28 U.S.C. § 1334. See *Walker v. Cadle Co. (In re Walker)*, 51 F.3d 562, 568 (5th Cir. 1995) (explaining that the power to hear a "case under title 11" is the power to hear the "bankruptcy petition,

itself") (citing *Wood v. Wood (In re Wood)*, 825 F.2d 90, 92 (5th Cir. 1987)). However, a bankruptcy petition filed without proper corporate authority must be dismissed because if the Debtor did not have ***sufficient corporate authority*** for the filing of its petition, then this Court lacks subject matter jurisdiction over the case. *Price v. Gurney*, 324 U.S. 100, 106, 65 S.Ct. 513, 89 L.Ed. 776 (1945). The Fifth Circuit acknowledged that a bankruptcy court lacks subject matter jurisdiction over a bankruptcy petition filed without the required corporate authority. *Treen v. Orrill, Cordell, & Beary, LLC (In re Delta Starr Broad., LLC)*, 422 Fed.Appx. 362, 368 (5th Cir.2011)("Any suit lacking subject matter jurisdiction must be dismissed regardless of how long a case has been pending.")(citing *Temple Drilling Co. v. La. Ins. Guar. Ass'n.*, 946 F.2d 390 (5th Cir.1991)).

"State law ... determines who has the authority to file a voluntary petition on behalf of the corporation." *Franchise Servs. of Am., Inc. v. United States Trustee (In re Franchise Servs. of Am., Inc.)*, 891 F.3d 198, 206 (5th Cir. 2018) (citing *Price v. Gurney*, 324 U.S. 100, 106–07 (1945); *In re Nica Holdings, Inc.*, 810 F.3d 781, 789 (11 Cir. 2015)). In Franchise Services, the Fifth Court stated:

> "If the petitioners lack authorization under state law, the bankruptcy court has no alternative but to dismiss the petition. It is not enough that those who seek to speak for the corporation may have the right to obtain that authority. Rather, they must have it at the time of filing. Absent a duly authorized petition, the bankruptcy court has no power to shift the management of a corporation from one group to another, to settle intracorporate disputes, and to adjust intracorporate claims. 891 F.3d at 206–07 (quoting *Price*, 324 U.S. at 106–07) (internal quotations omitted)."

The Fifth Circuit's opinion in *Carver v. Atwood* stated that "dismissal is mandatory when a court discovers that it lacks subject-matter jurisdiction." 18 F.4th 494, 497 (5th Cir. 2021)

(citing Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."); *Ex parte McCardle*, 74 U.S. 506, 514 (1869) ("Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."). The time-of-filing rule—that subject matter jurisdiction is determined when a federal court's jurisdiction is first invoked—is "hornbook law." *Double Eagle Energy Serv., L.L.C. v. MarkWest Utica EMG, L.L.C.*, 936 F.3d 260, 263 n.1 (5th Cir. 2019) (citing *Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 570 (2004) ("It has long been the case that 'the jurisdiction of the court depends upon the state of things at the time of the action brought.' ") (quoting *Mollan v. Torrance*, 22 U.S. 537, 539 (1824))). "Although courts have not often considered the time-of-filing rule for cases related to bankruptcy, it applies to bankruptcy jurisdiction no less than it applies to diversity or federal question jurisdiction." *Id.* (citing *In re Canion*, 196 F.3d 579, 586 n.29 (5th Cir. 1999)).

Here, the most concerning component of this matter that is disturbing is Mendez's lack of authorization granted to allow the filing of the original petition of bankruptcy. Roher knew he did not have Mendez's authorization as the other 50% member of DRO 15R, LLC to proceed with the filing of the bankruptcy. When Mendez came before the court and made the argument that the entire action was not authorized, and filed without his own authorization, Roher, knowing this fact, failed to acknowledge this to the Court. When all the parties heard this position from Mendez, instead of stopping the action were it lay, the parties proceeded forward, without jurisdiction over the case, against the wishes of Mendez. It is clear that "a party cannot subject an entity to bankruptcy without authority." *In re FKF Madison Park Grp. Owner, LLC*, No. 10-11867 (KG), 2011 Bankr. LEXIS 344,

2011 WL 350306, at *3 (Bankr. D. Del. Jan. 31, 2011) (citing *Price v. Gurney*, 324 U.S. 100, 105-07, 65 S. Ct. 513, 89 L. Ed. 776 (1945)); *In re S & R Grandview, LLC*, No. 13-03098-8-RDD, 2013 Bankr. LEXIS 4182, 2013 WL 5525729, at *1 (Bankr. E.D.N.C. Oct. 4, 2013) ("A bankruptcy court cannot establish jurisdiction over a petitioning entity where the individual instituting the proceeding lacks authority under state law or the corporate governing documents.").

If a complaint in a federal court is not authorized by the members, the court may not have jurisdiction, especially if the members are necessary parties to the case, and the lack of authorization could be a jurisdictional defect. "The authority to file a bankruptcy petition on behalf of a corporation must derive from state corporate governance law." *In re Gen–Air Plumbing & Remodeling, Inc.*, 208 B.R. 426, 430 (Bankr.N.D.Ill.1997). It is well-settled that objections to subject matter jurisdiction may be made at any time, and may even be raised and decided by the Court on its own motion if the parties overlook or elect not to press such an objection. *Henderson v. Shinseki*, 562 U.S. 428, 434–35, 131 S.Ct. 1197, 179 L.Ed.2d 159 (2011). If the Court finds that the purported individual who signed the petition did not have sufficient corporate authority to file the Debtor's petition, then the Court lacks subject matter jurisdiction over this bankruptcy case and has no alternative but to dismiss it. See *id.*

Section 605.04073 of the Florida Statutes provides "[e]xcept as otherwise provided in this chapter, the affirmative vote or consent of a majority-in-interest of the members is required to undertake an act...***outside the ordinary course of the company's activities and affairs***, including a transaction under ss. 605.1001-605.1072" for both member-managed and manager-managed limited liability companies. Fla. Stat. § 605.04073(1)(c),

(2)(d) (2018). The decision to file bankruptcy is an act outside of the ordinary course of any business, See *In re Zaragosa Properties, Inc.* 156 B.R. 310, 313 (Bankr. M.D. Fla. 1993)("Certainly, filing a Petition for Relief under Title 11 is not the ordinary course of anyone's business."), and is more than a mere, everyday business decision. See *In re Bel-Aire Investments*, Inc., 97 B.R. 88, 89 (Bankr. M.D. Fla. 1989). In *Bel-Aire*, one of the corporation's two directors filed a voluntary petition without the consent of the other director. The court held that "[t]here is no question that the authority to manage the affairs of the corporation does not include the right to file a petition for relief under any of the operating chapters of the Bankruptcy Code." *Id.* at 89-90. Under Florida law the Debtor, a Member Managed LLC, must get the consent of the requisite majority of members to take the outside of ordinary course action of filing a Chapter 11 case.

Federal Circuit Split

This discussion cannot be had without addressing the current state of the law and the split in the circuits which exist on the aspect of the whether subsequent conduct o may ratify the initial lack of corporate authority into proper authority thus giving the court jurisdiction over the matter and whether such an issue would constitute a lack of subject matter jurisdiction.

Courts in support retaining jurisdiction when there is a lack of corporate authority argue that *Hager v. Gibson*, 108 F.3d 35 (4th Cir. 1997) supports the position. In *Hager*, a two-owner corporation was put into bankruptcy by one of the corporate owners, who had a fifty percent interest. *Id.* at 38. Twenty months later, the corporate owner who did not consent to the filing argued that the bankruptcy court lacked authority over the case because both members did not consent to the bankruptcy filing and that the case should

be dismissed. *Id.* The bankruptcy court disagreed, finding that the doctrine of laches applied and that it was too late to raise a jurisdictional argument. *Id.* The district court disagreed with the bankruptcy court, noting that laches did not apply because the subject matter jurisdiction could be raised at any time. *Id.* Nonetheless, the district court found that Virginia state law allowed for *ratification* of the owner's authority to file the petition. *Id.* On appeal to the Fourth Circuit, the court had to consider whether *Price v. Gurney* precluded ratification because *Price* held that a petition filed without the requisite authority gives a bankruptcy court no power over the petition. *Id.* The Fourth Circuit noted that *Price* did not address whether the required authorization under local law could be acquired through ratification. *Id.* at 39. The Fourth Circuit found that:

> "[U]nder Virginia law, the unauthorized filing of a voluntary petition in bankruptcy in behalf of a corporation might be ratified in appropriate circumstances by ensuing conduct of persons with power to have authorized it originally. Under such circumstances, it could therefore serve as the local law source of the authority required by *Price v. Gurney* for a voluntary bankruptcy filing in behalf of a corporation.

*Id.* at 40 (footnote omitted).

The Fourth Circuit reasoned that a "jurisdiction-by-consent contention simply misconceives the basis of the rule that subject matter jurisdiction cannot be so created. That rule is concerned with litigation conduct aimed at, or urged as having created, subject matter jurisdiction that does not as an objective matter exist." *Id.* at 41. The Fourth Circuit then stated:

> "Ratification conduct is not of this sort, but involves extra-judicial primary conduct by parties that does not purport to waive jurisdictional requirements nor to forego objection to their absence as incidents of a litigation process in which they may then or later be involved. Though its substantive effect

> may be, as in this case, the supplying by relation-back of a necessary jurisdictional fact, the result is a court then proceeding with an objectively grounded jurisdiction rather than—as the no-jurisdiction-by-consent rule is intended to prevent—without it."

*Hager*, 108 F.3d at 41.

Apparently, *Hager* placed little emphasis on subject matter jurisdiction being determined at the time of filing. In fact, *Hager* was critical of the time-of-filing rule for subject matter jurisdiction and noted that "this rule is not one of statutory or constitutional limitation upon the jurisdiction of federal courts but, exists simply as "one of federal interstitial common law, judicially created, grounded in policy and necessity—the necessity to have a generally applicable and easily administered rule." *Id.* (internal quotations omitted). Moreover, the Fourth Circuit found that [t]he relation-back principle, though a legal fiction, is a well-established substantive one having wide application. *Id.* (citations omitted). The Fourth Circuit concluded that "jurisdiction-as-of-commencement-of-action rule does not prevent that result." *Id.* (citations omitted). As framed by the Fourth Circuit, the ratification of the lack of corporate authority would allow subject matter jurisdiction to exist at a later stage, albeit not at inception and is supported by other Circuits. See *In re Martin–Trigona*, 760 F.2d 1334, 1341 (2d Cir.1985) (holding, on assumption of initial lack of authority to file voluntary petition in behalf of corporation, that corporation and sole stockholder "acquiesced in and ratified" filing by their ensuing participatory conduct); *Boyce v. Chemical Plastics, Inc.*, 175 F.2d 839, 842–44 (8th Cir.1949) (finding unauthorized filing ratified and jurisdiction thereby validated by later board of directors' resolution).

Courts contrary to that position have ruled that a invalid position deprives a court of subject matter jurisdiction. See *Keenihan v. Heritage Press, Inc.*, 19 F.3d 1255, 1259 (8th Cir. 1994) ("In the absence of a valid petition, a bankruptcy court has no basis upon which to dispose of a corporation's assets or resolve its debt status"). They assume the position that ratification cannot solve the issue of infirmity at inception. In a later case, the Fifth Circuit acknowledged that a bankruptcy court lacks subject matter jurisdiction over a bankruptcy petition filed without the required corporate authority. *Treen v. Orrill, Cordell, & Beary, LLC (In re Delta Starr Broad., LLC)*, 422 Fed.Appx. 362, 368 (5th Cir.2011)("Any suit lacking subject matter jurisdiction must be dismissed regardless of how long a case has been pending.")(citing *Temple Drilling Co. v. La. Ins. Guar. Ass'n.*, 946 F.2d 390 (5th Cir.1991)). Although *Delta Starr* is an unpublished Fifth Circuit case, and therefore of limited precedential value, its holding was premised on the United States Supreme Court case, *Price v. Gurney*, 324 U.S. 100, 106, 65 S.Ct. 513, 89 L.Ed. 776 (1945), which is, of course, binding authority. In *Price*, the Supreme Court held that if the trial court "finds that those who purport to act on behalf of the corporation have not been granted authority by local law to institute the proceedings, it has no alternative to dismiss the petition." *Id.* at 106, 65 S.Ct. 513. Standing on those grounds is support under *In re Mid-South Bus. Assocs., LLC*, 555 B.R. 565 (Bankr. N.D. Miss. 2016). *In re Mid-South* explicitly adopted the position advanced by Appellants. "[A] bankruptcy petition filed without proper corporate authority must be dismissed independent of any finding of 'cause' under § 1112(b), because if the Debtor did not have sufficient corporate authority for the filing of its petition, then this Court lacks subject matter jurisdiction over the case." 555 B.R. 565,

570 (citing *Price*, 324 U.S. at 106, 65 S.Ct. 513). The bankruptcy court for the Northern District of Mississippi concluded its analysis as follows,

> "Because Dr. Windham filed the Debtor's bankruptcy petition without sufficient corporate authority under the Operating Agreement and applicable Mississippi law, the Court lacks subject matter jurisdiction over this bankruptcy and has no alternative but to dismiss this case."

The *In re Mid-South* court explicitly read *Price* to prescribe a rule that governs the subject matter jurisdiction of bankruptcy courts. It is well-settled that objections to subject matter jurisdiction may be made at any time, and may even be raised and decided by the Court on its own motion if the parties overlook or elect not to press such an objection. *Henderson v. Shinseki,* 562 U.S. 428, 434–35, 131 S.Ct. 1197, 179 L.Ed.2d 159 (2011). Any suit lacking subject matter jurisdiction must be dismissed regardless of how long a case has been pending. *Temple Drilling Co. v. La. Ins. Guar. Ass'n,* 946 F.2d 390 (5th Cir.1991). This Court should read Price to address subject matter jurisdiction and this matter should be dismissed for a lack of it.

Court's Violation of Article III

This Court clearly violated Article III of the constitution when it ruled on what essentially amounts to a claim under the Supreme Court's holding in *Stern v. Marshall*, 564 U.S. 462, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011). The Court, in deciding the adversarial proceeding under 22-01130-LMI, was tasked to resolve what was a state claim in an action for quiet title. The Court was without jurisdiction to enter a final order on the grounds that this Court has no constitutional power to enter a final judgment on a state claim and the power of the debtor to consent to any voluntary adjudication by the

Court was infirm due to the lack of corporate authorization. Here, the claim in the adversarial proceeding was a Stern claim.

The district courts of the United States have "original and exclusive jurisdiction of all cases under title 11." 28 U.S.C. §1334(a). Congress has divided bankruptcy proceedings into three categories: those that "aris[e] under title 11"; those that "aris[e] in" a Title 11 case; and those that are "related to a case under title 11." § 157(a). The manner in which a bankruptcy judge may act on a referred matter depends on the type of proceeding involved. Bankruptcy judges may hear and enter final judgments in "all core proceedings arising under title 11, or arising in a case under title 11." §157(b)(1). "Core proceedings include, but are not limited to," 16 different types of matters, including "allowance or disallowance of claims against the estate or exemptions from property of the estate". §157(b)(2)(C). When a bankruptcy judge determines that a referred "proceeding ... is not a core proceeding but ... is otherwise related to a case under title 11," the judge may only "submit proposed findings of fact and conclusions of law to the district court." §157(c)(1). It is the district court that enters final judgment in such cases after reviewing de novo any matter to which a party objects. *Ibid.*

Article III, § 1, of the Constitution mandates that "[t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." The same section provides that the judges of those constitutional courts "shall hold their Offices during good Behaviour" and "receive for their Services[ ] a Compensation[ ] [that] shall not be diminished" during their tenure. In general, Congress may not "withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty." *Murray's*

*Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 18 How. 272, 284, 15 L.Ed. 372 (1856). When a suit is made of "the stuff of the traditional actions at common law tried by the courts at Westminster in 1789," *Northern Pipeline*, 458 U.S., at 90, 102 S.Ct. 2858 (Rehnquist, J., concurring in judgment), and is brought within the bounds of federal jurisdiction, the responsibility for deciding that suit rests with Article III judges in Article III courts. The Constitution assigns that job—resolution of "the mundane as well as the glamorous, matters of common law and statute as well as constitutional law, issues of fact as well as issues of law"—to the Judiciary. *Id.*, at 86–87, n. 39, 102 S.Ct. 2858 (plurality opinion).

*Stern* made clear that some claims labeled by Congress as "core" may not be adjudicated by a bankruptcy court in the manner designated by §157(b). *Stern* did not, however, address how the bankruptcy court should proceed under those circumstances. By definition, a *Stern* claim may not be adjudicated to final judgment by the bankruptcy court, as in a typical core proceeding. But the alternative procedure, whereby the bankruptcy court submits proposed findings of fact and conclusions of law, applies only to non-core claims. See §157(c)(1). The statute permits Stern claims to proceed as non-core within the meaning of § 157(c). Pursuant to *Stern v. Marshall*, 564 U.S. 462, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011), adjudication of the claim here to resolve the title dispute is a classic state property claim and falls within those claims categorized as Stern claims and follows the practice of non-core proceedings with the bankruptcy court having authority only to enter proposed findings of fact and conclusion of law, despite the cause of action being listed in 28 U.S.C. §157(b) as core. *Exec. Benefits Ins. Agency v. Arkison*, —— U.S. ——, 134 S.Ct. 2165, 2174, 189 L.Ed.2d 83 (2014). Nonetheless, pursuant to

*Wellness Int'l Network, Ltd. v. Sharif*, 135 S.Ct. 1932, 191 L.Ed.2d 911 (2015), bankruptcy judges can adjudicate non-core proceedings and enter final orders and judgments with the consent of all parties. Neither occurred here. As discussed above, the consent, if there was any, to have this Court adjudicate a Stern claim is infirm on the grounds that the debtor lacked corporate authority to authorize the filing of the petition, so it follows that the debtor's consent is also infirm on the same grounds. There being no voluntary consent, Article III was violated once Judge Isicoff determined and issued a final judgement on the Stern claim.

<u>Court Exceeded Its Jurisdiction After Determining The Property Wasn't Debtor's</u>

The Court issued its order in the adversarial proceeding that the Property did not belong to the debtor. At that particular moment, the Court should have examined its "related to" jurisdiction. If an examination was performed, the Court would have known that once the Property was classified as non-estate property, its authority to make any determinations about it ceased.

It is without question that the Court has the power to determine what is and is not property of the estate under 11 U.S.C. §541. That determination is a core proceeding. It is well settled that the jurisdiction of the bankruptcy courts to hear cases related to bankruptcy is limited initially by statute and eventually by Article III. *Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3rd Cir.1984). For subject matter jurisdiction to exist there must be some nexus between the related civil proceeding and the Title 11 case. The fact that property was once owned by a bankrupt does not supply federal jurisdiction of all future disputes concerning the property. *In Re Chicago, Rock Island & Pac. Ry.*, 794 F.2d 1182, 1187 (7th Cir.1986). Likewise, once property is not attributable to the debtor in any

manner and cannot affect any outcome of the estate, the property and any matters concerning the property cease to be an issue for the estate. The broad jurisdictional provisions set forth in §1334 grant the district courts power to supervise the entire restructuring of the debtor's estate. However, once property is removed from the estate, further disputes have nothing to do with the debtor's estate.

Here, the Court determined that the property did not belong to the debtor. Once the determination was set in the Court's mind, the "related-to" nexus ceased to exist linking the Property to the estate. At that point, any matters concerning the property were not cognizant for the Court. Thus, when the Court determined whether the title to the Property was a non-debtor or whether the claims of liens that were property of Ofer and RO 15, LLC incumbered the Property, it exceeded its jurisdiction and encroached on the district court's jurisdiction or Florida State Court's jurisdiction. Its statutory and constitutional authority dissipated and the Judge no longer had legal authority to determine the affairs of the Property and the matter should have been remanded back to the state for ongoing adjudication.

Fraud Upon The Court

This matter has at it core a series of fraudulent misrepresentations and other egregious conduct which constitutes fraud upon the Court.

Rule 60(d)(3) permits courts to "set aside a judgment for fraud on the court." Fed. R. Civ. P. 60(d)(3). The "fraud on the court" referenced in Rule 60(d)(3) is distinct from fraud between the parties in that the latter does not threaten public injury and therefore requires a lower standard to prove. *Sec. & Exch. Comm'n v. ESM Grp., Inc.*, 835 F.2d 270, 273 (11th Cir. 1988) (quoting *Travelers Indem. Co. v. Gore*, 761 F.2d 1549, 1552

(11th Cir. 1985) Fraud on the court "embrace[s] only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases." *Travelers Indem. Co. v. Gore*, 761 F.2d 1549, 1551 (11th Cir. 1985). The Eleventh Circuit has said that "only the most egregious misconduct," such as "fabrication of evidence by a party in which an attorney is implicated," constitutes a fraud on the court. *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1338 (5th Cir. 1978). The moving party must show fraud by clear and convincing evidence. *Booker v. Dugger*, 825 F.2d 281, 283 (11th Cir. 1987). "Conclusory averments of the existence of fraud made on information and belief and unaccompanied by a statement of clear and convincing probative facts which support such belief do not serve to raise the issue of the existence of fraud." *Id.* at 283–84 (alterations adopted). Finally, to prevail on a Rule 60(d)(3) motion, the movant must "prove[ ] by clear and convincing evidence that an adverse party has obtained the verdict through fraud, misrepresentation, or other misconduct." *Cox Nuclear Pharm., Inc. v. CTI, Inc.*, 478 F.3d 1303, 1314 (11th Cir. 2007).

<u>Fraudulent Inclusion Of Equitable Interest</u>

As stated earlier, Ofer maintained an equitable interest in the Property by virtue of providing his personal funds for the purchase of the Property directly without any intent to designate those funds as anything other than direct investment for himself. Since 2021, Ofer has asserted that the proceeds that he used to purchase the Property were his own funds and *<u>were not intended</u>* to be comingled with the debtor's assets and become debtor property by way of contribution or any other manner of allocation in which Ofer's private funds would be applied or attributable to the debtor or the capital account of Ofer or

Mendez with the debtor. His intention he has always maintained to have his personal funds and investments separate. In this regard, Ofer maintained a equitable interest in the property directly. This interest was not property of the estate as defined in 11 U.S.C. §541.

When Ajar caused the transfer of the Property from Drexel to Ajar, it was done by quit claim deed which only transferred the bare legal title which Drexel possessed and not the equitable interest possessed by Ofer. The lack of the possession of the equitable interest in the Property by Ajar, ROIV and Kalb knowing about the equitable interest, renders all their claims to the Court a fraudulent misrepresentation. They were aware of the equitable interest by Ofer's repeated claims, yet did nothing to refrain from injuring that equitable interest. Instead, the proceeded to submit documents to the Court, in the form of motions and pleadings, in order to cause the Court to enter the summary judgment adjudicating the Property, as a whole including the equitable interests, as property of Ajar. §541(d) of the Bankruptcy Code is relevant to the findings here. It reads "Property in which the debtor holds, as of the commencement of the case, ***only legal title and not an equitable interest***, such as a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection (a)(1) or (2) of this section ***only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold."*** Ofer's pre-petition equitable interest is not a component of the estate and this Court had no jurisdiction to adjudicate the equitable interest and give such interest to Ajar when the interest is not a asset of the estate.

Ajar continuously submitted pleadings and motions, as well as presented oral argument and representations to the Court which misinformed the Court as to the actual Property status, its various components and the ultimately caused the use of the representations to the Court by Ajar and ROIV essentially cased a fraudulent transfer of the Property.

## Conclusion

Based on the foregoing, the Court's final judgment should be set aside on the grounds of lack of corporate authority, lack of subject matter jurisdiction and the Court acting in excess of its jurisdiction.

[INTENTIONALLY LEFT BLANK]

Respectfully,

/s/ Raziel Ofer
Raz Ofer
3206 NE 2nd Ave, #1093
Miami, FL 33137
Raz.ofer2@gmail.com

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this ______day of October 2026, a true and correct copy of the foregoing was served by email on all parties listed below.

Respectfully,

/s/ Raziel Ofer
Raz Ofer
3206 NE 2nd Ave, #1093
Miami, FL 33137
Raz.ofer2@gmail.com

Scott Neil Brown
Bast Amron LLP
Suntrust International Center
1 S.E. 3rd Avenue - #1440
Miami, FL 33131
305-379-7904
Fax: 305-379-7905
Email: sbrown@bastamron.com

<u>VERIFICATION OF FACTS</u>

I HEREBY CERTIFY that the statements of facts that are preceding are such facts which are true, correct and complete and are known to me through firsthand knowledge and experiences. The information and facts stated herein are correct in their veracity and are made under the penalty of perjury.

Respectfully,

/s/ Raziel Ofer
Raz Ofer
3206 NE 2nd Ave, #1093
Miami, FL 33137
Raz.ofer2@gmail.com

STATE/PROVIDENCE OF Florida

COUNTY/PARISH OF Broward

The above named person appeared before me and affixed his signature or mark, sworn to (or affirmed) and subscribed before me this 14th day of October, 20 26, by Raziel Ofer (Name of Person Making Statement).

(Seal)

NOTARY PUBLIC STATE OF FLORIDA

Notarial Act performed by Audio-Video Communication.

Signature of Notary Public

David Merkatz
Print, Type or Stamp Name of Notary

Personally Known: ____
OR Produced Identification: x
Type of Identification Produced: Passport

# EXHIBIT "B"

FILED BY ________ D.C.
FEB 26 2026
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 1:23-CV-24738-WFJG

RAZIEL OFER,
Plaintiff,

v.

LAUREL M. ISICOFF,
Defendant,
_____________________________/

PLAINTIFF'S AMENDED RENEWED MOTION FOR LEAVE TO DEPOSE NONPARTY WITNESS STEPHEN MILLAN

Plaintiff, Raziel Ofer ("Ofer" or "Plaintiff"), as a self-represented litigant, files his renewed motion for leave of the Court to depose non-party witness, former State Court Judge, Stephen Millan. Plaintiff states:

1. Plaintiff seeks to depose non-party Stephen Millan as a person who has material information as to the instant matter concerning the conduct of the Defendant in this matter and the allegations made.
2. Fed. R. Civ. P. 30(a)(2) states that, with regard to deposition by oral examination, "A party must obtain leave of court, and the court must grant leave to the extent consistent with Rule 26(b)(1) and (2)........(A) if the parties have not stipulated to the deposition and .... (iii) the party seeks to take the deposition before the time specified in Rule 26(d)."
3. The scheduling order and conference, as required under Fed. R. Civ. P. 26(f), has been completed as to the Defendant and Plaintiff, so the grant of the request for the deposition is proper.
4. As such, the deposition may not occur unless leave of the Court is sought.

5. In order to progress the matter here, the deposition of former Judge Stephen Millan is instrumental to the disposition of this matter. It's abundantly clear that as a result of Millan's deposition, the case will be ripe for a motion for summary judgment (MSJ), or a partial MSG.

6. There is the matter as to the knowledge that Mr. Millan possesses, on a firsthand basis, as to the facts involved in this matter and to the conflicts that arise in it.

7. Plaintiff originally consulted with Mr. Millan in 2019, prior to the Opustone Action being initiated in the Florida State Circuit Court in 2019.

8. At the time that Plaintiff met with Mr. Millan, whom he went to see in regards to handling litigation defense in several actions then existing, Mr. Millan was receiving rent free office space in a shared space with other nonparties Roniel Rodriguez, IV and Stuart R. Kalb.

9. These individuals have been discovered to have made bribery payments to judges and were recorded discussing the Defendant and how she would rule at a time when there was no filed bankruptcy petition which she could have presided over. The name Laurel Isicoff is mentioned in this recording some three months before she was even appointed to preside over the case.

10. Subsequently, a recording of a call involving Mr. Millan and Ofer was made where he was prepared to hand over Mr. Rodriguez and Mr. Kalb to law enforcement for prosecution of their unlawful conduct, describing the web of players involved in the conspiracy to bribe judges.

11. Mr. Millian also had information discussing how the Defendant had found a way to influence the district court judge who presided over the Plaintiff's case to which Judge William Jung presides against the Defendant.

12. The deposition of Mr. Millan to discover more in-depth facts to this situation is paramount to this matter.

13. The deposition of Mr. Millan is crucial to Plaintiff's claims and would provide more than the necessary testimony to present to the Court and the Defendant, showing the Defendant took actions, in her official capacity, which the Defendant was aware of but failed to act upon, giving rise to the Defendant's liability here.

14. Plaintiff would be able to file for summary judgment in light of the deposition of Millan and findings of fact, coupled with the recording to which Mr. Millan was a participant, will establish the liability of the Defendant.

STATEMENT OF CONFERRAL

Pursuant to local rule, Plaintiff has sent an email to counsel for the defendant to seek agreement with or opposition to the deposition of this material witness to the events which are associated with this case. The email was sent to counsel for the Defendant, AUSA Kelsi Romero at kelsi.romero@usdoj.gov. There was not any response to the original email sent for over a week. A follow up email was also sent again on Feb. 25, 2026, seeking a response to the entry of the motion. As of the filing of this motion, counsel for the defense has not responded to the request although a response is expected from them in the near future. Opposition to the motion is unknown. Plaintiff has also conferred previously with the proposed deponent Mr. Millan

on several occasions, the most recent being on or about Dec. 2, 2025 and several attempts made after that during the month of January 2026 to attempt to obtain dates and times for the deposition. Mr. Millan has cited scheduling conflicts previously. Millan has admitted that he had received physical threats not to agree or turn up to any deposition, from Rodrigues IV (ROIV) and his business partner Stuart Kalb (Kalb), so he would only turn up to a deposition if ordered to do so by the Court.

WHEREFORE, Plaintiff Ofer seeks that non-party former Judge Stephen Millan be deposed prior to the conferral conference under Fed. R. Civ. P. 26(f) with the remaining defending parties occurs or any other relief which the Court deems just and proper.

Respectfully,

/s/

Raz Ofer
c/o 3701 DeGarmo Lane
Coconut Grove, FL 33133
Raz.ofer2@gmail.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT a true and correct copy has been served on the following via email and at the address below on this _____ day of Feb., 2026.

Respectfully,

/s/_______________

Raz Ofer
C/O 3701 DeGarmo Lane
Coconut Grove, FL 33133
Raz.ofer2@gmail.com

# EXHIBIT "C"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 1:23-CV-24738-WFJG

RAZIEL OFER,
Plaintiff,

v.

LAUREL M. ISICOFF,
Defendant,
_______________________________/

FILED BY [signature] D.C.
DEC 16 2025
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

PLAINTIFF'S MOTION FOR RECUSAL OR DISQUALIFICATION

Plaintiff, Raz Ofer ("Ofer" or "Plaintiff"), proceeding pro se, enters his MOTION FOR RECUSAL OR DISQUALIFICATION directed toward Hon. Judge William F. Jung, District Court for the Middle District of Florida ("Jung") on the basis that the judge is not impartial and conflicted, Plaintiff feels he will not receive fair and impartial adjudication of his matter, as follows:

BACKGROUND

This matter is in regards to manipulation and other misconduct which has ensnared District Court Judge William F. Jung in its net cast by attorney Roniel Rodriguez IV (ROIV) and Mr. Stuart Kalb (Kalb), his corrupt business partner. In the web of deceit, the criminal duo is responsible for the theft of over $50 million of real estate from the Plaintiff in addition to $70 million in damages, through engineered judicial manipulation of bribes and judicial abuse. Within this web is the Defendant, Judge Laurel Isicoff, amongst others, who has received $2 million in bribes to cooperate with the criminal pair in order to achieve the theft. The history of the criminal pair does not stop there as they are engaged in

extortion, blackmail and physical threats of witnesses, And this Court and judge are not without taint in this conspiracy committed jointly with Judge Isicoff. Isicoff's actions are being investigated by the Eleventh Circuit Court of Appeal (Eleventh), separately from any appeal.

After the filing of the initial complaint in this matter in the Southern District, this case changed hands between five judges who sua sponte recused themselves from presiding over this case, including Chief Judge Altonaga due to apparent conflicts those judges had in relation to this matter due to their familiarity with Isicoff. Following those recusals, the Chief Judge of the Eleventh Circuit sought ***volunteers*** to accept the matter and preside over the case. After the Defendant's peers recused themselves from this matter, Judge Jung placed himself in the position to volunteer to preside over this matter. The Eleventh Circuit Chief Judge appointed Judge Jung to preside over this matter which was followed by his entry of a stay. On motion to dismiss the matter by the Defendant's attorney, Judge Jung, without notice to the Plaintiff, engaged in conduct which was tantamount to lifting the stay to enter a dismissal of this matter with prejudice, in a clear breach of due process and the Statute, all in an effort to protect the Defendant which is in line with the recording made with the call involving Mr. Millan, a former Circuit Court Judge and the Plaintiff, see details below. Although former Judge Millan was removed from the bench, as a former Judge he still enjoys a certain level of credibility, over and above other witnesses.

Prior to the entry of the dismissal by Judge Jung, Mr. Millan had a call with the Plaintiff (Ofer) arranged by a friend of Mr. Millan and Ofer. Mr. Millan was in his office with his door open and Plaintiff was at a resident Bar on the 57th Floor of his resident building

in London with a girlfriend situated next to him who recorded the call. The resident's bar was quite busy with other residents also sitting in close proximity to Mr. Ofer and his girlfriend. The call was through the cell phone of the joint friend of Mr. Ofer and Mr. Millan, the call was on speaker. There was also a State Attorney detective listening to the call in the next-door office where Mr. Millan was located. Mr. Millan has received free office space from ROIV and Kalb for 7 years, so he had intimate knowledge of the criminal activities and bribes committed by this pair of criminals. In this call Mr. Millan offered to turn over ROIV & Kalb to law enforcement, in exchange for being paid $ 1 million, obviously to protect himself from the threats of ROIV & Kalb and provide full details and evidence of their bribes to Judges. Mr. Ofer's lawyers confirmed that if Millan provides the necessary evidence to law enforcement, the State Attorney or the FBI, than Mr. Ofer is allowed to legally pay him. Mr. Millan was given free office space by ROIV & Kalb in their office for 7 years, so he had intimate knowledge about their criminal activities. When the lawsuit against the Defendant was mentioned during the call, Mr. Millan responded to the information and said "Raz you can forget about this complaint, Isicoff found a way to influence Judge Jung and your complaint would be dismissed", which clearly occurred three weeks after the call took place. The Judge in this case, Judge Jung, is clearly implicated in Isicoff's criminal activities, by former Judge Millan's comments. Mr. Millan also elaborated during the call about payments and bribes to other Circuit (State) Court Judges. Judge Jung's decision to dismiss the initial complaint was clearly motivated by the fact that he's conflicted and implicated by this criminal conspiracy along with Isicoff. It's with no surprise that Judge Isicoff has recused herself without a pending recusal motion, after at earlier stages has denied numerous recusal motions. In another surprising

move she also announced her retirement, only a few months after she assured to finish her 17-year term, which started about a year earlier. Judge Isicoff isn't aware that some of her closest friends are also my close friends, so I do know certain things she shares with them. These issues will come to a head during the trial. Former Judge Millan's deposition will open a pandora box never seen before. I've elaborated on the above in a separate lawsuit in District Court, including everything that Mr. Millan has disclosed to me during the call, Millan never denied what I said, his only response was that he's not the one that recorded the call, which is true. Mr. Millan must be subpoenaed and compelled to appear to a deposition, as he's under violent threats from ROIV and Kalb not to appear. Honorable Judge Jung decision does not allow Mr. Millan's deposition before I produce the recording, isn't just highly suspicious and corrupt, it's absurd as Mr. Millan already confirmed all the above, so judge Jung attempt to protect himself and his conflict is doomed. The opposite, it only goes to vindicate Mr. Ofer's claims about gross corruption involving this case. Of course, Mr. Ofer will never agree to produce the tape before Mr. Millan is deposed, as such premature production will enable Mr. Millan to avoid perjury and help him prepare for his deposition. Just as an example, in case the recording is somehow lost, although it's not lost and is available, would Judge Jung in this case prevent me from deposing Mr. Millan, despite the fact that Mr. Millan already confirmed all the above. Of course, Judge Jung would have allowed such deposition to proceed, it's unlikely that Judge Jung wants his decisions being reversed for the second time by the Eleventh. Regardless of the recusal motion, I ask Judge Jung to immediately allow the depositions of Mr. Millan, Attorneys Mr. Winker and Mr. Roher and also Recall Judge Paul Hyman, his evidence would be shocking with far reaching implications on Isicoff, this isn't

the forum to elaborate on his testimony. If necessary, I hope it won't get to it, Ofer would appeal Judge Jung's decision to the Eleventh straight away.

The Plaintiff appealed the decision to dismiss the initial case with prejudice to the Eleventh Circuit. In his argument, the Plaintiff raised the issue of the propriety of the dismissal without due process. In other words, the claim raised was one that called into question the actions of the dismissal at a time when the stay was in place, no notice given by the Court to lift the stay and the immediate dismissal on the Defendant's motion.....all without hearing. The appeals court reversed and remanded specifically finding that the Court did not allow the Plaintiff's right to amend the complaint to be exercised. In short, Judge Jung acted in a way that clearly abused the discretion vested in him and violated the Plaintiff's due process rights. It appears the intent was to not just close the case, but shut the case down with a clear dismissal with prejudice to foreclose future actions. Judge Jung failed in his evil plan, luckily the Eleventh has proven once again their competency and honesty. Ofer seized the opportunity to amend the initial complaint by clarifying the initial complaint and adding new issues that turned up after the initial complaint was filed, these new issues go a long way to prove the case against Isicoff.

To be clear, this motion for disqualification is not directed at a judgment entered by Judge Jung, but the very conflict and bias that arises here being influenced by the Defendant as confirmed by the call with former Judge Millan. This is the core reason for the recusal. This conduct gives a very real fear to the Plaintiff that his claims will not be adjudicated with a cold neutrality required by a Judge to act in a case. But the concerns do not stop here. The Court has, for the second time in this matter, requested that the recording of the phone conversation between the Plaintiff and Millan to be produced with

a video of the conversation implicating the Defendant in the crimes with ROIV & Kalb, despite the audio regarding the Defendant was previously disclosed. Regardless, Mr. Ofer will produce the video of the discussion between ROIV & Kalb implicated Isicoff with their crimes, although he already filed the recording numerous times and it's also part of this complaint. The recording of ROIV and Kalb took place some 3 months before the case was even filed, at that time ROIV & Kalb already knew that Judge Laurel Isicoff would be the Judge presiding over this case and knew how she would rule.... I repeat, although I already filed this recording, I'll also file the video of this outrageous discussion

It's absurd, very disturbing and unthinkable that Mr. Ofer would agree to release the recording with Mr. Millan before the Plaintiff can depose former Judge, Mr. Millan. Producing the tape before such deposition, will enable Mr. Millan to calculate his replies in order to avoid perjury and to be able to plan to which questions he should invoke a defense against self-incrimination. It's clear that Judge Jung wants the recording with Mr. Millan produced before Mr. Millan's deposition in order to protect himself as he knows it could have personal implications, possibly criminal, on him personally, this will never happen. The fact that a Judge would order evidence of his own wrongdoing and corruption produced just to have the ability to review it prior to any other action being taken on it is unthinkable, alarming and corrupt. Not only is this an abuse of power and discretion, but unethical in so many ways. This is tantamount to using his position to protect himself from being implicated by judicial fiat. Should Judge Jung hear something which implicates him in this recording and he rules on this matter in a way that amounts to tampering with evidence or suppressing it so it cannot be used against him in the future, there is the very

real likelihood that such an act would open him to personal liability, both civil and criminal, and judicial immunity could not be there to protect him.

If there are any reasons for recusing himself, this proves to be the basis for it, not to mention his outrageous actions and breach of due process in the initial complaint. The appearance of impropriety cannot be clearer. One, the Judge dismisses an action with prejudice not allowing an amendment of the pleading which is a matter of right, a right well known, especially to a Judge with such tenure on the bench. Then, the Plaintiff discloses that Judge Jung is manipulated by the Defendant. On the surface, there would not be an apparent connection between a Miami bankruptcy Judge and the District Judge from the Middle District of Florida. However, their paths converged in the Southern District of Florida between 1987-1990 when Judge Jung served as an Assistant United States Attorney in the Southern District of Florida. With Judge Isicoff active. Judge Jung association with Isicoff is at least the same as the 5 other District Court Judges who recused themselves due to their familiarity and knowledge of Isicoff, but nor Judge Jung, who feels that he's above the law. The connection between the two are even more pronounced when the Defendant's brother in law, Eric Isicoff and his firm, Isicoff Ragatz, comes into play. Given that Eric Isicoff is a known associate of ROIV in a bribery scheme, and the Defendant received her bribes through Eric Isicoff, the Influence asserted over Judge Jung cannot be more apparent. In the case before Jung in *Rutstein v. Viva 5 Group, LLC*, Case No. 8:24-cv-02417-WFJ-AAS (MDFL 2024), Isicoff Ragatz represented the Defendants Viva 5 Group, LLC who had been accused of plundering the assets of Nature's Craft to the tune of millions of dollars. Judge Jung favorably granted the motion. Obviously another example of manipulation by the Defendant, in a case closely related

to Judge Isicoff. There has never been a stronger case mandating a recusal than this one with Judge Jung.

ANALYSIS AND POINTS OF LAW

Recusal is governed by two federal statutes, 28 U.S.C. §§144 and 455. Under the former, a judge must recuse himself when a party to a district court proceeding files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party. 28 U.S.C. §144. Congress amended the recusal statute in 1974, which "liberalized greatly the scope of disqualification in the federal courts." *United States v. State of Alabama*, 828 F.2d 1532, 1541 (11th Cir. 1987). Under section 455, a judge has a "self-enforcing obligation to recuse himself where the proper legal grounds exist." *Id.* at 1540. Most important, the benefit of the doubt must be resolved in favor of recusal. *Id.* Section 455 designates two primary reasons that a judge must recuse himself. *United States v. Patti*, 337 F.3d 1317, 1321 (11th Cir. 2003). Under §455(a), a judge should recuse himself "when there is an appearance of impropriety." *Id.* The standard of review for whether a judge should have recused himself under §455(a) "is whether an objective, disinterested, lay observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant doubt about the judge's impartiality." *Id.* (quotation marks omitted). Recusal decisions under "§455(a) are extremely fact driven and must be judged on their unique facts and circumstances more than by comparison to situations considered in prior jurisprudence." *In re Moody*, 755 F.3d 891, 895 (11th Cir. 2014) (quotation marks omitted).

The Supreme Court has stated that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States*, 510 U.S. 540, 555, 114 S. Ct. 1147, 127 L. Ed. 2d 474 (1994). Indeed, bias "must stem from *extrajudicial* sources, unless the judge's acts demonstrate such pervasive bias and prejudice that it unfairly prejudices one of the parties." *Berger,* 375 F.3d at 1227 (quotation marks omitted). By "extrajudicial sources," we mean that a litigant cannot seek recusal simply because a judge has ruled against him. *Id.* But "[a]n exception to that rule is made when a judge's remarks in a judicial context demonstrate such pervasive bias and prejudice that it constitutes bias against a party." *Hamm v. Members of the Bd. of Regents*, 708 F.2d 647, 651 (11th Cir. 1983). "

Nonetheless, "a judge, having been assigned to a case, should not recuse himself on unsupported, irrational, or highly tenuous speculation." *In re Moody*, 755 F.3d at 895 (quotation marks omitted). Distinctively, §455(b) lists the several circumstances for when a judge should recuse himself, including, in relevant part, "[w]here he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C. § 455(b). Under § 455(b), "a judge should recuse himself under §455(b) when any of the specific circumstances set forth in that subsection exist, which show the fact of partiality," and finding that one of the circumstances exists requires recusal. *Patti,* 337 F.3d at 1321-22.

## CONCLUSION

There is no doubt that Judge Jung's influence by Judge Isicoff, which is supported by the recording of the conversation between Mr. Millan and Plaintiff would call into question "whether an objective, disinterested, lay observer fully informed of the facts

underlying the grounds on which recusal was sought would entertain a significant doubt about the judge's impartiality." Recusal is justified.

THE STATEMENTS CONTAINED HEREIN ARE MADE FROM FIRSTHAND KNOWLEDGE AND ARE TRUE, CORRECT AND COMPLETE, TO THE BEST OF MY KNOWLEDGE, UNDER THE PENALTY OF PERJURY. THIS STATEMENT IS BEING MADE PURUSANT TO 28 U.S.C. §1746.

I CERTIFY THAT THE FOREGOING IS MADE IN GOOD FAITH AND NOT MADE TO HINDER, DELAY OR HARASS ANY PARTY. THE MOVANT IS NOT REPRESENTED BY COUNSEL AND IS A PRO SE LITIGANT AND ACCORDINGLY SELF-CERTIFIES THIS MOTION. IT IS TO BE UNDERSTOOD THAT THE AFFIDAVIT IS INCORPORATED INTO THIS CERTIFICATION.

/s/____________________

Raz Ofer
C/O 3701 DeGarmo Lane
Coconut Grove, FL 33133
Raz.ofer2@gmail.com

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have served a copy of the foregoing on the attorney for the Defendant, Laurel Isicoff, Johnathan Douglas Lott, DOJ-USAO, 500 E Broward Blvd, Suite 700, Fort Lauderdale, FL 33394, (954) 660-5931, Email: johnathan.lott@usdoj.gov, pursuant to FRCP 11(b), via first class mail on this ______ Day of December, 2025.

/s/________________

Raz Ofer
C/O 3701 DeGarmo Lane
Coconut Grove, FL 33133
Raz.ofer2@gmail.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 1:23-CV-24738-WFJG

RAZIEL OFER,
Plaintiff,

v.

LAUREL M. ISICOFF,
Defendant,
_______________________________/

FILED BY [signature] D.C.
MAR 16 2026
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

PLAINTIFF'S SUPPLEMENTAL TO MOTION FOR RECUSAL OR DISQUALIFICATION

Plaintiff, Raz Ofer ("Ofer" or "Plaintiff"), proceeding pro se, enters his supplement to his previously filed MOTION FOR RECUSAL OR DISQUALIFICATION directed toward Hon. Judge William F. Jung, District Court for the Middle District of Florida ("Jung") on the basis that the judge is not impartial. Plaintiff feels he will not receive fair and impartial adjudication of his matter, as follows:

PRELIMINARY STATEMENT CONCERNING SUCCESSIVE MOTION

Plaintiff recognizes that this motion is a successive motion filed seeking the relief of disqualification against Judge Jung. The current operative motion seeking disqualification in this matter was filed on Dec. 16, 2025, [ECF No. 64], **Exhibit A,** also seeks the same relief of recusal of Judge Jung. Plaintiff states that the two motions are independent of each other and the intent of this successive motion is NOT to cause the Dec. 16, 2025, submission to become waived, withdrawn or mooted by this successive motion. The motions are to be considered independently of one another and raise different grounds seeking disqualification. Under no circumstances is the Dec. 16, 2025,

intended to be withdrawn or waived by the filing of this motion to the extent allowable and expressed in this part.

## BACKGROUND

This matter is in regards to manipulation and other misconduct which has ensnared District Court Judge William F. Jung in its net cast by attorney Roniel Rodriguez IV (ROIV) and Mr. Stuart Kalb (Kalb), his corrupt business partner. In the web of deceit, the criminal duo is responsible for the theft of over $50 million of real estate from the Plaintiff in addition to $70 million in damages, through engineered judicial manipulation of bribes and judicial abuse. Within this web is the Defendant, Judge Laurel Isicoff, amongst others, who has received $2 million in bribes to cooperate with the criminal pair in order to achieve the theft. The history of the criminal pair does not stop there as they are engaged in extortion, blackmail and physical threats of witnesses, and this Court and judge are not without taint in this criminal conspiracy committed jointly with Judge Isicoff. Isicoff's actions are being investigated by the Eleventh Circuit Court of Appeal (Eleventh), separately from any appeal, in addition to the FBI investigation. Ofer agreed to provide details of special agents involved with the investigation for in-camera inspection by the Court.

After the filing of the initial complaint in this matter in the Southern District, this case changed hands between five judges who ***sua sponte*** recused themselves from presiding over this case, including Chief Judge Altonaga, due to apparent conflicts, although not disclosed, that those judges had in relation to this matter or the parties. Following those recusals, the Chief Judge of the Eleventh Circuit sought ***volunteers*** to accept the matter and preside over the case. After the Defendant's peers recused

themselves from this matter, Judge Jung placed himself in the position to volunteer to preside over this matter of his old friend, Isicoff. Of course, Judge doesn't have the same level of integrity as the other 5 District Court Judges who recused themselves due their knowledge of Isicoff. The Eleventh Circuit Chief Judge appointed Judge Jung to preside over this matter which was followed by his entry of a stay. On motion to dismiss the matter by the Defendant's attorney, Judge Jung, without notice to the Plaintiff, engaged in conduct which was tantamount to lifting the stay to enter a dismissal of this matter with prejudice and without notice to the Plaintiff despite a clear statutory right of the Plaintiff to amend the complaint and Court possessing no discretion to avoid the amendment, in a clear breach of due process and the Rule, all in an effort to protect the Defendant and himself (Jung) which is in line with the recording made with the call involving Mr. Millan, a former Circuit Court Judge and the Plaintiff[1].

Now, there are new events which have transpired since the previous motion being entered on Dec. 16, 2025, [ECF No. 64] which warrants further consideration of the ability of Judge Jung to exercise the cold neutrality required of his office and not have the appearance of partiality and bias. In addition to the recent conduct in which Judge Jung displayed support of the Defendant's antisemitic fervor which includes a denial of the holocaust and other similar slogans to those used by Hitler, and apparent disregard for the health and well-being of the Plaintiff.

<u>Health Related Bias</u>

[1] The record of this matter reflects that the Defendant was discussed in a recorded conversation taken in a public setting between ROIV and Kalb where they discussed how the Defendant would rule in a bankruptcy matter ***prior*** to the petition being filed and her being appointed to the case to preside. They also admitted to a Grand Theft of Ofer's properties in this recordingm which has now been filed with the Court.

In his Dec. 17, 2025, notice of hearing setting the date on all then pending motions [ECF No. 66], except of course to the motion to disqualify Judge Jung. Judge Jung issued a requirement that all of the participants appear before the Court physically. This requirement was in light of the Plaintiff clearly notifying the Court of a recent loss of consciousness which hampers his travel over long distances, in addition to the previous notifications to this Court and other matters pending before the District Court of medical conditions which prohibit the Plaintiff's ability to physically attend any hearing before this or any court outside the United Kingdom for that matter[2]. In his Jan. 12, 2026, supplement to his Motion To Alter or Amend Judgment [ECF No. 69], the Plaintiff describes his loss of consciousness and the resultant monitoring for malignant tumor growth as a potential cause for the loss of consciousness. This process resulted in physician's treating the Plaintiff notifying the Civil Aviation Authority in the United Kingdom (CAA) of the Plaintiff's inability to travel by air. This reporting requires the Plaintiff to obtain a "Fit To Fly" examination by an aviation medical examiner followed by the issuance of a certificate. Without this, no airline will be able to allow the Plaintiff to board on a plane and fly from a point of origin in the United Kingdom. The key to the aviation examination is the General Physician for the Plaintiff issuing the referral for its performance, an event which has not happened as of yet and is not expected until the monitoring for the malignant tumor is complete. Despite this, Judge Jung has yet to reverse his requirement for physical appearance before him. JUdge JUng was fully aware that if Ofer loses his consciesness on board a flight, the plane will need to divert to allow Ofer to receive an urgent medical treatment, not available on board a plane. Jung knew that such an order could result in

---

[2] Even travel within the United Kingdom is limited to less than a few hours by vehicle.

fatality and that he put Ofer's life at risk. It seems that Jung was hoping that something would happen to Ofer so that he can dismiss the case without allowing the deposition of former Judge, Stephen Millan, which would incriminate both Isicoff and Jung in a criminal conspiracy to steal $50M plus $70M in damages.

But the disregard for the health of others is not new for Judge Jung. As reported in the media concerning rulings on a Rule issued under the Biden Administration regarding gender and sexual orientation-based discrimination in healthcare payments under the Florida Medicare program, Judge Jung blocked the implementation of a rule which would have stopped gender-based discrimination in providing funding for medical treatment to transgender persons in Florida. In an article published through NPR, written by Jim Saunders on July 3, 2024, shows that Judge Jung clearly sided with restricting the use of the rule in Florida which would have protected funding on an equal footing for all persons. Judge Jung shows his disregard for the well-being of people who face discrimination. This conduct supporting this type of discrimination is similar to his support allowing antisemitic hate speech to continue in this matter, just as the Defendant did. But that is expected given the Defendant's influence and close relationship with Judge Jung.

Adding to this already sordid mix of intolerable behavior, Judge Jung showed his bias clearly directed at the Plaintiff. As mentioned earlier, the Plaintiff suffers from medical ailments which prevent his travel by air on the grounds it poses a significant risk to his health and mortality. This results in him not being able to travel by air and fall within those classes of people who cannot travel without Civil Aviation's medical clearance. When Judge Jung set an in person hearing for certain pending motions before this Court, he was petitioned to reverse such a decision in light of the sheer impossibility of the Plaintiff

to be able to comply due to the restrictions implemented by the CAA in the United Kingdom. After several pleadings on being excused from physical appearance before the Court in light of the inability to comply, defense counsel filed a motion to likewise be excused due to medical related events. Instead of keeping the decision neutral, the decision was entered which disregarded nearly 3 months of insistent pleadings, the Court reversed course and excused physical appearance before the Court. This clearly shows that the Court has a bias against the Plaintiff which adds to his deep rooted fear that he will get a fair and impartial trial. It's crystal clear that Jung has a superior motive, to prevent the deposition of former Judge Millan, that would certainly lead to his recusal, impeachment and a referral to the State Attorney or the FBI for investigation. Furthermore, Ofer emailed Isicoff on 12th March 2026, asking the defendant whether should join him in requesting the Court to allow former Judge Millan's deposition, of course Isicoff refused. This refusal is a clear admission by Isicoff of her guilt, for which Ofer is entitled to a summary judgment against the defendant.

ANALYSIS AND POINTS OF LAW

Recusal is governed by two federal statutes, 28 U.S.C. §§144 and 455. Under the former, a judge must recuse himself when a party to a district court proceeding files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party. 28 U.S.C. §144. Congress amended the recusal statute in 1974, which "liberalized greatly the scope of disqualification in the federal courts." *United States v. State of Alabama*, 828 F.2d 1532, 1541 (11th Cir. 1987). Under section 455, a judge has a "self-enforcing obligation to recuse himself where the proper legal grounds exist." *Id.* at 1540. Most important, the

benefit of the doubt must be resolved in favor of recusal. *Id.* Section 455 designates two primary reasons that a judge must recuse himself. *United States v. Patti*, 337 F.3d 1317, 1321 (11th Cir. 2003). Under §455(a), a judge should recuse himself "when there is an appearance of impropriety." *Id.* The standard of review for whether a judge should have recused himself under §455(a) "is whether an objective, disinterested, lay observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant doubt about the judge's impartiality." *Id.* (quotation marks omitted). Recusal decisions under "§455(a) are extremely fact driven and must be judged on their unique facts and circumstances more than by comparison to situations considered in prior jurisprudence." *In re Moody*, 755 F.3d 891, 895 (11th Cir. 2014) (quotation marks omitted).

The Supreme Court has stated that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States*, 510 U.S. 540, 555, 114 S. Ct. 1147, 127 L. Ed. 2d 474 (1994). Indeed, bias "must stem from *extrajudicial* sources, unless the judge's acts demonstrate such pervasive bias and prejudice that it unfairly prejudices one of the parties." *Berger*, 375 F.3d at 1227 (quotation marks omitted). By "extrajudicial sources," we mean that a litigant cannot seek recusal simply because a judge has ruled against him. *Id.* But "[a]n exception to that rule is made when a judge's remarks in a judicial context demonstrate such pervasive bias and prejudice that it constitutes bias against a party." *Hamm v. Members of the Bd. of Regents*, 708 F.2d 647, 651 (11th Cir. 1983). "

Nonetheless, "a judge, having been assigned to a case, should not recuse himself on unsupported, irrational, or highly tenuous speculation." *In re Moody*, 755 F.3d at 895

(quotation marks omitted). Distinctively, §455(b) lists the several circumstances for when a judge should recuse himself, including, in relevant part, "[w]here he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C. § 455(b). Under § 455(b), "a judge should recuse himself under §455(b) when any of the specific circumstances set forth in that subsection exist, which show the fact of partiality," and finding that one of the circumstances exists requires recusal. *Patti,* 337 F.3d at 1321-22.

## CONCLUSION

There is no doubt that Judge Jung's conduct and his likewise disregard for the well-being of the Plaintiff, with the corresponding influence by the Defendant outlined in the First Motion To Disqualify filed Dec. 16, 2025, **Exhibit A**, which is supported by the recording of the conversation between Mr. Millan and Plaintiff would call into question "whether an objective, disinterested, lay observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant doubt about the judge's impartiality." Recusal is justified.

[INTENTIONALLY LEFT BLANK].

THE STATEMENTS CONTAINED HEREIN ARE MADE FROM FIRSTHAND KNOWLEDGE AND ARE TRUE, CORRECT AND COMPLETE, TO THE BEST OF MY KNOWLEDGE, UNDER THE PENALTY OF PERJURY. THIS STATEMENT IS BEING MADE PURUSANT TO 28 U.S.C. §1746.

I CERTIFY THAT THE FOREGOING IS MADE IN GOOD FAITH AND NOT MADE TO HINDER, DELAY OR HARASS ANY PARTY. THE MOVANT IS NOT REPRESENTED BY COUNSEL AND IS A PRO SE LITIGANT AND ACCORDINGLY SELF-CERTIFIES THIS MOTION. IT IS TO BE UNDERSTOOD THAT THE AFFIDAVIT IS INCORPORATED INTO THIS CERTIFICATION.

/s/________________
Raz Ofer
C/O 3701 DeGarmo Lane
Coconut Grove, FL 33133
Raz.ofer2@gmail.com

CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT a true and correct copy has been served on the following via email and at the address below. I HEREBY CERTIFY that I have served a copy of the foregoing on the attorney for the Defendant, Laurel Isicoff, Johnathan Douglas Lott, DOJ-USAO, 500 E Broward Blvd, Suite 700, Fort Lauderdale, FL 33394, (954) 660-5931, Email: johnathan.lott@usdoj.gov, pursuant to FRCP 11(b), via first class mail on this ______ Day of March, 2026.

/s/________________
Raz Ofer
C/O 3701 DeGarmo Lane
Coconut Grove, FL 33133
Raz.ofer2@gmail.com

# EXHIBIT "A"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 1:23-CV-24738-WFJG

RAZIEL OFER,
Plaintiff,

v.

LAUREL M. ISICOFF,
Defendant,

FILED BY [signature] D.C.
DEC 16 2025
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

PLAINTIFF'S MOTION FOR RECUSAL OR DISQUALIFICATION

Plaintiff, Raz Ofer ("Ofer" or "Plaintiff"), proceeding pro se, enters his MOTION FOR RECUSAL OR DISQUALIFICATION directed toward Hon. Judge William F. Jung, District Court for the Middle District of Florida ("Jung") on the basis that the judge is not impartial and conflicted, Plaintiff feels he will not receive fair and impartial adjudication of his matter, as follows:

BACKGROUND

This matter is in regards to manipulation and other misconduct which has ensnared District Court Judge William F. Jung in its net cast by attorney Roniel Rodriguez IV (ROIV) and Mr. Stuart Kalb (Kalb), his corrupt business partner. In the web of deceit, the criminal duo is responsible for the theft of over $50 million of real estate from the Plaintiff in addition to $70 million in damages, through engineered judicial manipulation of bribes and judicial abuse. Within this web is the Defendant, Judge Laurel Isicoff, amongst others, who has received $2 million in bribes to cooperate with the criminal pair in order to achieve the theft. The history of the criminal pair does not stop there as they are engaged in

extortion, blackmail and physical threats of witnesses, And this Court and judge are not without taint in this conspiracy committed jointly with Judge Isicoff. Isicoff's actions are being investigated by the Eleventh Circuit Court of Appeal (Eleventh), separately from any appeal.

After the filing of the initial complaint in this matter in the Southern District, this case changed hands between five judges who sua sponte recused themselves from presiding over this case, including Chief Judge Altonaga due to apparent conflicts those judges had in relation to this matter due to their familiarity with Isicoff. Following those recusals, the Chief Judge of the Eleventh Circuit sought ***volunteers*** to accept the matter and preside over the case. After the Defendant's peers recused themselves from this matter, Judge Jung placed himself in the position to volunteer to preside over this matter. The Eleventh Circuit Chief Judge appointed Judge Jung to preside over this matter which was followed by his entry of a stay. On motion to dismiss the matter by the Defendant's attorney, Judge Jung, without notice to the Plaintiff, engaged in conduct which was tantamount to lifting the stay to enter a dismissal of this matter with prejudice, in a clear breach of due process and the Statute, all in an effort to protect the Defendant which is in line with the recording made with the call involving Mr. Millan, a former Circuit Court Judge and the Plaintiff, see details below. Although former Judge Millan was removed from the bench, as a former Judge he still enjoys a certain level of credibility, over and above other witnesses.

Prior to the entry of the dismissal by Judge Jung, Mr. Millan had a call with the Plaintiff (Ofer) arranged by a friend of Mr. Millan and Ofer. Mr. Millan was in his office with his door open and Plaintiff was at a resident Bar on the 57th Floor of his resident building

in London with a girlfriend situated next to him who recorded the call. The resident's bar was quite busy with other residents also sitting in close proximity to Mr. Ofer and his girlfriend. The call was through the cell phone of the joint friend of Mr. Ofer and Mr. Millan, the call was on speaker. There was also a State Attorney detective listening to the call in the next-door office where Mr. Millan was located. Mr. Millan has received free office space from ROIV and Kalb for 7 years, so he had intimate knowledge of the criminal activities and bribes committed by this pair of criminals. In this call Mr. Millan offered to turn over ROIV & Kalb to law enforcement, in exchange for being paid $ 1 million, obviously to protect himself from the threats of ROIV & Kalb and provide full details and evidence of their bribes to Judges. Mr. Ofer's lawyers confirmed that if Millan provides the necessary evidence to law enforcement, the State Attorney or the FBI, than Mr. Ofer is allowed to legally pay him. Mr. Millan was given free office space by ROIV & Kalb in their office for 7 years, so he had intimate knowledge about their criminal activities. When the lawsuit against the Defendant was mentioned during the call, Mr. Millan responded to the information and said "Raz you can forget about this complaint, Isicoff found a way to influence Judge Jung and your complaint would be dismissed", which clearly occurred three weeks after the call took place. The Judge in this case, Judge Jung, is clearly implicated in Isicoff's criminal activities, by former Judge Millan's comments. Mr. Millan also elaborated during the call about payments and bribes to other Circuit (State) Court Judges. Judge Jung's decision to dismiss the initial complaint was clearly motivated by the fact that he's conflicted and implicated by this criminal conspiracy along with Isicoff. It's with no surprise that Judge Isicoff has recused herself without a pending recusal motion, after at earlier stages has denied numerous recusal motions. In another surprising

move she also announced her retirement, only a few months after she assured to finish her 17-year term, which started about a year earlier. Judge Isicoff isn't aware that some of her closest friends are also my close friends, so I do know certain things she shares with them. These issues will come to a head during the trial. Former Judge Millan's deposition will open a pandora box never seen before. I've elaborated on the above in a separate lawsuit in District Court, including everything that Mr. Millan has disclosed to me during the call, Millan never denied what I said, his only response was that he's not the one that recorded the call, which is true. Mr. Millan must be subpoenaed and compelled to appear to a deposition, as he's under violent threats from ROIV and Kalb not to appear. Honorable Judge Jung decision does not allow Mr. Millan's deposition before I produce the recording, isn't just highly suspicious and corrupt, it's absurd as Mr. Millan already confirmed all the above, so judge Jung attempt to protect himself and his conflict is doomed. The opposite, it only goes to vindicate Mr. Ofer's claims about gross corruption involving this case. Of course, Mr. Ofer will never agree to produce the tape before Mr. Millan is deposed, as such premature production will enable Mr. Millan to avoid perjury and help him prepare for his deposition. Just as an example, in case the recording is somehow lost, although it's not lost and is available, would Judge Jung in this case prevent me from deposing Mr. Millan, despite the fact that Mr. Millan already confirmed all the above. Of course, Judge Jung would have allowed such deposition to proceed, it's unlikely that Judge Jung wants his decisions being reversed for the second time by the Eleventh. Regardless of the recusal motion, I ask Judge Jung to immediately allow the depositions of Mr. Millan, Attorneys Mr. Winker and Mr. Roher and also Recall Judge Paul Hyman, his evidence would be shocking with far reaching implications on Isicoff, this isn't

the forum to elaborate on his testimony. If necessary, I hope it won't get to it, Ofer would appeal Judge Jung's decision to the Eleventh straight away.

The Plaintiff appealed the decision to dismiss the initial case with prejudice to the Eleventh Circuit. In his argument, the Plaintiff raised the issue of the propriety of the dismissal without due process. In other words, the claim raised was one that called into question the actions of the dismissal at a time when the stay was in place, no notice given by the Court to lift the stay and the immediate dismissal on the Defendant's motion.....all without hearing. The appeals court reversed and remanded specifically finding that the Court did not allow the Plaintiff's right to amend the complaint to be exercised. In short, Judge Jung acted in a way that clearly abused the discretion vested in him and violated the Plaintiff's due process rights. It appears the intent was to not just close the case, but shut the case down with a clear dismissal with prejudice to foreclose future actions. Judge Jung failed in his evil plan, luckily the Eleventh has proven once again their competency and honesty. Ofer seized the opportunity to amend the initial complaint by clarifying the initial complaint and adding new issues that turned up after the initial complaint was filed, these new issues go a long way to prove the case against Isicoff.

To be clear, this motion for disqualification is not directed at a judgment entered by Judge Jung, but the very conflict and bias that arises here being influenced by the Defendant as confirmed by the call with former Judge Millan. This is the core reason for the recusal. This conduct gives a very real fear to the Plaintiff that his claims will not be adjudicated with a cold neutrality required by a Judge to act in a case. But the concerns do not stop here. The Court has, for the second time in this matter, requested that the recording of the phone conversation between the Plaintiff and Millan to be produced with

a video of the conversation implicating the Defendant in the crimes with ROIV & Kalb, despite the audio regarding the Defendant was previously disclosed. Regardless, Mr. Ofer will produce the video of the discussion between ROIV & Kalb implicated Isicoff with their crimes, although he already filed the recording numerous times and it's also part of this complaint. The recording of ROIV and Kalb took place some 3 months before the case was even filed, at that time ROIV & Kalb already knew that Judge Laurel Isicoff would be the Judge presiding over this case and knew how she would rule.... I repeat, although I already filed this recording, I'll also file the video of this outrageous discussion

It's absurd, very disturbing and unthinkable that Mr. Ofer would agree to release the recording with Mr. Millan before the Plaintiff can depose former Judge, Mr. Millan. Producing the tape before such deposition, will enable Mr. Millan to calculate his replies in order to avoid perjury and to be able to plan to which questions he should invoke a defense against self-incrimination. It's clear that Judge Jung wants the recording with Mr. Millan produced before Mr. Millan's deposition in order to protect himself as he knows it could have personal implications, possibly criminal, on him personally, this will never happen. The fact that a Judge would order evidence of his own wrongdoing and corruption produced just to have the ability to review it prior to any other action being taken on it is unthinkable, alarming and corrupt. Not only is this an abuse of power and discretion, but unethical in so many ways. This is tantamount to using his position to protect himself from being implicated by judicial fiat. Should Judge Jung hear something which implicates him in this recording and he rules on this matter in a way that amounts to tampering with evidence or suppressing it so it cannot be used against him in the future, there is the very

real likelihood that such an act would open him to personal liability, both civil and criminal, and judicial immunity could not be there to protect him.

If there are any reasons for recusing himself, this proves to be the basis for it, not to mention his outrageous actions and breach of due process in the initial complaint. The appearance of impropriety cannot be clearer. One, the Judge dismisses an action with prejudice not allowing an amendment of the pleading which is a matter of right, a right well known, especially to a Judge with such tenure on the bench. Then, the Plaintiff discloses that Judge Jung is manipulated by the Defendant. On the surface, there would not be an apparent connection between a Miami bankruptcy Judge and the District Judge from the Middle District of Florida. However, their paths converged in the Southern District of Florida between 1987-1990 when Judge Jung served as an Assistant United States Attorney in the Southern District of Florida. With Judge Isicoff active. Judge Jung association with Isicoff is at least the same as the 5 other District Court Judges who recused themselves due to their familiarity and knowledge of Isicoff, but nor Judge Jung, who feels that he's above the law. The connection between the two are even more pronounced when the Defendant's brother in law, Eric Isicoff and his firm, Isicoff Ragatz, comes into play. Given that Eric Isicoff is a known associate of ROIV in a bribery scheme, and the Defendant received her bribes through Eric Isicoff, the Influence asserted over Judge Jung cannot be more apparent. In the case before Jung in *Rutstein v. Viva 5 Group, LLC*, Case No. 8:24-cv-02417-WFJ-AAS (MDFL 2024), Isicoff Ragatz represented the Defendants Viva 5 Group, LLC who had been accused of plundering the assets of Nature's Craft to the tune of millions of dollars. Judge Jung favorably granted the motion. Obviously another example of manipulation by the Defendant, in a case closely related

to Judge Isicoff. There has never been a stronger case mandating a recusal than this one with Judge Jung.

ANALYSIS AND POINTS OF LAW

Recusal is governed by two federal statutes, 28 U.S.C. §§144 and 455. Under the former, a judge must recuse himself when a party to a district court proceeding files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party. 28 U.S.C. §144. Congress amended the recusal statute in 1974, which "liberalized greatly the scope of disqualification in the federal courts." *United States v. State of Alabama*, 828 F.2d 1532, 1541 (11th Cir. 1987). Under section 455, a judge has a "self-enforcing obligation to recuse himself where the proper legal grounds exist." *Id.* at 1540. Most important, the benefit of the doubt must be resolved in favor of recusal. *Id.* Section 455 designates two primary reasons that a judge must recuse himself. *United States v. Patti*, 337 F.3d 1317, 1321 (11th Cir. 2003). Under §455(a), a judge should recuse himself "when there is an appearance of impropriety." *Id.* The standard of review for whether a judge should have recused himself under §455(a) "is whether an objective, disinterested, lay observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant doubt about the judge's impartiality." *Id.* (quotation marks omitted). Recusal decisions under "§455(a) are extremely fact driven and must be judged on their unique facts and circumstances more than by comparison to situations considered in prior jurisprudence." *In re Moody*, 755 F.3d 891, 895 (11th Cir. 2014) (quotation marks omitted).

The Supreme Court has stated that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States*, 510 U.S. 540, 555, 114 S. Ct. 1147, 127 L. Ed. 2d 474 (1994). Indeed, bias "must stem from *extrajudicial* sources, unless the judge's acts demonstrate such pervasive bias and prejudice that it unfairly prejudices one of the parties." *Berger*, 375 F.3d at 1227 (quotation marks omitted). By "extrajudicial sources," we mean that a litigant cannot seek recusal simply because a judge has ruled against him. *Id.* But "[a]n exception to that rule is made when a judge's remarks in a judicial context demonstrate such pervasive bias and prejudice that it constitutes bias against a party." *Hamm v. Members of the Bd. of Regents*, 708 F.2d 647, 651 (11th Cir. 1983). "

Nonetheless, "a judge, having been assigned to a case, should not recuse himself on unsupported, irrational, or highly tenuous speculation." *In re Moody*, 755 F.3d at 895 (quotation marks omitted). Distinctively, §455(b) lists the several circumstances for when a judge should recuse himself, including, in relevant part, "[w]here he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C. § 455(b). Under § 455(b), "a judge should recuse himself under §455(b) when any of the specific circumstances set forth in that subsection exist, which show the fact of partiality," and finding that one of the circumstances exists requires recusal. *Patti*, 337 F.3d at 1321-22.

## CONCLUSION

There is no doubt that Judge Jung's influence by Judge Isicoff, which is supported by the recording of the conversation between Mr. Millan and Plaintiff would call into question "whether an objective, disinterested, lay observer fully informed of the facts

underlying the grounds on which recusal was sought would entertain a significant doubt about the judge's impartiality." Recusal is justified.

THE STATEMENTS CONTAINED HEREIN ARE MADE FROM FIRSTHAND KNOWLEDGE AND ARE TRUE, CORRECT AND COMPLETE, TO THE BEST OF MY KNOWLEDGE, UNDER THE PENALTY OF PERJURY. THIS STATEMENT IS BEING MADE PURUSANT TO 28 U.S.C. §1746.

I CERTIFY THAT THE FOREGOING IS MADE IN GOOD FAITH AND NOT MADE TO HINDER, DELAY OR HARASS ANY PARTY. THE MOVANT IS NOT REPRESENTED BY COUNSEL AND IS A PRO SE LITIGANT AND ACCORDINGLY SELF-CERTIFIES THIS MOTION. IT IS TO BE UNDERSTOOD THAT THE AFFIDAVIT IS INCORPORATED INTO THIS CERTIFICATION.

/s/____________________

Raz Ofer
C/O 3701 DeGarmo Lane
Coconut Grove, FL 33133
Raz.ofer2@gmail.com

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have served a copy of the foregoing on the attorney for the Defendant, Laurel Isicoff, Johnathan Douglas Lott, DOJ-USAO, 500 E Broward Blvd, Suite 700, Fort Lauderdale, FL 33394, (954) 660-5931, Email: johnathan.lott@usdoj.gov, pursuant to FRCP 11(b), via first class mail on this ______ Day of December, 2025.

/s/______________

Raz Ofer
C/O 3701 DeGarmo Lane
Coconut Grove, FL 33133
Raz.ofer2@gmail.com

# EXHIBIT "D"

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**RAZIEL OFER,**

Plaintiff,

v. Case No. 1:23-cv-24738-WFJG

**LAUREL ISICOFF,**

Defendant.
_______________________________________/

## ORDER

Before the Court is Defendant Laurel Isicoff's Motion to Partially Lift Stay and to Dismiss (Dkt. 16). Plaintiff Raziel Ofer has responded (Dkt. 17), and Defendant has replied (Dkt. 18). Plaintiff has also filed two supplementary briefings (Dkt. 19; Dkt. 21). Upon careful consideration, the Court grants Defendant's Motion.

## BACKGROUND

Plaintiff is an interest holder in two entities that have been subject to federal bankruptcy proceedings in the Southern District of Florida. *See in re 942 Penn RR, LLC*, No. 1:22-bk-14038 (Bankr. S.D. Fla.); *in re DRO 15R LLC*, No. 1:22-bk-12017 (Bankr. S.D. Fla.) (dismissed July 17, 2023); *see also, e.g.*, *DRO 15R LLC v. Ajar Holdings, LLC*, No. 1:22-ap-1128 (Bankr. S.D. Fla. adversary proceeding); *DRO 15R LLC v. Ajar Holdings, LLC*, No. 1:22-ap-1130 (Bankr. S.D. Fla. adversary proceeding). Defendant is a United States Bankruptcy Judge who has presided, and

is still presiding, over these proceedings. In the instant case, Plaintiff, proceeding *pro se*, accuses Defendant of participating in a vast antisemitic conspiracy to dispossess Jewish property for personal monetary gain. *See generally* Dkt. 1.

Following multiple recusals in the Southern District of Florida, the Chief Judge of the United States Court of Appeals for the Eleventh Circuit assigned Plaintiff's case to this Court. Dkt. 11. The Court subsequently entered a stay pending appeal of Plaintiff's bankruptcy proceedings. Dkt. 15. Defendant now requests that the Court partially lift the stay to address her arguments for dismissal. Dkt. 16.

## LEGAL STANDARD

A complaint withstands dismissal under Federal Rule of Civil Procedure 12(b)(6) if the alleged facts state a claim for relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This standard does not require detailed factual allegations but demands more than an unadorned accusation. *Id.* All facts are accepted as true and viewed in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008).

At the dismissal stage, a court may consider matters judicially noticed, such as public records, without converting a defendant's motion to one for summary judgment. *See Universal Express, Inc. v. S.E.C.*, 177 F. App'x 52, 52 (11th Cir. 2006). Additionally, documents may be considered at the dismissal stage if they are

central to, referenced in, or attached to the complaint. *LaGrasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004). Documents attached to a motion to dismiss may also be considered if the documents are (1) central to the plaintiff's claim, and (2) undisputed (if their authenticity is not challenged). *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002).

## DISCUSSION

"The inherent discretionary authority of [district courts] to stay litigation pending the outcome of related proceeding[s] in another forum is not questioned." *CTI-Container Leasing Corp. v. Uiterwyk Corp.*, 685 F.2d 1284, 1288 (11th Cir. 1982). For this reason, district courts also enjoy discretion in lifting stays to address discrete legal issues. *Tribble v. Tew*, 760 F. App'x 718, 722 (11th Cir. 2019) (concluding that "the district court did not abuse its discretion by temporarily lifting the stay and discharging [the plaintiff-appellant's] lis pendens"). The Court chooses to exercise this discretion here because, notwithstanding Plaintiff's ongoing bankruptcy proceedings, the instant case is patently frivolous and ripe for dismissal.[1]

[1] The Court recognizes that the automatic stay provision of 11 U.S.C. § 362(a) is at play in the underlying bankruptcy proceedings. But, as other courts have held, "Section 362 by its terms only stays proceedings *against* the debtor. The statute does not address actions brought *by* the debtor[.]" *Trans Caribbean Lines, Inc. v. Tracor Marine, Inc.*, 49 B.R. 360 (S.D. Fla. 1985) (quoting *Assoc. of St. Croix Condo. Owners v. St. Croix Hotel Corp.*, 682 F.2d 446, 448 (3d Cir. 1982). Further, this is not an appeal from proceedings that were originally brought against the debtor.

The Eleventh Circuit has "recognized that district courts have the inherent power to *sua sponte* dismiss frivolous suits without giving notice to the parties." *Davis v. Kvalheim*, 261 F. App'x 231, 234 (11th Cir. 2008) (citing *Jefferson Fourteenth Assocs. v. Wometco de Puerto Rico, Inc.*, 695 F.2d 524, 526 (11th Cir. 1983); *see also Bingham v. Thomas*, 654 F.3d 1171, 1175 (11th Cir. 2011). A claim is frivolous if it "'lacks an arguable basis either in law or in fact.'" *Miller v. Donald*, 541 F.3d 1091, 1100 (11th Cir. 2008) (quoting *Neitzke v. Williams*, 490 U.S. 319, 327 (1989). An example "of the former class are claims against which it is clear that the defendants are immune from suit[.]" *Neitzke*, 490 U.S. at 327. "Examples of the latter class are claims describing fantastic or delusional scenarios, claims with which federal district judges are all too familiar." *Id.* at 328.

Plaintiff's Complaint has no arguable basis in fact. According to Plaintiff, Defendant is a corrupt judge who has been acting in concert with an undisclosed number of antisemitic co-conspirators for over 20 years. Dkt. 1 at 2–10. This largely unidentified antisemitic "mafia" includes multiple federal judges and attorneys who believe that "Jews . . . own too many properties and [Jewish] properties need to be confiscated." *Id.* at 4. Thus, when given the chance during Plaintiff's Chapter 11 bankruptcy (which was itself allegedly set up through the "gross corruption" of an Eleventh Circuit Judge), "[Defendant] awarded her partners an $18M building for $5.00." *Id.* at 9. Defendant purportedly did so despite being fully aware that the

Federal Bureau of Investigation ("FBI") had launched an investigation into her corruption. *Id.* at 6. Plaintiff maintains that this is "one of the worst [antisemitic] cases in [United States] history." *Id.* at 12. Still, he presents no support for these fantastical conspiracy accusations. The Court finds them to be delusional and malicious. *See Neitzke*, 490 U.S. at 327.

Plaintiff's attached exhibit does not change the Court's analysis. As an initial matter, the documents contained therein largely consist of additional unsupported claims which seek to recast Plaintiff's prior bankruptcy and court proceedings as a wide-ranging conspiracy to dispossess and steal Jewish property. *See generally* Dkt 1-2. Indeed, beyond the attached motion for recusal, Plaintiff includes attachments that link to articles about the Adolf Eichmann trial and an FBI report on antisemitism. *Id.* at 19–20. Plaintiff points to nothing evincing Defendant's alleged antisemitism except "antisemitic affidavits" which do not reference or in any way implicate Defendant. *Id.* at 31–32. The affidavits and attachments, moreover, are fantastical—they allege, for instance, that the bankruptcy judge Defendant threatened to murder Plaintiff. *Id.* at 21.

The grand judicial conspiracy Plaintiff complains of is simply unbelievable. Courts faced with complaints containing similar allegations have found such complaints frivolous. *See Williams v. St. Vincent Hosp.*, 258 F. App'x 293, 294 (11th Cir. 2007) (upholding *sua sponte* dismissal of § 1983 claim where the complaint

presented "a far-fetched scenario based on assertions of a massive conspiracy" that was "clearly baseless"); *Davis*, 261 F. App'x at 235 (upholding *sua sponte* dismissal where conspiracy "allegations were clearly baseless and without arguable merit in fact"); *Smith v. Albert*, No. 23-21644-CIV, 2023 WL 3277774, at *2 (S.D. Fla. May 5, 2023) (dismissing *sua sponte* where the plaintiff's allegations amounted to "an archetype of fantastic or delusional scenarios"). So too does this Court.[2]

"While a *pro se* litigant generally must be given at least one opportunity to amend his complaint, a district judge need not allow an amendment where amendment would be futile." *Cornelius v. Bank of Am., NA*, 585 F. App'x 996, 1000 (11th Cir. 2014) (citing *Cockrell v. Sparks,* 510 F.3d 1307, 1310 (11th Cir. 2007) (per curiam). Amendment would be futile here due to the delusional nature of Plaintiff's allegations. This case is dismissed with prejudice.

**CONCLUSION**

The Court **DISMISSES** Plaintiff's Complaint (Dkt. 1) **WITH PREJUDICE.**

**DONE AND ORDERED** at Tampa, Florida, on April 30, 2024.

[2] The Court also notes that the gravamen of Plaintiff's Complaint relates to judicial conduct undertaken by Defendant in her official capacity. *See generally* Dkt. 1. It follows that Defendant would be immune from liability as it relates to this conduct even if Plaintiff's allegations were believable. *Bush v. Washington Mut. Bank*, 177 F. App'x 16, 17 (11th Cir. 2006) (explaining that judicial "immunity applies even when the judge is accused of acting maliciously and corruptly" and that "judicial immunity prevents a civil suit against a federal judge accused of taking bribes"). For the reasons explained above, however, none of Plaintiff's allegations are believable, including those that relate to what is arguably non-judicial conduct.

*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO:**
Counsel of Record
Plaintiff, *pro se*

# EXHIBIT "E"

# EXHIBIT "F"

## AFFIDAVIT

I, Bernard Adell, say under penalties of perjury that:

1. I have a personal knowledge of the facts recited herein.
2. Mr Ramon Abadin knocked on my door saying he's the owner of 1560 & 1568 Drexel Ave and 1568 Drexel Ave.
3. Mr Ramon Abadin says I must not talk to Raz Ofer who no longer owns the building and added that the Jews own too many buildings, and he needs to pau an end.
4. Mr Ramon Abadin made it clear that I'm not allowed to speak to Raz Ofer and if I do, he'll do all he can to evict me.
5. Furthermore, Mr Abadin said that if I agree to testify against Raz Ofer than he'll let me live rent free in apartment 6, 1568 Drexel Ave, for 12 months.

Under penalties of perjury, I declare that I have read the foregoing Affidavit and that the facts stated in it are true.

Name:
Date: 2/10/2022

STATE OF FLORIDA
COUNTY OF Miami Dade
The foregoing instrument was acknowledged before me by means of ( X ) physical presence or (____) online notarization this 10 day of February, 20 22
By: ADell Bernard
Personally Known ____ OR produced Identification X
Type of Identification Produced Driver License

X

JOSE GABRIEL SANCHEZ
Commission # HH 206194
Expires December 8, 2025

**AFFIDAVIT**

I, Debora Garcia say under penalties of perjury that:

1. I have a personal knowledge of the facts recited herein.
2. Mr Abadin knocked on my door at Apartment 5, 1568 Drexel Ave and said that he's the owner of 1560 Drexel Ave & 1568 Drexel Ave, Miami Beach.
3. He asked me if I'm Jewish and if I know if there're other Jewish tenants in the building? I answer NO to both questions and asked him why my religion is relevant? Mr Abadin replied that the previous owner was Jewish and they don't want to rent apartments to Jews, I was shocked and terrified.

Under penalties of perjury, I declare that I have read the foregoing Affidavit and that the facts stated in it are true.

[signature]

Name: Debora Garcia
Date: 02/11/2022

# EXHIBIT "G"

Docusign Envelope ID: D84E6E9D-C4C3-4E11-9B6D-14510691F608

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:24-CV-22349-BB

RAZIEL OFER, individually,
Plaintiff(s),

vs.

MARK S. ROHER, ESQ., individually,
Defendant,
_______________________________________/

**CONFIDENTIAL STIPULATION OF FACTS IN SUPPORT OF JOINT MOTION TO DISMISS WITH PREJUDICE**

Plaintiff, Raz Ofer ("Ofer" or "Plaintiff"), proceeding as a pro se litigant, and Defendant Mark S. Roher, Esq. ("Roher" or "Defendant") enter into this Confidential Stipulation of Facts in Support of Joint Motion to Dismiss With Prejudice and mutually agree the facts set forth below are correct. The parties stipulate as follows:

1. Roher served as bankruptcy counsel to DRO 15R, LLC ("DRO") and 942 Penn RR, LLC ("942 Penn") for the filing of reorganizations for the companies.

2. Ofer was 50% owner of both companies with Robert Mendez who owned the remaining 50% of the companies.

3. Ofer signed two retainer agreements on behalf of DRO and 942 Penn in which Roher was hired by Ofer to provide bankruptcy counsel to the companies.

4. Ofer maintains that he never consulted with Mendez over hiring Roher for representation for the companies, nor did Ofer ask Mendez for his agreement to file for Chapter 11 for both entities.

5. Mendez did not sign either of the retainer agreements.



DS RO

DS MR

6. Ofer maintains that Mendez never granted Ofer authorization to file the bankruptcies, verbally, in the form of resolution or any other instrument and Ofer did so without the authorization required.

7. Mendez never signed any board resolution, retainer agreement or signed the form agreeing for both entities to file for Chapter 11.

8. Roher knew that Mendez did not authorize the filing of the bankruptcies prior to the filings.

9. Roher advised that Ofer would maintain operational control of 942 Penn after the filing of the bankruptcy case for 942 Penn.

10. Ofer maintains that he consulted with other attorneys as to retaining Roher to file the 942 Penn bankruptcy case and was advised that the filing of the bankruptcy case was not the proper course of action.

11. Ofer advised Roher about the other lawyer's opinions, but Roher discounted those opinions, saying they are not bankruptcy lawyers and that the filing of the 942 Penn bankruptcy case was the proper course of action.

12. Attorney Eddy Leal and Attorney David Winker, both spoke with Roher and advised Roher that the 942 Penn case should not be filed because there was a possibility that the bankruptcy court would appoint a trustee.

13. Roher failed to advise Ofer that after filing of its bankruptcy case, 942 Penn would be required to close its bank accounts and open a debtor-in-possession operational account, and that 942 Penn would no longer be allowed to continue to utilize its banking accounts.

14. Roher failed to advise Ofer that there would be a possibility that a Trustee could be appointed in the 942 Penn bankruptcy case.



DS RO

DS MR

15. Roher was shocked to learn of several antisemitic affidavits directed against Ofer that were filed in United States courts.

16. After failing to advise Ofer about the opening of a debtor in possession banking account for the 942 Penn, and Ofer failing to open one because of this failure, the bankruptcy court found this to be the reason that a Trustee was necessary and thereafter appointed a trustee in the case.

17. After the hearing on the appointment of the Trustee, Roher had verbalized to attorney David Winker, one of Ofer's personal lawyers, that Roher thought Ofer would sue him for malpractice.

18. Roher confirms that the aforementioned constitute malpractice and as a result Ofer and the entities could not have received a fair trial and are entitled for both Judgments, on DRO and 942 Penn to be vacated and for a new trial to take place,

19. Roher confirms that in relation to Mendez' lack of knowledge of the bankruptcy filings, he made a fatal mistake after being made aware of cases which Mendez and Ofer presented that reflects that a petition filing is disallowed without a properly signed board resolution and an agreement by the members to file for bankruptcy. Ofer, along with Mendez, maintains that without such an agreement by Mendez, the bankruptcy was not authorized to move forward and the entire proceeding is a nullity. After a review of the cases presented by Ofer and Mendez, Roher is of the legal opinion that without Mendez properly authorizing the filing of the bankruptcy, the bankruptcy proceeding may be voided on this ground alone.

20. Roher acknowledges that Ofer presented claims to him that corruption was involved in the bankruptcy case and that he could not get a fair trial due to the corruption. Roher considered the claim but failed to raise them or properly support them before the bankruptcy court.



DS RO

DS MR

21. Roher admits to using Ofer's credit card without his express consent and authorization for each and every purchase. Roher admits that, although it was discussed that he would give credit toward the legal fees of the money spent using Ofer's credit card, Roher confirms that he never gave credit or refunded any money to Ofer.

22. Roher confirms that due to the malpractice, Ofer did not have proper legal representation in both cases, DRO and 942 Penn.

23. The parties have agreed to a dismissal of this action *with* prejudice with each party to bear their own fees and costs.

24. The parties agree that this agreement shall remain strictly confidential and if any party wishes to submit this agreement to any court, it must be filed under seal for an *in-camera* review and shall not be filed in any such case. This is a material term of this settlement agreement.

25. If a party is compelled to disclose any of the terms of this agreement or this agreement by a court order, the party must immediately notify the other party as soon as possible beforehand and take steps to minimize the disclosure any other third-party shall be bound to this agreement's confidentiality provisions. This is a material term of this settlement agreement.

26. The parties agree that this agreement shall not be submitted to the Florida Bar or any law enforcement agency for any purpose whatsoever. This is a material term of this settlement agreement.

27. Ofer has had the opportunity to consult with his legal advisors as to the terms of this agreement.

28. The parties agree to the prohibition of any public statements or social media communications regarding this settlement or the underlying litigation and may only state the matter has been settled on a confidential basis. This is a material term of this settlement agreement.



DS RO

DS MR

29. The parties agree that if any party breaches the confidentiality provisions of this agreement, the breaching party shall fully and completely indemnify the non-breaching party for any damages, attorneys' fees and costs arising from the breach. This is a material term of this settlement agreement.

30. In the event that either party fails to comply with any of the terms and conditions set forth in this Settlement Agreement, either party agrees to pay liquidated damages to the other party in the amount of $50,000.00 for each occurrence of non-compliance. This amount has been agreed upon by the parties as a reasonable estimate of the damages that either of the parties would incur due to such non-compliance and is not intended to be a penalty. This is a material term of this settlement agreement.

31. The liquidated damages set forth above shall be payable within 14 days of the non-compliance event occurring. If payment is not made within the prescribed period, the non-breaching party shall be entitled to pursue enforcement of this provision, including any additional remedies available under law. This is a material term of this settlement agreement.

32. The parties agree that the liquidated damages specified herein are intended to compensate either of the parties for losses suffered as a result of the breach, and are not a penalty. The liquidated damages amount is reasonable and reflective of the actual or anticipated harm resulting from such breach. This is a material term of this settlement agreement.

33. In the event that any litigation must be brought in connection with this agreement, the parties agree that Broward County, Florida is the proper venue and that the laws of the State of Florida shall apply and both parties consent to personal jurisdiction in Broward County, Florida.

*-signatures appear on the following page-*

DS RO



DS MR

Dated 1/24/2025.

/s/ DocuSigned by: Raziel Ofer 80A71662DAFA42E...

Raz Ofer
c/o 3701 DeGarmo Lane
Coconut Grove, FL 33133
Raz.ofer2@gmail.com

Dated 1/24/2025.

/s/ DocuSigned by: Mark Roher 793D7027FA05415...

Mark Stuart Roher, Esq.
Law Office of Mark S. Roher, P.A.
1806 N. Flamingo Road, Suite 300
Pembroke Pines, FL 33028
(954) 353-2200
Fax: (877) 654-0090
mroher@markroherlaw.com

# EXHIBIT "H"

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
www.flsb.uscourts.gov

In re:

942 PENN RR, LLC,

Debtor.
_____________________________/

Case No. 22-14038-LMI

Chapter 11

**MOTION FOR VOLUNTARY DISMISSAL OF CHAPTER 11 CASE**

942 Penn RR, LLC (the "**Debtor**"), through undersigned proposed counsel, and pursuant to 11 U.S.C. § 1112(b)(1), files this Motion for Voluntary Dismissal of Chapter 11 Case, as follows:

1. This chapter 11 case was filed on May 23, 2022 (the "Petition Date") [ECF No. 1].

2. All of the Debtor's day-to-day employees are insiders.

3. Debtor reasonably believes that the Court will not approve the payment of post-petition wages to the Debtor's insiders and salaries to its members, forcing the Debtor to have to hire non-insiders as employees, which will be severely disruptive to its business operations.

4. Accordingly, this creates a situation where there is an absence of reasonable likelihood of rehabilitation under the circumstances.

5. Prior to the Petition Date, the following creditors were parties with the Debtor in the following litigations in state court:

a. **120916 Ontario Limited**, Miami-Dade Circuit Court Case No. 2019-030695-CA-01;

b. **Steven D. Pals, Jr.**, Miami-Dade County Court Case No. 2021-011401-CC-05;

c. **Marjam Supply of Florida LLC**, Miami-Dade Circuit Court Case No. 2018-014439-CA-01;

d. **G. Proulx, LLC**, Miami-Dade Circuit Court Case No. 2018-038233-CA-01;

e. **Immokalee Real Estate Holdings, LLC**, Miami-Dade Circuit Court Case No. 2017-026820-CA-01; and

f. **Florida Fair Housing Alliance, Inc.**, 2021-001068-CA-01.

6. Upon dismissal, these creditors will be free to continue their state court actions against the Debtor and enforce any of their rights against the Debtor.

7. It is also in the best interests of creditors and the estate for this case to be dismissed.

8. As such, "cause" exists pursuant to 11 U.S.C. § 1112(4)(A) for dismissal of this case.

**WHEREFORE**, Debtor respectfully requests the entry of an order dismissing this chapter 11 case and providing for such other relief as deemed appropriate under the circumstances.

Dated this 2nd day of June, 2022.

**LAW OFFICE OF MARK S. ROHER, P.A.**
*Proposed Counsel for Debtor*
1806 N. Flamingo Road, Suite 300
Pembroke Pines, Florida 33028
Email: mroher@markroherlaw.com
Telephone: (954) 353-2200

By: */s/ Mark S. Roher*
Mark S. Roher
Florida Bar No. 178098

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 2nd day of June, 2022, a true and correct copy of the foregoing was served by CM/ECF on all parties listed below.

*/s/ Mark S. Roher*
Mark S. Roher

Office of the US Trustee
USTPRegion21.MM.ECF@usdoj.gov

Eric J Silver on behalf of Creditor 1250916 ONTARIO LIMITED
esilver@stearnsweaver.com,
jless@stearnsweaver.com;fsanchez@stearnsweaver.com;cgraver@stearnsweaver.com;mfernand
ez@stearnsweaver.com

Dan L Gold on behalf of U.S. Trustee Office of the US Trustee
Dan.L.Gold@usdoj.gov

Kenneth L Minerley, Esq. on behalf of Attorney G. Proulx, LLC
ken@minerleyfein.com,
litigation@minerleyfein.com;fileclerk@minerleyfein.com;meghan@minerleyfein.com

# EXHIBIT "I"

**ORDERED in the Southern District of Florida on June 16, 2022.**

Laurel M. Isicoff
Chief United States Bankruptcy Judge

---

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
www.flsb.uscourts.gov

In re:

942 Penn RR, LLC, | Case No. 22-14038-LMI
Chapter 11

Debtor.
_______________________________/

**ORDER DENYING MOTION FOR VOLUNTARY DISMISSAL OF CHAPTER 11 CASE**

This matter came before the Court on June 8, 2022, at 9:30 a.m. the ("Hearing") upon the *Motion for Voluntary Dismissal of Chapter 11 Case* [ECF No. 33] (the "Motion") filed by 942 Penn RR, LLC (the "Debtor"). The Court having reviewed the Motion, the objections filed by 1250916 Ontario Limited [ECF No. 37] G. Proulx, LLC [ECF No. 49], and Immokalee Real Estate Holdings, LLC [ECF No. 54], and the joinder in Ontario's objection filed by Marjam Supply of Florida, LLC [ECF No. 52], having considered the arguments of counsel at the Hearing, and being familiar with the record of this proceeding, finds it appropriate to deny the

relief requested in the Motion for the reasons set forth on the record at the Hearing, which are incorporated in this Order by reference. Therefore, it is -

ORDERED and ADJUDGED that the Motion [ECF No. 33] is DENIED.

###

Submitted by:

Eric J. Silver, Esq.
Florida Bar No. 057262
esilver@stearnsweaver.com
STEARNS WEAVER MILLER
WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower Building, Suite 2200
150 West Flagler Street
Miami, Florida 33130
Telephone: (305) 789-3200
Facsimile: (305) 789-3395

*Counsel for 1250916 Ontario Limited*

*(Attorney Silver is directed to serve this Order upon all non-registered users or registered users who have yet to appear electronically in this case and file a conforming Certificate of Service.)*

# EXHIBIT "J"

**ORDERED in the Southern District of Florida on March 3, 2025.**

Laurel M. Isicoff, Judge
United States Bankruptcy Court

---

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

In re: Case No. 22-14038-BKC-LMI

942 PENN RR, LLC, Chapter 11

Debtor.
_______________________________/

**ORDER OF RECUSAL**

THIS CAUSE came before the Court *sua sponte*. The Court has determined it is necessary and appropriate that she recuse herself from this bankruptcy case. Accordingly, it is

ORDERED that Judge Isicoff is recused from this case and the Clerk of the Court is directed to reassign the case.

###

Copies furnished to:
Scott Brown, Esq.
Raziel Ofer, pro se

Case No. 22-14038-BKC-LMI

*The Clerk of Court shall serve a conformed copy of this order upon all parties in interest.*